1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; THE PEOPLE OF
THE STATE OF MICHIGAN; STATE OF
NEW MEXICO; STATE OF NEW YORK;
STATE OF NEVADA; STATE OF
OREGON; STATE OF RHODE ISLAND;
and STATE OF WISCONSIN,

                 Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
EDUCATION; and LINDA MCMAHON,
in Her Official Capacity as United States
Secretary of Education,

                 Defendants.

NO.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

**TABLE OF CONTENTS**

I.      INTRODUCTION..................................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................................. 6

III.    PARTIES................................................................................................................. 6

        A.   Plaintiffs ................................................................................................... 6

        B.   Defendants ................................................................................................ 9

IV.     FACTUAL ALLEGATIONS ................................................................................. 9

        A.   Congress's Creation and Funding
             of Mental Health Programs in Schools ................................................... 9

        B.   The Department's Process for
             Awarding New Grants Is Separate and
             Apart from Its Process for Awarding Continuing Grants ...................... 13

        C.   The Department's Review and
             Selection of MHSP Applicants Based on Published Priorities ............. 15

        D.   The Department's Review and
             Selection of SBMH Applicants Based on Published Priorities ............. 17

        E.   Grantees in Plaintiff States Accomplished
             the Programmatic Goals of These Mental Health Grants ...................... 19

        F.   The Department Discontinued
             Grants in Plaintiff States ....................................................................... 22

        G.   Impact of The Department's
             Non-Continuation Decision on
             Students, Schools, and Plaintiff States .................................................. 25

V.      CAUSES OF ACTION ........................................................................................ 28

VI.     PRAYER FOR RELIEF....................................................................................... 42

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# I.    INTRODUCTION

1.    Starting this fall, many of Plaintiffs' elementary and secondary schools will no longer reliably offer mental health services critical to their students' well-being, safety, and academic success as a result of the U.S. Department of Education's (Department) decision to discontinue mental health funding (Non-Continuation Decision). The Department had awarded this funding to the nation's high-need, low-income, and rural schools pursuant to its Mental Health Service Professional Demonstration Grant Program (MHSP) and its School-Based Mental Health Services Grant Program (SBMH) (collectively referred to as "Programs").

2.    Congress funded these grants because they served the government's interests in safe, educational environments for our nation's children. Spurred by episodes of tragic and devastating loss from school shootings, Congress established and funded MHSP in 2018 and SBMH in 2020 to provide students access to mental health services: MHSP addresses the shortage of school-based mental health service providers in low-income schools–a Congressional directive–by awarding multi-year grants to projects that expand the pipeline for counselors, social workers, and psychologists through partnerships between institutes of higher education and local educational agencies; and SBMH funds multi-year grants to increase the number of professionals that provide school-based mental health services to students through direct hiring and retention incentives. The ultimate goal of the Programs was to permanently bring 14,000 additional mental health professionals into U.S. schools that needed it the most– primarily in low-income and rural communities.

3.    Each year, the Department announced the priorities it used to guide its grant selection process for each of the Programs. Plaintiffs designed their projects based on that year's Program priorities and application criteria. The Department then awarded new grants to the most competitive applications.

4.    Understanding that lasting change takes time, the Department approved new Program grants for a 5-year project period, funding the initial 1-year budget period and indicating

1   its intention to fund the remainder of the project through subsequent 1-year continuation awards.

2   As required by its regulations, the Department considered the grantee's performance when

3   making the continuation decision.

4     5. The Programs, including Plaintiffs' projects, have been an incredible success. In

5   their first year, they provided mental and behavioral health services to nearly 775,000 elementary

6   and secondary students nationwide. Sampled projects showed real results: a 50% reduction in

7   suicide risk at high-need schools, decreases in absenteeism and behavioral issues, and increases

8   in positive student-staff engagement. Data also showed recruitment and retention are working–

9   in the first year of the Programs, 1,296 school mental health professionals were hired and 95%

10  of new and existing professionals were retained. Importantly, these newly hired and retained

11  school-based mental health providers were able to create an 80% reduction in student wait time

12  for services. By all markers, these Programs work.

13    6. Despite these successes, on or about April 29, 2025, the Department decided to

14  discontinue Program grants based on an alleged conflict with the current Administration's

15  priorities. The Department implemented its Non-Continuation Decision by sending boilerplate

16  notices to Plaintiffs claiming that their grants conflicted with the Trump Administration's

17  priorities and would not be continued. The Department intends to recompete these Program

18  funds based on new priorities, which it identified as "merit, fairness, and excellence in

19  education," and which it communicated to the grantees for the first time in these boilerplate

20  notices.

21    7. The Department issued these boilerplate notices to Plaintiffs' grantees, including

22  state education agencies, local education agencies, and institutes of higher education, providing

23  little to no insight into the basis for the discontinuance, yet destroying projects years in the

24  making. These notices provided a disjunctive list of four potential bases for the discontinuances,

25  alleging the Programs: violate the letter or purpose of Federal civil rights law; conflict with the

26  Department's policy of prioritizing merit, fairness, and excellence in education; undermine the

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF
     2     ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1  well-being of the students these Programs are intended to help; or constitute an inappropriate use

2  of federal funds. The Department then concluded Plaintiffs' grants no longer served the

3  government's best interest without identifying which bases applied to Plaintiffs' specific projects

4  or providing further explanation.

5         8.     The Non-Continuation Decision is unlawful under the Administrative Procedure

6  Act (APA), Defendants' regulatory and statutory authority, and the Constitution.

7         9.     The notices implementing the Non-Continuation Decision violate the APA

8  because they are arbitrary and capricious for several reasons. For one, the notices contained the

9  same boilerplate language for every grantee. As such, they fail to: (1) provide any individualized

10  reason for the change; (2) consider Plaintiffs' substantial reliance interests; or (3) consider the

11  tremendously harmful impact to children dependent on these mental health services, the

12  educational mission of Plaintiffs' schools, and the mental health workforce pipeline, designed to

13  alleviate nationwide shortages. The Department also provided Plaintiffs a disjunctive list of four

14  potential bases for Defendants' conclusion that Plaintiffs' projects were not in the best interest

15  of the government. To this day, Plaintiffs do not know which of the four theoretical reasons

16  apply to their grants or why the Department discontinued *their* grants but not Program grants to

17  other states that had been awarded using the same priorities and selection criteria.

18        10.    Additionally, Defendants Non-Continuation Decision is contrary to law.

19  Defendants cannot discontinue a multi-year grant based on newly sprung priorities. *See* 34

20  C.F.R. § 75.253(b) (2024). The Department publishes the priorities for new multi-year grants at

21  the *start* of a grant competition and then uses them to select awardees from a pool of competing

22  applicants. *See* 34 C.F.R. § 75.100(a) (1994), 75.101(a)(4) (2024), 75.105 (2024); U.S.

23  Department of Education, *Discretionary Grantmaking at ED* (*Discretionary Grantmaking*) 14–

24  15 (2024), https://www.ed.gov/media/document/grantmaking-ed-108713.pdf (describing the

25  use of priorities in grant competitions).

26

11.    In contrast, continuation awards do not go through an application process. *See* 34 C.F.R. § 75.118 (2024); 59 Fed. Reg. 30,258 (July 24, 1985) (eliminating application requirement for continuation awards). Instead, the Department considers a grantee's performance, including performance measures, performance reports, and financial data, when deciding whether the grantee met the requirements to receive a continuation award, which are listed in 34 C.F.R. § 75.253(a). *See* 34 C.F.R. § 75.253(b) (2024) (solely identifying "any relevant information regarding grantee performance" as the "[i]nformation considered" when "determining whether the grantee has met the requirements described in paragraph (a)"); 59 Fed. Reg. 30,259 (June 10, 1994) ("[T]he continuation award decision . . . will be based entirely on the submission of [performance] reports . . . rather than on the submission of a continuation award application."); *see also Discretionary Grantmaking* at 31–32 (describing the performance information used by the Department for its continuation award decision). Should the grantee meet those requirements, the Department prioritizes continuing multi-year grants (such as those awarded to Plaintiffs) over funding new grants. *See* 34 C.F.R. § 75.253(c) (2024); *Discretionary Grantmaking* at 45 ("A grantee does not have to compete with other applicants to receive [a continuation award].").

12.    Defendants concluded that, due to the alleged conflict with the current Administration's priorities, Plaintiffs' grants were not in the federal government's best interest, thereby failing to meet 34 C.F.R. § 75.253(a)(5) (2024). However, Defendants have never alleged, much less demonstrated, any performance issue which could serve as the basis for Plaintiffs' discontinuances. Their boilerplate notices do not mention grantee performance. Defendants' Non-Continuation Decision based on new priorities unrelated to grantee performance violates 34 C.F.R. § 75.253(b)–(c).

13.    The Non-Continuation Decision also contravenes General Education Provisions Act (GEPA), thereby violating the Constitution's Spending Clause. For the Department's financial assistance programs, GEPA requires that the Department follows the

notice and comment rulemaking process when setting the priorities for its competitive grants process. 20 U.S.C. §§ 1221e-4; 1232(a)(2), (d).[1] Even if the Department were somehow permitted to force grantees to re-design their projects and performance measurements to demonstrate new priorities partway through their project–which they are not–the Department did not follow the required notice-and-comment process before unlawfully applying "new priorities" to discontinue Plaintiffs' grants.

14.    The Non-Continuation Decision is also unconstitutional because it undermines Congress's equity directive. Through GEPA, Congress mandates that the Department requires applicants to ensure equity in its financial assistance programs by addressing barriers to equitable participation. 20 U.S.C. § 1228a(b) (the GEPA Equity Directive). Congress explained this requirement was necessary for the Department to achieve its "mission to ensure equal access to education and to promote educational excellence throughout the Nation." 20 U.S.C. § 1228a(a). Although not stated in its notices, the Department has cited diversity, equity, and inclusion (DEI) as a basis for discontinuing Plaintiffs grants in media comments. To the extent Defendants punished Plaintiffs for their compliance with this law, the Non-Continuation Decision undermines Congress's GEPA Equity Directive and therefore contravenes the Constitution's separation of powers constraints.

15.    Defendants' unlawful actions have already caused and will cause immediate and devastating harm to Plaintiffs. Starting this fall, many schools in Plaintiff states will no longer be able to reliably provide mental health services to the kids that need them most. These discontinuances threaten the very purpose of these Programs—to protect the safety of our children by permanently increasing the number of mental health professionals providing mental health services to students in low-income and rural schools.

16.    If the discontinuances are not rescinded, Plaintiff educational agencies will be forced to lay off the very same professionals they recruited and hired to provide mental health

---

[1] The statute includes exceptions that do not apply here.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

5

services at their rural and low-income schools using Program funds. Plaintiff institutes of higher education will be forced to terminate financial support for graduate student internships to provide mental health services to rural and low-income schools. As a result, hundreds of graduate students will make the difficult choice whether they should enter or continue a graduate program no longer able to offer tuition assistance–drying up a workforce pipeline Congress recognized needed development.

17.    Accordingly, Plaintiffs bring this action against the Department and United States Secretary of Education Linda McMahon seeking to: vacate and set aside Defendants' Non-Continuation Decision; preliminarily and permanently enjoin Defendants from implementing or enforcing the Non-Continuation Decision or reinstituting it for the same or similar reasons; and declare that Defendants misapplied the Department's continuation regulation 34 C.F.R. 75.253 and that the Non-Continuation Decision violates the APA.

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704.

19.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 705–06.

20.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are an agency of the United States Government, and an officer sued in their official capacity. Plaintiff State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Western District of Washington.

## III.    PARTIES

### A.    Plaintiffs

21.    Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief

1  law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this

2  action.

3       22.    Plaintiff State of California, is a sovereign state in the United States of America.

4  California is represented by Rob Bonta, the Attorney General of California, who is the chief law

5  enforcement officer of California and authorized to sue on the State's behalf, including its

6  universities and schools and its residents.

7       23.    Plaintiff State of Colorado is a sovereign state of the United States of America.

8  Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General

9  acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-

10  101 to pursue this action.

11       24.    Plaintiff State of Connecticut is a sovereign state of the United States of America.

12  Connecticut is represented by and through its chief legal officer, Attorney General William

13  Tong, who is authorized under Gen. Stat. § 3-125 to pursue this action on behalf of the State of

14  Connecticut.

15       25.    Plaintiff the State of Delaware is a sovereign state of the United States of

16  America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The

17  Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this

18  action pursuant to Del. Code Ann. tit. 29, § 2504.

19       26.    Plaintiff State of Illinois is a sovereign state in the United States of America.

20  Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law

21  enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law,

22  the Attorney General is authorized to represent the State's interests by the Illinois Constitution,

23  article V, § 15. *See* 15 Ill. Comp. Stat. 205/4.

24       27.    Plaintiff State of Maine is a sovereign state of the United States of America.

25  Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General

26  is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit., 5 § 191.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

28.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

29.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

30.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

31.     Plaintiff State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Raúl Torrez is the chief legal officer of the State of New Mexico. He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. § 8-5-2(B). Likewise, he shall appear before federal courts to represent New Mexico when, in his judgment, the public interest of the state requires such action. N.M. Stat. Ann. § 8-5-2(J). This challenge is brought pursuant to Attorney General Torrez's statutory authority.

32.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

33.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

34. Plaintiff State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

35. Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

36. Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B.    Defendants**

37. Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government that has been created by Congress. 20 U.S.C. § 3411.

38. Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. § 3412.

## IV.    FACTUAL ALLEGATIONS

**A.    Congress's Creation and Funding of Mental Health Programs in Schools**

39. Congress created the two Programs at issue here, MHSP and SBMH, in response to profound losses Americans have suffered from school shootings.

40. On February 14, 2018, a former student shot and killed 14 students and 3 staff members at a high school in Parkland, Florida.

41. Immediately following the Parkland tragedy, Congress used its National Activities for School Safety, Elementary and Secondary Education Act, 20 U.S.C. § 7281(a)(1)(B), authorization to create the MHSP and appropriate it $10 million. Congress

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

intended for this demonstration program "to test and evaluate innovative partnerships between institutions of higher education and States or high-need local educational agencies to train . . . mental health professionals qualified to provide school-based mental health services, with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools in order to address the shortages of mental health service professionals in such schools." H.R. Rep. No. 115-952, at 543 (2018) (*Conf. Rep.*), https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf.

42.   Soon thereafter, President Trump established a Federal Commission on School Safety (Commission) to make meaningful and actionable recommendations to keep students safe. 84 Fed. Reg. 29,180 (June 21, 2019). The Commission held multiple meetings and listening sessions and found a consistent theme—longstanding concern over limited access to mental health professionals in high-poverty districts and schools where needs are the greatest. *Id.* The Commission's final report offers recommendations for improving school safety, including providing students access to mental health care services in schools, where treatment is much more likely to be effective and completed. Betsy DeVos, et al., Federal Commission on School Safety, *Final Report of the Federal Commission on School Safety* 37 (Dec. 18, 2018), https://www2.ed.gov/documents/school-safety/school-safety-report.pdf.

43.   Congress continued to fund MHSP in the Department of Education Appropriations Act of 2019 and repeated its direction for the Department to address shortages of mental health professionals in low-income schools. *Conf. Rep.* at 543. On June 21, 2019, the Department published a notice inviting applications for the first MHSP grant competition and pursuant to 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d)(1) and 34 C.F.R § 75.105(b)(2)(ii), it established priorities for the fiscal year 2019 grant competition. *See* 84 Fed. Reg. 29,180–82 (June 21, 2019).

44.   Congress established SBMH in the Department's fiscal year 2020 appropriations by appropriating $10 million "to increase the number of qualified, well-trained . . . mental health

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                    10                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Complex Litigation Division
                                                                              800 Fifth Avenue, Suite 2000
                                                                              Seattle, WA 98104
                                                                              206-464-7744

professionals that provide school-based mental health services to students." Explanatory Statement, *Division A-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2020*, at 134 (Dec. 16, 2019), https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf. Because Congress wanted to eventually develop sustainable programs for these services, it directed the Department to require that awards include a 25% match from the grantee. *Id.* That year, the Department published a notice inviting applications for the first SBMH grant competition, and pursuant to 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d)(1) and 34 C.F.R § 75.105(b)(2)(ii), it established priorities for the fiscal year 2020 grant competition. 85 Fed. Reg. 32,025 (May 28, 2020). That same bill directed the Department to continue MHSP and required the SBMH program to implement trauma-informed practices, which "support learning environments where students feel safe, supported, and ready to learn." *See supra*, Appropriations Act, 2020, at 134.

45.     Subsequently, Congress expressly directed the Department to spend appropriated money on these Programs. For fiscal year 2021, Congress maintained funding for MHSP at the $10 million level and increased funding for SBMH from $10 million to $11 million. *See* Joint Explanatory Statement, *Division H-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2021*, at 113 (Dec. 21, 2020), https://docs.house.gov/billsthisweek/20201221/BILLS-116RCP68-JES-DIVISION-H.pdf. In the Consolidated Appropriations Act of 2022, Congress increased the allocations to $55 million for MHSP and to $56 million for SBMH. Explanatory Statement, *Division H-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2022*, at 126 (Mar. 7, 2022), https://docs.house.gov/billsthisweek/20220307/BILLS-117RCP35-JES-DIVISION-H_Part1.pdf.

46.     Less than three months later, a former student shot and killed 19 students and 2 teachers at an elementary school in Uvalde, Texas.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                        11                ATTORNEY GENERAL OF WASHINGTON
                                                           Complex Litigation Division
                                                           800 Fifth Avenue, Suite 2000
                                                           Seattle, WA 98104
                                                           206-464-7744

47.    The tragic events of the Uvalde school shooting prompted a bipartisan Congress to dramatically increase the historical funding levels for the Programs and ensure future funds would be available through the Bipartisan Safer Communities Act, Pub. L. No. 117-159. In this bill, Congress directed the Department to make available an additional $100 million per year for each of MHSP and SBMH for fiscal years 2022 through 2026. Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1342 (June 25, 2022). Congress also maintained oversight over the MHSP and SBMH funds by requiring the Department to provide a detailed spend plan for how it expected to use the funds, to update these plans every 60 days until all funds were expended, and to submit biweekly obligation reports for the funds. *Id.* at 1342–43.

48.    The Act's Republican champions explained, "We crafted this landmark law with a simple purpose: to reduce violence and save lives. The law contains commonsense measures to improve how our schools address mental health, alongside targeted resources to help harden schools against violent threats." John Cornyn, et al., *The Bipartisan Safer Communities Act Is Cause for Optimism*, Newsweek (Nov. 25, 2024), https://www.newsweek.com/bipartisan-safer-communities-act-cause-optimism-opinion-1990754. They also explained, "Too often, adolescents with untreated mental health conditions become the very same perpetrators who commit acts of violence. For this reason, we crafted our law to . . . connect [students experiencing mental health crises] with the care they need before it's too late." *Id.*

49.    MHSP and SBMH are "applicable programs" under the General Education Provisions Act (GEPA) and are therefore subject to Congress's mandate that the Department require grant applicants to address equity issues. GEPA Equity Directive, 20 U.S.C. §§ 1221, 1228a(b). Indeed, applicants are required to:

> develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                    12                    ATTORNEY GENERAL OF WASHINGTON
                                                                                                  Complex Litigation Division
                                                                                                  800 Fifth Avenue, Suite 2000
                                                                                                  Seattle, WA 98104
                                                                                                  206-464-7744

20 U.S.C. §1228a(b). These Programs are also governed by statutory notice-and-comment rulemaking requirements. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

**B.     The Department's Process for Awarding New Grants Is Separate and Apart from Its Process for Awarding Continuing Grants**

50.     GEPA and the Department's own financial assistance regulatory framework governs the Department's administration of these Program funds. GEPA requires that rules affecting the Department's provision of financial assistance go through the APA's notice and comment process. *See* 20 U.S.C. §§ 1221e-4, 1232; *see also* 5 U.S.C. § 553. The Department's financial assistance regulations fulfill these statutory requirements by publicly setting the rules for: (1) the Department's competitive grantmaking selection process for new grants; and (2) its determination whether to continue a grantee's multi-year project–a process that does not involve competition with other grantees.

51.     When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things:

- How to apply for a new grant;

- Whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved;

- The priorities established for the selection of new grants for the program that year, including any competitive preference priorities for which an application could receive bonus points;

- The selection criteria and factors used to decide which applications will be awarded new grants and how the criteria will be weighted; and

- Any program performance measure requirements, including whether the application should propose project-specific performance measures and explain how the proposed measures would accurately measure project performance.

*See* 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201 (2024).

52.     The Department then scores the quality of each application using the selection criteria and competitive priorities, ranks the applications, and selects applications for new grants in order. 34 C.F.R. § 75.217; *Discretionary Grantmaking* at 26-27. The selection criteria are given point values up to the total possible score that the Department announced for that year's grant competition. *See* 34 C.F.R. § 75.201; *Discretionary Grantmaking* at 26-27. Additional points may be earned if applicants meet competitive preference priorities. 34 C.F.R. 75.105(c); *Discretionary Grantmaking* at 27.

53.     The selection procedures for the Department's decision of whether to continue multi-year grants is quite different from its process for awarding new grants for many reasons, but primarily because it is not a competitive process. *See Discretionary Grantmaking* at 31–32, 45.

54.     *First*, when awarding multi-year projects, the Department funds the initial budget period (usually 12-months) and "indicates [its] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251 (2024).

55.     *Second*, to be continued, multi-year projects do not go through an application process, where priority weights are assigned to competing applicants. *Compare Discretionary Grantmaking* 26-27 *with* 31–32, 45. Rather than reviewing an application, the Department reviews information relevant to grantee's performance for that year, including performance reports, performance measures, and financial data. *See* 34 C.F.R. §§ 75.118, .253(b) (2024); *Discretionary Grantmaking* at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); 59 Fed. Reg. 30,259 (June 10, 1994) ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

14

56. *Third*, instead of competing for funds, the Department assigns a multi-year project priority in receiving funds over new grants. 34 C.F.R. § 75.253(c); *Discretionary Grantmaking* at 45 ("A grantee does not have to compete with other applicants to receive [a continuation award]."); 45 Fed. Reg. 22,559 (Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [§ 253(a)] and will not be subject to competition with other applications") (emphasis added).

57. Consistent with this process, the Department has long represented that a cut-off in continuation award funding is "extremely rare in practice." 59 Fed. Reg. 30,259 (June 10, 1994). More recently, the Department explained, "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." 89 Fed. Reg. 70,316 (Aug. 29, 2024).

## C.   The Department's Review and Selection of MHSP Applicants Based on Published Priorities

58. The MHSP provides competitive grants to attract candidates for school-based mental health professions, including school psychology, and provides training opportunities for students in rural and other high-need local educational agencies (LEAs). MHSP facilitates partnerships between high-need school districts and institutions of higher education (IHEs), allowing opportunities for practicum students and interns to obtain clinical supervision required for licensure and increase children's access to school mental health services.

59. The first Trump Administration published a notice inviting applications for the first MHSP grant competition on June 21, 2019. 84 Fed. Reg. 29,180 (June 21, 2019). The notice explained that "[n]on-Federal peer reviewers will evaluate and score each application program narrative" against regulatory selection criteria such as project need, significance, and project design, assigning up to 100 total points. *Id*. The notice set out one "absolute priority" that all applicants were required to meet: "Expand the capacity of high-need LEAs in partnership with IHEs to train school-based mental health services providers . . . with the goal of expanding the

15

pipeline of these professionals into high-need public elementary schools and secondary schools in order to address the shortages of school-based mental health service providers in such schools." *Id*. It also set out two "competitive preference priorities" that applicants could optionally address to earn up to five additional points on their application. *Id*. The notice explained these priorities applied "[f]or FY 2019 and any subsequent year in which we make awards from the list of unfunded applications from this competition." *Id*.

60.     In 2022, the Department engaged in statutorily required rulemaking to set new priorities for future MHSP competitions. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d) (2024). It published the proposed priorities, requirements, and definitions, and invited the public to comment. 87 Fed. Reg. 47,159 (Aug. 2, 2022). When proposing these priorities, the Department explained, "The priorities will enable the Department to administer a competitive grant program consistent with the intent of Congress . . . ." 87 Fed. Reg. 47,165 (Aug. 2, 2022).

61.     The Department then published a notice announcing the "final priorities, requirements, and definitions" for future MHSP grant competitions and addressing the public comments. 87 Fed. Reg. 60,083 (Oct. 4, 2022). For instance, the Department explained it would not add a definition for "diverse backgrounds" due to "the breadth of diversity that exists across LEAs nationwide." *Id*. The Department also announced four final priorities: (1) expand the number of school-based mental health services providers in high-need LEAs through partnerships with IHEs, wherein IHE graduate students would be placed in high-need LEAs; (2) increase the number of school-based mental health services providers in high-need LEAs that reflect the diverse communities served by the high-need LEAs; (3) provide evidence-based pedagogical practices in mental health services provider preparation programs or professional development programs that are inclusive and that prepare school-based mental health services providers to create culturally and linguistically inclusive and identity-safe environments for students when providing services; and (4) partner with historically black colleges and universities; tribal colleges and universities; and minority-serving institutions. *Id*. The

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                        16                   ATTORNEY GENERAL OF WASHINGTON
                                                                                            Complex Litigation Division
                                                                                            800 Fifth Avenue, Suite 2000
                                                                                            Seattle, WA 98104
                                                                                            206-464-7744

Department explained, "We may use one or more of these priorities . . . for competitions in fiscal year (FY) 2022 and later years." *Id.*

62.    The Department then issued a notice inviting applications for new MHSP grants for fiscal year 2022 and announced that it would consider three of the priorities as part of that year's competition. *See* 87 Fed. Reg. 60,144 (Oct. 4, 2022). The final rules notice included a statement that "[a]ll strategies to increase the diversity of providers must comply with applicable Federal civil rights laws, including Title VI of the Civil Rights Act of 1964." *Id.* at n.2. For fiscal years 2023 and 2024, the Department did the same—issued a notice, invited applications for new MHSP grants, and identified which of the final priorities would be considered for the grant competitions that year. *See* 87 Fed. Reg. 72,976 (Nov. 28, 2022); 89 Fed. Reg. 15,180 (Mar. 1, 2024).

**D.    The Department's Review and Selection of SBMH Applicants Based on Published Priorities**

63.    The purpose of SBMH is to provide competitive grants to LEAs or consortia of LEAs to increase the number of credentialed mental health services providers providing school-based mental health services to students in LEAs with demonstrated need. 85 Fed. Reg. 32,025 (May 28, 2020). Without these funds, children in these school districts will have limited or no access to critical mental health services.

64.    The Department ran the first SBMH grant competition in 2020. *Id.* As with MHSP, the Department used the rulemaking process to set new priorities for future SBMH competitions. *See* 87 Fed. Reg. 47,152 (Aug. 2, 2022) (proposed priorities, requirements, and definitions); 87 Fed. Reg. 60,092 (Oct. 4, 2022) (final priorities, requirements, and definitions). The Department explained that the notice's priorities, requirements, and definitions were necessary, because,

> The authorizing statute does not provide sufficient detail to develop and administer a competitive grant program consistent with the intent of Congress as expressed in the Explanatory Statement accompanying the Department of Education Appropriations Act 2022, which provided funding for the program in FY 2022, or the Bipartisan Safer Communities Act, which provided additional

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

funding for FYs 2022 through 2026. Consequently, absent the final priorities, requirements, and definitions, the Department will not have a sufficient basis for evaluating the quality of applications or ensuring that the program achieves its intended objectives.

87 Fed. Reg. 47,152 (Aug. 2, 2022).

65.    For SBMH, the Department announced four "final priorities": (1) proposals from SEAs to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need through recruitment and retention; (2) proposals from LEAs with demonstrated need to increase the number of credentialed school-based mental health services providers through recruitment and retention; (3) proposals prioritizing respecialization, professional retraining, or other preparation plan that leads to a state credential as a school-based mental health services provider and that is designed to increase the number of services providers qualified to serve in LEAs with demonstrated need; and (4) proposals to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need. 87 Fed. Reg. 60,092, 60,097 (Oct. 4, 2022).

66.    As with MHSP, the Department issued a notice inviting applications for new SBMH grants for fiscal year 2022, setting the first two priorities as "absolute priorities" for SEAs and LEAs respectively, and setting the second two priorities as "competitive preference" priorities that were optional but would earn applicants extra points. 87 Fed. Reg. 60,137–39 (Oct. 4, 2022). The Department did the same for fiscal year 2024—issuing a notice inviting new grant applications for the SBMH program and identifying the priorities that it would consider for that year's competition. *See* 89 Fed. Reg. 15,173 (Mar. 1, 2024).

67.    Against this backdrop, Plaintiffs applied for Program grants, tailoring their projects to the priorities announced by the Department for the Programs that year to make their applications more competitive. After deciding Plaintiffs would receive multi-year, multi–million-dollar grants for Program projects, the Department awarded funding for the first budget year, then provided annual one-year continuation awards for the subsequent budget years.

1  **E.    Grantees in Plaintiff States Accomplished the Programmatic Goals of These Mental Health Grants**

2      68.    The Department awarded hundreds of MHSP and SBMH grants across the nation:



Metrics, *Interactive Project Map*, https://www.metricscenter.org/about-us/interactive-map (last visited June 30, 2025).[2]

        69.    Once the grants were awarded, grantees in Plaintiff states were successful in accomplishing programmatic goals, improving the mental health of thousands of students.

        70.    For example, the Department awarded a five-year SBMH grant beginning on January 1, 2023, to Educational Service District 189 (NWESD), an LEA that serves as a regional liaison between Washington State and 35 school districts located in northwest Washington. In its application, NWESD explained that 40 percent of its schools were unable to access critical mental health services for students due to barriers such as geographic isolation, high student-to-provider ratios, attrition, complexity and intensity of mental health challenges, cumbersome and unsuccessful navigation to community-based services, and cultural and linguistic hurdles. For instance, two of the counties in NWESD's service area are located on islands, and the other three

        [2] The Department also awarded grants from the Bipartisan Safer Communities Act funding to grantees in Alaska and Puerto Rico.

counties contain very rural schools that reach east into the foothills of the Cascade Mountain range and north to the Canadian border, far from the single major interstate (I-5) where most of the population and services are located in its region.

71.    NWESD proposed five goals for its project: (1) increase the number of credentialed school-based mental health professionals (MHPs) in northwest Washington schools from 10 to 30 providers by December 2027; (2) expand the diversity of credentialed MHPs by at least 25% so as to develop a workforce that more closely represented the students who are served; (3) increase retention of its credentialed MHPs; (4) decrease the ratio of students to MHPs from 1:1,640 to 1:547 by December 2027; and (5) diversify funding mechanisms to sustain MHPs in schools.

72.    By the second year of its five-year project, NWESD had exceeded its early recruitment and retention goals. NWESD was able to use the SBMH grant to develop a recruiting package that allowed it to fill positions more quickly than anticipated. For instance, by the end of its second year, NWESD had hired 19 new MHPs—outpacing not only its original year two goal of 14 professionals, but its year three goal of 17 professionals. NWESD saw only one MHP leave during this period, and it was quickly able to fill that position.

73.    The increase in staffing has already allowed NWESD to improve its MHP-to-student ratio by 60%—from 1:1,160 to 1:656. In 2024, NWESD was able to provide 795 individual students with 7,870 mental health related service sessions—allowing students to access treatment during the school day that they may not have otherwise been able to access or would have had to experience a disruption to their school day to receive.

74.    As another example, the Department awarded a five-year MHSP grant beginning on January 1, 2023, to the University of Washington SMART Center for its Workforce for Student Well-Being Initiative (WSW). In its application, the SMART Center cited a state audit that detailed a significant lack of school mental health providers in Washington state. It proposed three project goals: 1. Increase the number of qualified school mental health service

professionals who work in high-need school districts; 2. Provide high-quality advanced skills training (called the Community of Practice) for graduate students in the WSW as well as post-graduation support to retain these skilled professionals in schools; 3. Train participating high need school districts on effective school mental health practices.

75.    The WSW funds competitive conditional scholarships to graduate students who are enrolled in six schools of social work across Washington. These scholarships are awarded to graduate students with demonstrated financial need and allow candidates who are passionate and adept at working with youth to avoid the high amount of debt that would normally force them to take positions with high-paying private clinical practices rather than low-paying school mental health programs. The scholarships are awarded using an objective set of criteria based on the candidates' demonstrated commitment to working with students in high-need K-12 public and tribal schools.

76.    As a condition of the scholarship, WSW participants are required to work in a high-need school district for a minimum of two years after graduation. To ensure they are successful, the WSW provides free licensure supervision and group consultation and training to graduates as they begin their new careers. These are much-needed services—67% of the year one cohort received post-graduation licensure supervision support from WSW project staff.

77.    As of June 2025 (halfway through year three), the WSW project has recruited and trained 27 graduate students committed to maintaining employment as school social workers in high-need school districts across Washington State and has significantly reduced their debt burden. The project is also gaining momentum in reaching candidates who may not have a path towards graduate-level social work practice without federal funding—candidates whose backgrounds reflect the communities that the WSW serves. For example, 31% of year one cohort were first-generation college students vs. 63% of year two students. The WSW project has also demonstrated an increase in the skills and competencies of participating graduate students through pre- and post-test surveys measuring competencies in core skills taught through the 40-

1  hour community of practice course that WSW provides to participants.

2        78.    Similarly, in Michigan, the Department awarded a five-year MHSP grant, starting

3  on January 1, 2023, to the Michigan Department of Education. The grant funded the Michigan

4  Earn, Learn, and Serve in Schools (Mi-ELSiS) program, which aims to create 165 new school

5  mental health providers working in high-need schools across Michigan to combat a critical

6  shortage of school-based mental health professionals. The program offers stipends to 33 master's

7  level students completing their required internships in counseling (11 interns), social work (11

8  interns), and psychology (11 interns) each year of the grant. To date, sixty-nine (69) graduate-

9  level students have been trained after receiving the stipends, with several additional students

10  currently in graduate programs and receiving the stipends.

11        79.    These are not isolated examples. The National Association of School

12  Psychologists (NASP) found that during the Programs' first year under Congress's

13  transformative funding appropriation, grantees served nearly 775,000 elementary and secondary

14  students and hired nearly 1,300 school mental health professionals. NASP, *The Impact of*

15  *Federal Support for School Mental Health Services* (May 8, 2025) 2,

16  https://www.congress.gov/119/meeting/house/118317/documents/HHRG-119-ED00-

17  20250604-SD003.pdf. These improvements led to real results: a 50% reduction in suicide risk

18  at high-needs schools, decreases in absenteeism and behavioral issues, and increases in positive

19  student-staff engagement based on data from sampled programs. *Id.*

20  **F.    The Department Discontinued Grants in Plaintiff States**

21        80.    On April 29, 2025, the Department sent "Notice[s] of Non-Continuation of Grant

22  Award," notifying grantees in Plaintiff states that their Program grants would be discontinued at

23  the end of the grants' current budget period. To Plaintiffs' knowledge, all notices stated the

24  following:

25        This letter provides notice that the United States Department of Education has
        determined not to continue your federal award, S184xxxxxxx, in its entirety,
26        effective at the end of your current grant budget period. See, inter alia, 34 C.F.R.
        § 75.253(a)(5) and (f)(1).

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                              22                ATTORNEY GENERAL OF WASHINGTON
                                                                    Complex Litigation Division
                                                                  800 Fifth Avenue, Suite 2000
                                                                      Seattle, WA 98104
                                                                         206-464-7744

. . . The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, *in that the programs*: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

For grantees, these notices discontinued Program grants on December 31, 2025; most or all of the Program grants in Plaintiff states were discontinued.

81.    That same day, the Department sent an email to Congress informing it of its Non-Continuation Decision, discontinuing approximately $1 billion in awards. The Department stated that it only discontinued "certain" grants that "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." It claimed that "[t]he prior Administration's preferences are not legally binding" and told Congress that it planned to "re-envision and re-compete" the funds.

82.    To members of the press, the Department conceded it targeted Plaintiffs' grants for their perceived diversity, equity, and inclusion (DEI) efforts. *See* Kaylin Belsha, *After Uvalde, school mental health grants had bipartisan support. Now Trump is cutting them*., Chalkbeat (May 2, 2025), https://www.chalkbeat.org/2025/05/02/trump-administration-cuts-school-mental-health-grants-over-diversity-goals/. The Department objected to the Biden Administration's published priorities, i.e. its "decision to give schools more points on their grant application if they planned to increase the number of mental health staffers from diverse backgrounds or who were from the communities where they'd be working with kids." *Id.*; *see also, e.g.*, 87 Fed. Reg. 60,083 (Oct. 4, 2022). However, in the Federal Register notice announcing those final priorities, the Biden Administration declined to define "diverse" "given the breadth of diversity that exists across LEAs nationwide," and demanded that any hiring strategies had to follow federal civil rights laws. *See, e.g.*, 87 Fed. Reg. 60,087, 60,088 n.2 (Oct. 4, 2022).

83.     The Department's claimed rationale for discontinuing Plaintiffs' grants does not square with the grants left intact that served the same priorities as grantees in Plaintiff states and complied with the GEPA Equity Directive. For instance, media has reported that "[t]he Indiana Department of Education, Fort Wayne Community Schools in Indiana, and Norma[n] Public Schools in Oklahoma" had not been contacted about funding changes. *See supra*, Belsha. However, these projects served the same priorities as Plaintiffs' projects. For instance, according to the Department's website, Fort Wayne Community Schools received a MHSP grant in 2023 based on a project that would "meet Competitive Priorities 1, 2, and 3." U.S. Department of Education, *Mental Health Service Professional Demonstration Grant Program*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-supportive-schools/mental-health-service-professional-demonstration-grant-program#prior-year-awards (last visited June 29, 2025). Those priorities that year were: "Competitive Preference Priority 1—Increase the Number of Qualified School-Based Mental Health Services Providers in High-Need LEAs Who Are from Diverse Backgrounds or from Communities Served by the High-Need LEA"; "Competitive Preference Priority 2—Promote Inclusive Practices"; and "Competitive Preference Priority 3—Partnerships with [minority serving institutions]." 87 Fed. Reg. 72,977-78 (Nov. 28, 2022).

84.     Similarly, according to the Department's website, Norman Public Schools received an SMBH grant in 2024 "under . . . Competitive Preference Priority 2." U.S. Department of Education, *Mental Health Service Professional Demonstration Grant Program*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-supportive-schools/school-based-mental-health-services-grant-program#current-year-awards (last visited June 29, 2025). That year's competition identified the priority as: "Competitive Preference Priority 2—Increasing the Number of Credentialed School-Based Mental Health Services Providers in LEAs with Demonstrated Need Who Are from Diverse Backgrounds or from Communities Served by the LEAs with Demonstrated Need." 89 Fed. Reg. 15,175

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

24

(Mar. 1, 2024). The abstract for the Indiana Department of Education's SBMH award explains it "seeks to . . . recruit and retain school counseling candidates by creating a talent pipeline of mental health service providers whose racial and ethnic backgrounds parallel their students" through its grant. U.S. Department of Education, *84.184H School-Based Mental Health Services (SBMH)grant program ABSTRACTS* 20, https://www.ed.gov/sites/ed/files/2023/01/CORRECT ED_SBMH-Application-ABSTRACTS_012423-1.pdf (last visited June 29, 2025).

G.    **Impact of The Department's Non-Continuation Decision on Students, Schools, and Plaintiff States**

85.    The Department's Non-Continuation Decision, and apparent abandonment of the Congress's GEPA Equity Directive and appropriation directives for these Programs to promote equity and mental health services in low-income schools, are causing irreparable harm to our children, schools, and school-based mental health service providers. The cost to our children's safety, well-being, and academic success is incalculable. The Department made this Decision amid an unprecedented mental health crisis for our youth following years of isolation during the pandemic. These grants were designed to respond to America's school shooting crisis and fill a critical need in schools. Without them, many children in rural and lower-income schools will go without mental health services and will suffer the attendant consequences: short- and long-term health problems; lower grades; increased absenteeism, suspensions, and expulsions; and a higher risk of suicide and drug overdose. Independent School Management, *Understanding the Impact of Mental Health on Academic Performance* (Feb. 12, 2023), https://isminc.com/advisory/ publications/the-source/understanding-impact-mental-health-academic-performance.

86.    If Defendants are not enjoined from implementing the Non-Continuation Decision, grantees in Plaintiff states will be forced to lay off school-based mental health service providers, reducing access to much-needed mental health services to their rural and low-income schools. These grantees will lose qualified mental health service providers; and the benefits of the relationships their students have developed with these providers. The spillover effect of

students turning to community mental health services–to the extent they are available–will tax Plaintiffs' already-strained mental health care system.

87.     If Defendants are not enjoined from implementing the Non-Continuation Decision, grantees in Plaintiff states will also be forced to cut financial assistance for the graduate students who were training to provide school-based mental health services in these high-need settings and who were expecting to participate in practicums and internships. The pipeline of trained mental health providers to high-need schools will dry up. The arbitrary and capricious loss of funding will discourage these students and others from pursuing careers as school-based mental health services providers in rural and low-income communities. Plaintiffs' relationships with community partners will be irreparably damaged because Plaintiffs can no longer honor the commitments they made to provide mental health services to the children in these communities.

88.     For instance, upon information and belief, in California, 21 county offices of education and local education agencies received letters discontinuing their SBMH grants. These grantees will collectively lose at least $98 million.

89.     The Department has discontinued a SBMH grant awarded to Madera County Office of Education, resulting in a loss of roughly $3.8 million, including approximately $1.7 million that the County expected to receive for the spring semester of the 2025–2026 school year. The County's implementation of the grant has exceeded the County's expectations and served more than 12,500 students. The discontinuation is exacerbating a serious mental health crisis in the County, impacting thousands of students and their families. The County has the highest percentage of youth with serious emotional disturbance in the state, and 91% of the County's public school students are socioeconomically disadvantaged. The discontinuation will require the County to lay off 12 staff members that provide mental and behavioral health services. Because there are no accessible alternative resources for these services, the County's students and their families will likely go without consistent mental health support.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                      26                    ATTORNEY GENERAL OF WASHINGTON
                                                                                            Complex Litigation Division
                                                                                            800 Fifth Avenue, Suite 2000
                                                                                            Seattle, WA 98104
                                                                                            206-464-7744

90.    The Marin County Office of Education will lose roughly $8 million, including $1.9 million that it intended to receive for the spring semester of the 2025-2026 school year. The County sought the grant funding to establish partnerships with 12 universities, place 100 interns in high-need schools, and serve at least 2,500 students. Without the grant, the County lacks sustainable funding for school-based mental health services. Due to the discontinuation, current grant-funded staff are already pursuing other jobs. If the Department does not rescind the discontinuation, the County will have to eliminate nine full-time mental health positions.

91.    Additionally, in California, 28 MHSP grantees are set to lose at least $69 million. These grantees include county offices of education and local education agencies; the University of California, Santa Barbara, which planned to partner with four high-need local education agencies; and five California State University (CSU) campuses, which collectively sought to partner with at least 21 high-need local education agencies. Without these collaborative partnerships, these grantees will lose valuable pathways for behavioral health and social work professionals to serve the mental and emotional health needs of youth.

92.    Seven California grantees applied for their MHSP grants in 2024 and thus did not receive their awards until January 2025. As a result, they barely had time to implement any of their planned efforts and will be denied most of the five-year funding—a total loss of approximately $26.7 million—on which they had relied. For example, CSU East Bay Foundation, Inc.–a nonprofit corporation affiliated with CSU, East Bay–will lose $4 million. The university intended to use that funding to help three high-need local education agencies hire and retain 145 school psychologists and school counselors. The grant funding would enable the university to place 145 credential program and graduate students in practicums in high-need elementary and secondary schools. Another grantee, Solano County Office of Education, will lose over $2.3 million, including $595,408 that it expected to receive for the spring semester of the 2025–2026 school year. Grantee Santa Clara County Office of Education, which also received its initial award in 2023, will lose over $2.1 million.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

93.    As another example, on March 30, 2023, the Department awarded Oregon State University a grant for "Promoting and Advancing Training of High Desert School Counselors (PATHSC)," Award No. S184X230055. In its application, Oregon State University explained that it would partner with the High Desert Education Service District (HDESD) and four Central Oregon school districts. It further explained that Central Oregon had experienced a significant decline in community-based and residential services for mental health and was identified as a medically under-served area and classified as mental health professional shortage area by the Health Resources and Services Administration. Currently in Central Oregon, there are no intensive inpatient services offered for children and adolescents. The grant discontinuance is already causing harmful effects to Oregon State University and the people in that region. Many students will lose their scholarships, hard earned relationships will be damaged, and school counseling students from more rural districts, who depend on grant funding to attend graduate school, may no longer be able to attend, among other harmful effects.

94.    In sum, Defendants' Non-Continuation Decision and its implementation have already resulted in immediate and irreparable harm to Plaintiffs - their youth experiencing mental health crises, the school-based mental health service provider workforce pipeline, education agencies, mental health care system, and partnering private institutions of higher education. Without restoration of these federal funds, Plaintiffs and their residents will suffer immediate and irreparable harm from the loss of critical funding to support mental health services and a brighter, better, and safer future for their youth.

## V.    CAUSES OF ACTION

### Count I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

95.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

1     96.     The APA requires a court to "hold unlawful and set aside agency action, findings,

2   and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C.

3   § 706(2)(A).

4     97.     The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the

5   Defendants' Non-Continuation Decision is an agency action subject to review under the APA.

6     98.     An agency action is arbitrary or capricious where it is not "reasonable and

7   reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency

8   must provide "a satisfactory explanation for its action[,] including a rational connection between

9   the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm*

10   *Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citation modified).

11     99.     An agency action is also arbitrary and capricious if the agency has "relied on

12   factors which Congress has not intended it to consider, entirely failed to consider an important

13   aspect of the problem, offered an explanation for its decision that runs counter to the evidence

14   before the agency, or is so implausible that it could not be ascribed to a difference in view or the

15   product of agency expertise." *Id.*

16     100.    The Non-Continuation Decision is arbitrary and capricious because the

17   Department did not examine the relevant data and articulate a satisfactory explanation for its

18   action including a "rational connection between the facts found and the choice made." *See*

19   *Motor Vehicle Mfrs. Ass'n,* 463 U.S. 43; *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019).

20   Notices providing the same boilerplate explanations untethered to specific grants and the

21   performance of specific grantees show an obvious lack of this type of assessment. *See* Motion

22   Order 4, *New York v. U.S. Dep't Edu.*, Case No. 25-1424, ECF No. 40.1 (2d Cir. June 20, 2025)

23   (blanket action failed to provide individualized assessment); *Dickson v. Sec'y of Def.,* 68 F.3d

24   1396, 1405 (D.C. Cir. 1995) (faulting boilerplate language for making it impossible to discern

25   agency's rationale); *Gray Television, Inc. v. FCC*, 130 F.4th 1201, 1224 (11th Cir. 2025) (same);

26   *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121-MSM-LDA,

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF          29         ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

2025 WL 1426226, at *1, 17 (D.R.I. May 16, 2025) (boilerplate notices failed to demonstrate individualized assessments of grantees' compliance with the agreements). Based on the disjunctive list of theoretical reasons, Plaintiffs cannot identify the basis for the discontinuance, providing another reason the decision is arbitrary and capricious. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947) (holding agency action is arbitrary and capricious where party is "compelled to guess at the theory underlying the agency's action").

101.    The Non-Continuation Decision is arbitrary and capricious because Defendants relied on factors which Congress has not intended it to consider. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Pursuant to the GEPA Equity Directive, Congress required financial assistance applicants to describe in their applications the steps they would take to ensure equity in their programs. To the extent that Defendants' Non-Continuation Decision discontinued Plaintiffs' grants because Plaintiffs complied with this law, the Non-Continuation Decision is arbitrary and capricious. *Id.* Also, the Department publishes the priorities it uses to consider new grant award applications, not continuances for existing grants. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 34 C.F.R. §§ 75.105, .253 (2024). The department's unlawful consideration of the Department's new priorities without prior notice is arbitrary and capricious.

102.    The Non-Continuation Decision is arbitrary and capricious because the Department did not apply the same standards to all Program grants in deciding which grants were discontinued. Although its provided bases–the alleged "conflict" between the prior and current Administration's Program priorities–applied to all grantees, Defendants have permitted other Program grants to continue. Yet those non-discontinued grants are a part of the same Programs, were awarded using the same application criteria, and necessarily reflect the same prior Administration's priorities and policy preferences as Plaintiffs' grants.

103.    The Non-Continuation Decision is arbitrary and capricious because Defendants violated the "[t]he change-in-position doctrine," which prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025). "Under that

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                    30                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). Defendants' notices obliquely reference the Department's change in policy preferences without identifying or explaining this changed position, or how they allegedly conflicted with the prior Administration's policy preferences.

104.    The Non-Continuation Decision also violates this doctrine because Defendants failed to account for the serious reliance interests of grantees in Plaintiff states in making this change in policy. These grantees have structured their budgets with the understanding that Defendants would make annual continuation awards based on grantees' project performance, consistent with the Department's governing priorities at the time of the application, under the Programs through the remainder of the project performance period. *Discretionary Grantmaking* at 31–32. Grantees have also structured their budgets with the understanding that, consistent with their project proposals, they would have several years to generate performance results and identify and build relationships with new sources of funding that would allow grantees to continue their projects following the end of the federally funded performance period. Grantees' reliance is based on, among other things, Defendants' history and practice under the Programs, and Defendants' regulations showing Defendants' "intention to make continuation awards to fund the remainder of the project period" upon approval of multi-year grants, 34 C.F.R. § 75.251(b)(2) (2013), and prioritization of "continuation awards over new grants," 34 C.F.R. § 75.253(c) (2024). *See also, e.g.*, 59 Fed. Reg. 30,259 (June 10, 1994) (explaining that a cut-off in continuation award funding is "extremely rare in practice"); 89 Fed. Reg. 70,316 (Aug. 29, 2024) (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance"). Believing that discontinuances would be based on criteria within their control—i.e. their performance—grantees invested time and resources that will now be lost

31

1    with these discontinuances based on improper criteria outside their control. 34 C.F.R. §

2    75.253(b) (2024).

3       105.    The Department also failed to account for the reliance interests of the Program

4    participants: school-based mental health services providers who were recruited or provided

5    retention incentives to work in LEAs with demonstrated need; graduate students who are in the

6    middle of multi-year graduate programs and are learning that they will no longer receive tuition

7    assistance funded by the Programs or post-graduate supervision and support; and–most

8    importantly–our students in low-income and rural areas who, as the first Trump Administration

9    recognized, need mental health services and will go without should these Programs close.

10       106.    Defendants' Non-Continuation Decision has caused and is causing substantial

11    injury, including immediate and irreparable harm.

12       107.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to

13    an order and judgment, and to a preliminary and permanent injunction, holding unlawful and

14    vacating Defendants' Non-Continuation Decision and enjoining Defendants from implementing,

15    maintaining, or reinstating the Non-Continuation Decision.

16                              **Count II**
             **Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C)**

17                           **Contrary to Law**

18       108.    Plaintiffs reallege and incorporate by reference the allegations contained in each

19    of the preceding paragraphs as if fully set forth herein.

20       109.    The APA requires a court to "hold unlawful and set aside agency action, findings,

21    and conclusions found to be . . . not in accordance with law; or in excess of statutory jurisdiction,

22    authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

23       110.    Defendants' Non-Continuation Decision is contrary to law because it violates

24    Defendants' regulations addressing continuation funding for multi-year grant awards.

25       111.    Specifically, when determining whether a grantee has met the requirements to

26    receive a continuation award, Defendants are limited to consideration of "any relevant

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF           32           ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

information regarding grantee performance." 34 C.F.R. § 75.253(b) (2024); *see also, e.g.*, *Discretionary Grantmaking* at 32 (explaining that performance information is used "to determine" whether § 75.253(a) requirements, including the requirement that "continuation of the project is in the best interest of the Federal government," are met). By considering information outside of grantee performance, such as new, unlawfully relied upon priorities that purportedly conflict with the original priorities under which Plaintiffs' grant applications were selected and under which Plaintiffs' performance is being measured, Defendants have exceeded their regulatory authority. *See, e.g.*, 34 C.F.R. § 75.118 (2024); 59 Fed. Reg. 30,258 (explaining that "[t]he performance report . . . will provide the information on which the funding decision will be made").

112.    Defendants may only set program priorities for any given grant program at the outset of the program, when Defendants publish the application notice for new grants. Defendants cannot change the priorities for a grant after a multi-year grant has been awarded. *See, e.g.*, 34 C.F.R. § 75.100(a) (1994) ("Each fiscal year, the Secretary publishes application notices . . . *for new grants*[.]") (emphasis added); *id.* § 75.101(a)(4) (2024) (application notice includes "[a]ny priorities established by the Secretary for the program for that year"); *id.* § 75.105 (2024) (describing process for establishing "priorities for selection of applications in a particular fiscal year"). In contrast, continuation awards do not go through an application process. *See id.* § 75.118 (2024); 59 Fed. Reg. 30,259 ("[T]he continuation award decision— including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

113.    Further, Defendants actions have violated the priority 34 C.F.R. § 75.253(c) assigns to continuation awards over new grants. 34 C.F.R. § 75.253(c) (2024); *see, e.g.*, 45 Fed. Reg. 22,559 (Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

of the criteria in [§ 253(a)] and *will not be subject to competition with other applications*")
(emphasis added).

114.    Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

115.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Non-Continuation Decision and enjoining Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision.

**Count III**
**Declaratory Judgment**

116.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

117.    An actual and substantial controversy exists between Plaintiffs and Defendants about whether 34 C.F.R. § 75.253(b) and (c) prohibit Defendants from considering new agency priorities when determining whether the grantee has met the requirements to receive a continuation award under 34 C.F.R. § 75.253(a).

118.    This action is presently justiciable because Defendants have asserted that: (a) it may decide not to issue continuation awards to multi-year grants under 34 C.F.R. § 75.253 based on an alleged conflict with the current Administration's priorities and policies without regard to the grantee's actual performance, (b) "[t]he prior Administration's preferences are not legally binding," and (c) it may award Program funds to new grantees based on these new priorities.

119.    Plaintiffs assert that under 34 C.F.R. § 75.253(b), Defendants may only consider information relevant to a grantee's performance when determining whether the grantee has met the requirements of 34 C.F.R. § 75.253(a); and may not assess grantee's performance against new agency priorities. Additionally, considering these new priorities fails to afford continuation awards priority over new grants in violation of 34 C.F.R. § 75.253(c).

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

120.    Declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. § 2201, is appropriate to resolve this controversy.

**Count IV**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Notice and Comment**

121.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

122.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

123.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

124.    Under GEPA, Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grant competitions. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

125.    Consistent with their statutory obligations, Defendants underwent the notice-and-comment rulemaking process when they changed the SBMH and MHSP priorities in 2022. *See* 87 Fed. Reg. 47,152 (Aug. 2, 2022) (SBMH proposed priorities); 87 Fed. Reg. 60,092 (Oct. 4, 2022) (SBMH final priorities); 87 Fed. Reg. 47,159 (Aug. 2, 2022) (MHSP proposed priorities); 87 Fed. Reg. 60,083 (Oct. 4, 2022) (MHSP final priorities).

126.    Defendants cannot discontinue Plaintiffs' multi-year grants based on changed priorities, but even if they could, they may not do so without following the proper procedures.

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                      35                          ATTORNEY GENERAL OF WASHINGTON
                                                                                                          Complex Litigation Division
                                                                                                          800 Fifth Avenue, Suite 2000
                                                                                                          Seattle, WA 98104
                                                                                                          206-464-7744

127.    Without having proceeded through notice-and-comment procedures, the Non-Continuation Decision and Defendants' actions in implementing it are procedurally invalid under the APA.

128.    Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

129.    Pursuant to 5 U.S.C. §§ 705, 706, and 28 U.S.C. § 2201, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Non-Continuation Decision and enjoining Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision.

### Count IV
### Substantive Violation of the Spending Clause

130.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

131.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

132.    The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ."

133.    The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). Agencies must set out funding conditions "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 & n.6 (9th Cir. 2019) (applying Spending Clause constraints to "middleman agencies" charged with administering funds). This requirement flows from the Spending Clause principle that

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                    36          ATTORNEY GENERAL OF WASHINGTON
                                                          Complex Litigation Division
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104
                                                          206-464-7744

1    States must "voluntarily and knowingly" accept conditions attached to federal spending. *Id.* at

2    296 (quoting *Pennhurst*, 451 U.S. at 17). States "cannot knowingly accept conditions of which

3    they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst*, 451 U.S. at

4    17). The requirement of unambiguous conditions "enable[s] the States to exercise their choice

5    knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

6        134.    Defendants' Non-Continuation Decision altered the conditions upon which grants

7    were obligated and funds disbursed, contrary to the Spending Clause. To give grantees sufficient

8    notice of the applicable conditions for these awards, the Department published priorities,

9    requirements, and definitions in the Federal Register. *See, e.g.*, 87 Fed. Reg. 47,164

10   (Aug. 2, 2022); 87 Fed. Reg. 47,165 (Aug. 2, 2022). Grantees in Plaintiff states designed their

11   projects to meet the priorities announced in the year they applied. Grantees accepted their grant

12   awards with the understanding that they would be held to, and evaluated against, the projects

13   they proposed in their grant applications, and that the Department would prioritize continuation

14   awards over new grant awards. 34 C.F.R. § 75.253(c). The new priorities that served the basis

15   for the Non-Continuation Decision and were announced in the discontinuance notices put these

16   grantees at a disadvantage—new applicants can tailor their blank-slate projects to fit the

17   Department's new priorities, whereas grantees will have to rework the multi-year projects they

18   have already invested substantial time and resources into designing and implementing to

19   demonstrate the new priorities—in a competition grantees were never meant to endure. 34 C.F.R.

20   § 75.105 (2024); 34 C.F.R. § 75.253(c) (2024). These new priorities are retroactive conditions

21   which the Department has–without explanation – unfairly and summarily determined grantees

22   in Plaintiff states cannot meet.

23       135.    Defendants' Non-Continuation Decision further amounts to a new and retroactive

24   condition on Program funding, as Defendants now assert authority to unilaterally discontinue a

25   federal grant on grounds not authorized by Congress through the Program grant authorizing

26   statutes, GEPA, or 34 C.F.R. § 75.253. These alterations are retroactive, ambiguous, and

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                                37                ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA 98104
                                                                        206-464-7744

inconsistent with the purpose of the Programs, GEPA's requirement that grant recipients address "equity," *see* 20 U.S.C. § 1228a(b), and the final rulemaking priorities governing the Programs issued pursuant to GEPA and 34 C.F.R. § 75.105(b).

136.   Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

137.   For the foregoing reasons, Plaintiffs are entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision, and to a declaration pursuant to 28 U.S.C. § 2201 declaring unconstitutional, the Non-Continuation Decision and any action taken to enforce or implement it.

**Count V**
**Separation of Powers Violation**

138.   Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

139.   Congress possesses exclusive power to legislate. Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

140.   "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (Alexander Hamilton) & No. 51, at 350 (James Madison)).

141.   Thus "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the

1  details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (alteration

2  in original) (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)).

3      142.   The separation of powers doctrine thus represents a central tenet of our

4  Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC*,

5  591 U.S. at 227. Consistent with these principles, the Executive acts at the lowest ebb of his

6  constitutional authority and power when he acts contrary to the express or implied will of

7  Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

8  concurring). And, the Executive's powers are limited to those specifically conferred by the

9  Constitution and federal statutes, and do not include any undefined residual or inherent power.

10      143.   The Executive Branch violates the Take Care Clause where it declines to execute

11  or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated

12  regulations implementing such statutes. *See Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302, 327

13  (2014) (noting that the President "act[s] at times through agencies"). And, it "may not decline to

14  follow a statutory mandate or prohibition simply because of policy objections." *City & Cnty. of*

15  *San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (citation modified).

16      144.   In their notices, Defendants cited the current Administration's policies and

17  priorities as prompting the Non-Continuation Decision. In following these new Executive

18  policies and priorities, at the expense of Congress's GEPA Equity Directive, congressional

19  oversight, and its own implementing regulations, Defendants violated separation of power

20  principles and the Take Care Clause.

21      145.   Since 1994, Congress's GEPA Equity Directive has required that any applicant

22  for grant funding "develop and describe in such applicant's application the steps such applicant

23  proposes to take to ensure equitable access to, and equitable participation in, the project or

24  activity to be conducted with such assistance, by addressing the special needs of students,

25  teachers, and other program beneficiaries in order to overcome barriers to equitable participation,

26  including barriers based on gender, race, color, national origin, disability, and age."

20 U.S.C. § 1228a(b). Congress required this, so that the Department may achieve its "mission to ensure equal access to education and to promote educational excellence throughout the Nation." *Id.* § 1228a(a). To the press, the Department has alleged that it discontinued Plaintiffs' projects because they ensured equity. If so, the Non-Continuation Decision undermines Congress's longstanding GEPA Equity Directive and therefore violates the Take Care Clause.

146.    Congress created and has demanded committee oversight over these Programs. *See supra*, Section IV.A. This oversight included "a detailed spend plan of anticipated uses of funds" that the Department was required to submit to congressional committees every 60 days. Bipartisan Safer Communities Act, Pub. L. No. 117-159, §§ 22002-3, 136 Stat 1313, 42-43 (June 25, 2022). And, under 31 U.S.C. § 6507(a)(3), congressional committees are supposed to study grant programs and "give special attention to whether a change in purpose, direction, or administration of the original program, or in procedures and requirements applicable to the program, should be made." 31 U.S.C. § 6507(a)(3). Defendant's Non-Continuation Decision, discontinuing a swath of Plaintiffs' grants based on its own heretofore unannounced priorities, is a direct affront to Congress's oversight authority.

147.    Lastly, Defendants' Non-Continuation Decision violates the Take Care Clause because it goes against appropriation laws and its own regulations. Congress created and funded MHSP to recruit and train highly qualified mental health professionals to serve low-income schools. *Conference Report*, 543. And, the Department previously published priorities to ensure it collected the information necessary for competitive review of applications and to implement projects consistent with congressional intent. *See, e.g.*, 87 Fed. Reg. 47,164 (Aug. 2, 2022) ("The priorities will enable the Department to administer a competitive grant program consistent with the intent of Congress . . . ."); 57 Fed. Reg. 30,328 (July 8, 1992) ("The Secretary ensures that the establishment of any priorities are in furtherance of, and not contrary to, congressional intent."). In discontinuing Program grants based on the new Administration's priorities and policy preferences, irrespective of congressional intent, laws, and its own regulations, the

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF
40
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1    Department violates separation of powers constraints.

2    148.    The Department's Non-Continuation Decision therefore violates the separation

3    of powers constraints described above. Through their actions, Defendants have purportedly

4    overridden the careful judgment of Congress by discontinuing grant awards compliant with both

5    the published priorities in effect the fiscal year they applied and the GEPA Equity Directive, as

6    well as congressional oversight over the use and purpose of the Program funds.

7    149.    Defendants' Non-Continuation Decision has caused and is causing substantial

8    injury, including immediate and irreparable harm.

9    150.    For the foregoing reasons, Plaintiffs are entitled to a preliminary and permanent

10   injunction barring Defendants from implementing, maintaining, or reinstating the Non-

11   Continuation Decision.

12   151.    Plaintiffs are also entitled, pursuant to 28 U.S.C. § 2201, to a declaration that the

13   Non-Continuation Decision violates the Constitution's guarantee of separation of powers.

**Count VI**
**Equitable Ultra Vires**
**Conduct Outside the Scope of Statutory Authority Conferred on the Executive**

16   152.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as

17   if set forth herein.

18   153.    Federal courts possess the power in equity to "grant injunctive relief . . . with

19   respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. Indeed, the

20   Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond

21   th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337

22   U.S. 682, 689 (1949).

23   154.    The Department, through its officials, may exercise only the authority conferred

24   by statute and regulations.

25   155.    Defendants do not have authority to discontinue Plaintiffs' grants based on a

26   change in priorities after grants were issued in accordance with the GEPA Equity Directive and

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                              41                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Complex Litigation Division
                                                                      800 Fifth Avenue, Suite 2000
                                                                      Seattle, WA 98104
                                                                      206-464-7744

final priorities following statutorily required notice and comment process. Defendants' Non-Continuation Decision, without regard to the GEPA Equity Directive, GEPA notice and comment procedures, and the Department's own regulations, is contrary to law and outside of Defendants' authority.

156.    To the extent Defendants' Non-Continuation Decision discontinued Plaintiffs' grants by placing new, retroactive, ambiguous, and unrelated conditions on the grants, Defendants encroached upon Congress's Spending Clause authority and violated the separation of powers, and thereby acted ultra vires.

157.    Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

158.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' Non-Continuation Decision is ultra vires and therefore unlawful.

159.    Plaintiffs are also entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.    Enter an order pursuant to 5 U.S.C. § 705, postponing the effective date of the Defendants' Non-Continuation Decision and actions to effectuate it, including the Department's plan to recompete Program funds, pending the conclusion of this Court's review;

b.    Issue preliminary and permanent injunctive relief barring implementation of the Non-Continuation Decision as to grantees residing within Plaintiff states; and ordering equitable relief, requiring the Department to make a new continuation award decision prior to the next budget period without considering performance issues–if any–caused by the Department's Non-Continuation Decision and its disruptive effects;

c.    Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Defendants' Non-Continuation Decision and actions to effectuate it;

1        d.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 holding that

2 Defendants' Non-Continuation Decision and actions to effectuate it are unlawful because they

3 violate the APA;

4        e.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 holding that under 34

5 C.F.R. § 75.253(b) Defendants may only consider information relevant to a grantee's

6 performance when determining whether the grantee has met the requirements of 34 C.F.R. §

7 75.253(a); and this determination excludes consideration of new Department priorities not in

8 effect when the grant was originally awarded;

9        f.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

10 fees, pursuant to 28 U.S.C. § 2412; and

11       g.      Award such other relief as this Court may deem just and proper.

12       DATED this 30th day of June 2025.

COMPLAINT FOR INJUNCTION AND
DECLARATORY RELIEF

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

| | |
|---|---|
| 1 | NICHOLAS W. BROWN<br>Attorney General of Washington |
| 2 | |
| 3 | /s/ Ellen Range<br>ELLEN RANGE, WSBA #51334<br>JENNIFER K. CHUNG, WSBA #51583 |
| 4 | LUCY WOLF, WSBA #59028<br>Assistant Attorneys General |
| 5 | Complex Litigation Division<br>CYNTHIA ALEXANDER, WSBA #46019 |
| 6 | Deputy Solicitor General<br>Washington State Office of the Attorney General |
| 7 | 800 Fifth Avenue, Suite 2000<br>Seattle, WA 98104-3188 |
| 8 | 206-464-7744<br>Ellen.Range@atg.wa.gov |
| 9 | Jennifer.Chung@atg.wa.gov<br>Lucy.Wolf@atg.wa.gov |
| 10 | Cynthia.Alexander@atg.wa.gov |

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Ellen Range*
ELLEN RANGE, WSBA #51334
JENNIFER K. CHUNG, WSBA #51583
LUCY WOLF, WSBA #59028
Assistant Attorneys General
Complex Litigation Division
CYNTHIA ALEXANDER, WSBA #46019
Deputy Solicitor General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Ellen.Range@atg.wa.gov
Jennifer.Chung@atg.wa.gov
Lucy.Wolf@atg.wa.gov
Cynthia.Alexander@atg.wa.gov

*Attorneys for State of Washington*

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Sarah H. Weiss*
SARAH H. WEISS*
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
Sarah.Weiss@coag.gov

*Attorney for State of Colorado*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
JENNIFER-KATE AARONSON*
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

ROB BONTA
Attorney General of California

*/s/ Crystal Adams*
CRYSTAL ADAMS*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KATHLEEN BOERGERS*
Supervising Deputy Attorney General
KATHERINE MILTON*
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
916-210-7522
Crystal.Adams@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Katherine.Milton@doj.ca.gov

*Attorneys for State of California*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Andrew Ammirati*
ANDREW AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorney for State of Connecticut*

KWAME RAOUL
Attorney General of Illinois

*/s/ Emily Hirsch*
EMILY HIRSCH*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-835-0148
Emily.Hirsch@ilag.gov

*Attorney for State of Illinois*

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF                    44            ATTORNEY GENERAL OF WASHINGTON
                                                    Complex Litigation Division
                                                    800 Fifth Avenue, Suite 2000
                                                    Seattle, WA 98104
                                                    206-464-7744

AARON M. FREY
Attorney General of Maine

*/s/ Sarah A. Forster*
SARAH A. FORSTER*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Sarah.Forster@maine.gov

*Attorney for the State of Maine*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS*
Chief State Trial Counsel
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2277
Katherine.Dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Aletheia V.P. Allen*
ALETHEIA V.P. ALLEN*
Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
Aallen@nmdoj.gov

*Attorney for State of New Mexico*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us

*Attorney for State of Maryland*

DANA NESSEL
Attorney General for the People of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorney for the People of Michigan*

LETITIA JAMES
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Special Counsel for Federal Initiatives
MARK LADOV*
Special Counsel
28 Liberty Street
New York, NY 10005
212-416-8240
Rabia.Muqaddam@ag.ny.gov
Mark.Ladov@ag.ny.gov

*Attorneys for the State of New York*

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

AARON FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702-486-3420
HStern@ag.nv.gov

*Attorney for State of Nevada*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Kyla Duffy*
KYLA DUFFY*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2809
Kduffy@riag.ri.gov

*Attorney for State of Rhode Island*

DAN RAYFIELD
Attorney General of Oregon

*/s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
971-673-1880
Brian.S.Marshall@doj.oregon.gov

*Attorney for State of Oregon*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Frances Reynolds Colbert*
FRANCES REYNOLDS COLBERT*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-266-9226
Frances.Colbert@wisdoj.gov

*Attorney for State of Wisconsin*

*Pro hac vice forthcoming*

COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744