Judge Evanson

1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10

STATE OF WASHINGTON, et al.,

CASE NO.  C25-1228KKE

Plaintiffs,

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

v.

UNITED STATES DEPARTMENT OF
EDUCATION, et al.,

Defendants.

Defendants Linda McMahon, in her official capacity, and the U.S. Department of Education (collectively, "the Department"), submit this opposition to the motion for preliminary injunction filed by the States of Washington, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, New Mexico, New York, Nevada, Oregon, Rhode Island, Wisconsin, Massachusetts, and Michigan (collectively, "the States").

## INTRODUCTION

Under the Department's contractual grant agreements with school districts, regional education agencies, state education departments, and universities (collectively, the "Grantees"), the Department is required to determine that continuation of the awards is in the best interest of the federal government before obligating funding for each new year of the grant agreements.  If the

Department, in the exercise of its discretion, determines it is not, it decides to not renew the grants. On April 29, 2025, the Department's Office of Elementary and Secondary Education ("OESE") determined that the Grantees' grants no longer served the government's best interest and discontinued funding the awards for another year.

Discontinuation does not take effect until the beginning of the 2026 calendar year—and Grantees can continue to accrue expenses from this year's already obligated funds for the remainder of the year and make drawdown requests for a period of 120 days afterwards. Yet the States (but not the Grantees, who are not parties to this case) ask this Court for emergency relief from the discontinuation decisions, which they claim will cause "immediate" harm. Dkt. 49 at 2. Because the challenged decisions do not pose any imminent, irreparable harm and the States are unlikely to succeed on the merits, the Court should decline the States' request.

## STATEMENT OF FACTS

On October 4, 2022, OESE issued a Notice Inviting Applications ("NIA") directed at State Education Agencies ("SEAs")[1] and Local Education Agencies ("LEAs")[2] to solicit applications for the School-Based Mental Health Services Grant Program ("SBMH"). *Applications for New Awards; School-Based Mental Health Services Grant Program*, 87 Fed. Reg. 60,137 (Oct. 4, 2022). The NIA explained that the purpose of SBMH is to "increase the number of credentialed … school-based mental health services providers … providing mental health services to students in LEAs with demonstrated need[.]" *Id.* at 60,138.[3]

On the same date, OESE issued an NIA to solicit applications for the Mental Health Service Professional Demonstration Grant Program ("MHSP"). *Applications for New Awards; Mental Health Service Professional Demonstration Grant Program*, 87 Fed. Reg. 60,144 (Oct. 4, 2022). That NIA explained that the purpose of MHSP is to "increase the number and diversity of high-

---

[1] As defined at 20 U.S.C. §7801(49).

[2] As defined at 20 U.S.C. §7801(30).

[3] The Department repeated this process for fiscal year 2024. *See* 89 Fed. Reg. 15,173 (Mar. 1, 2024).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 2
(Case No. C25-1228KKE)

quality, trained providers available to address the shortages of mental health service professionals in schools served by high-need LEAs[.]" *Id.* at 60,145.[4]

SBMH and MHSP funding is conditioned upon recipients' "various assurances[,] including those applicable to Federal civil rights laws prohibiting discrimination in programs or activities receiving Federal financial assistance from the Department." *Id.* at 60,143, 60,150. Furthermore, the NIAs were explicit that for multi-year awards, funding for future years was not guaranteed and would depend upon the Secretary of Education's decision to make a "continuation award." *Id.* at 60,144, 60,151. The Secretary's decision-making authority was delegated to OESE. 20 U.S.C. §3414.

The Department's duly enacted regulations—cited to by the NIAs—govern continuation awards and establish mandatory criteria for award funding to continue. *See* 87 Fed. Reg. 60,144, 60,151 (citing 34 C.F.R. §75.253). There are five separate elements of the continuation criteria; they require the grantee to:

1. Either "demonstrate it has made substantial progress" toward the project goals or "[o]btain the Secretary's approval for changes to the project." 34 C.F.R. §75.253.

2. "Submit all reports as required by [34 C.F.R.] §75.118[.]" *Id.* at §75.253.

3. "Continue to meet all applicable eligibility requirements of the grant program[.]" *Id.*

4. "Maintain financial and administrative management systems that meet the requirements in 2 CFR [§§] 200.302[,] 200.303[.]" 34 C.F.R. §75.253.

5. "Receive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." *Id.*

The Grantees each applied for funding in response to the NIAs and were awarded SBMH grants, MHSP grants, or both. *See generally* Dkts. 51-57, 59–106. On April 29, 2025, the Department informed each of the Grantees that they had not qualified for a continuation award for

---

[4] The Department repeated this process for fiscal years 2023 and 2024. *See* 87 Fed. Reg. 72,976 (Nov. 28, 2022); 89 Fed. Reg. 15,180 (Mar. 1, 2024).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 3
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

the 2026 calendar year.  *See, e.g.*, Dkt. 106-2 ("Notice of Non-Continuation").  The Notice of Non-Continuation informed Grantees:

> The Department has undertaken a review of grants and determined that [Grantee's award] provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

*Id.*  The Notices each concluded that the relevant grant was "therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued."  *Id.*

The Notices offered Grantees the opportunity to "request reconsideration of this decision," *id.*, pursuant to 34 C.F.R. §75.253(g), which outlines the procedures for such an appeal.  Most of the Grantees appear to have requested reconsideration but then withdrew their requests when this suit was filed.  *See generally* Dkts. 51-57, 59–106.

The Notices of Non-Continuation further informed Grantees of their grant closeout responsibilities and the requirement that they "submit all final reports by no later than 120 calendar days after the end of the grant period of performance."  Dkt. 106-2.  Accordingly, the Grantees' grants' budget period will end December 31, 2025, with a standard 120-day liquidation extension until April 30, 2026.  Only then will Grantees lose access to grant funds under these awards.  There are no new restrictions on how the current year's funds may be used.  The Department intends to reissue NIAs for remaining SBMH and MHSP funds, and Grantees are welcome to submit applications for these funds.  Carr Decl. ¶9.

## STANDARDS OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary injunction the movant must establish (1) he or she is likely to succeed on the merits of his claim, (2) he or she is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his or her favor, and (4) a preliminary injunction is in the public interest.  *Baird v. Bonta*, 81 F.4th 1036, 1040

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 4
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

(9th Cir. 2023).  When the nonmovant is the government, the last two factors "merge."  *Nken v.*

*Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    THE STATES HAVE NOT CARRIED THEIR BURDEN TO PROVE STANDING IN RELATION TO EACH GRANTEE

"The party invoking federal jurisdiction bears the burden of establishing" the elements of

standing, and "each element must be supported in the same way as any other matter on which the

plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the

successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Yet the

States make no attempt here to prove their standing to represent the interests of third-party grantees.

Accordingly, this Court must deny the requested relief with respect to claims for which the Plaintiff

states are unable to show that the Grantees they purport to represent are arms of the state rather than

non-governmental organizations, municipal corporations, or other political subdivisions.  *See Trump*

*v. CASA, Inc.,* __ U.S. __, 145 S.Ct. 2540, 2563 (2025) (permitting preliminary injunction to stand

only as "necessary to provide complete relief to each plaintiff with standing to sue.");  *TransUnion*

*LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (because "standing is not dispensed in gross," plaintiffs

must "demonstrate standing for each claim that they press and for each form of relief that they

seek");  *cf. Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1030 (9th Cir. 2023) (en banc) (outlining the test

for determining whether entities are arms of the state in the context of Eleventh Amendment

immunity from suit).

In their complaint, the States assert that each named state Attorney General is authorized to

pursue legal actions on behalf of the state.  *See* Dkt. 1, ¶¶21–36.  But they do not identify which of

the Grantees are state entities on behalf of which the States have standing to sue.  While for some

Grantees that proposition may be easier to prove, *see, e.g.*, Dkt. 104 (declaration identifying the

University of Washington as a Grantee), for others that proposition is far from self-evident.  Take for

example, Grantee Para Los Ninos. Dkt. 56. Para Los Ninos is not a plaintiff in this action.  Declarant

Andrew Furedi describes Para Los Ninos as an organization founded "in 1980 in the Central City

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 5
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

East neighborhood of Downtown Los Angeles" that, among other things, "brings together community members with community-based organizations, city and county agencies, elected officials, and businesses to address social determinants of health." Dkt. 56, ¶4. While Para Los Ninos collaborates with some Los Angeles-based charter schools and applied for and received an SBMH grant in 2022, *id.*, ¶¶8–9, the state of California has provided no information establishing that it has standing to represent the interests of this non-governmental, 501(c)(3) non-profit organization that is not a plaintiff in this lawsuit. So far as the filings reveal, California's claim and requested relief as to Para Los Ninos is entirely premised on the unjustified premise that the federal government may be compelled to continue paying a nonparty simply because California thinks it should. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (it is well established that each party "must assert his own legal rights" and may not invoke the rights of "third parties").

Consider, too, non-plaintiff Educational Service District 112, described as one of nine statutory regional education service organizations in Washington created by the state legislature. Dkt. 100, ¶4. It is not obvious that ESDs in Washington, which represent groups of school districts, *see id.*, can themselves be represented by Washington as arms of the state in federal court. Indeed, precedent indicates that school districts in Washington can be *sued by* the State, tending to negate the inference that they are state instrumentalities. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 459 (1982). Moreover, the legal status of school districts *vis a vis* the government of the state in which they are located no doubt varies by state. Given these realities, the States must be put to their burden to demonstrate their standing in relation to each Grantee and each claim here. To the extent the grants the States seek to enforce are not their own, the States lack standing for their requested remedies and no relief may be awarded to non-plaintiff Grantees.

The States may respond that they have standing to vindicate the rights of their non-plaintiff school children. But such concerns about their citizens' health and well-being are *parens patriae* claims that do not provide a basis to challenge the Department's actions. *Murthy v. Missouri*, 603 U.S. 43, 76 (2024); *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) ("[a] State does not have standing as *parens patriae* to bring an action against the Federal Government") (simplified).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 6
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski*, 543 U.S. at 129 (simplified).  In order to invoke federal court jurisdiction to challenge federal government policy, the States must show a cognizable harm to themselves, not just to their students or their resident non-state entities.

The States also may try to rest on their assertions that if the Non-Continuation decisions are not rescinded, some Grantees "will be forced to lay off project staff and mental health service providers, reducing access to much-needed mental health services for students" in the States' rural and low-income schools, which will lead to a "spillover effect of students turning to community mental health services," which, in turn, will "tax [the States'] already-strained mental health care systems."  Dkt. 49 at 14.[5]  But this theory of fiscal injury is too speculative and too contingent to confer standing.  *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013) ("highly attenuated chain of possibilities" insufficient to show standing); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *cf. Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (finding standing because MOHELA was a "public instrumentality" of the state, the Secretary of Education's loan-discharge plan would immediately cause a "financial harm" to it, and the federal government conceded that harm was "an injury in fact *directly traceable* to the Secretary's plan" (emphasis added)).  Here, Grantees will be able to incur obligations under their current performance period through December 31, 2025, and will not lose access to funds until April 30, 2026.  Further, because the Department intends to reissue NIAs for remaining SBMH and MHSP funds, Grantees can reapply and might receive renewed grants, preventing the "spillover effect" about which the States hypothesize.  *See* Carr Decl. ¶9.  The States cannot show standing by speculating about downstream fiscal injuries that may depend upon third-party grantees' decisions to reapply for funding from the Department or an alternative source.

---

[5]  The States' assertion of standing on this basis lends further credence to the Departments' argument, *infra*, that the States' claims are contractual in nature and are subject to dismissal as impliedly forbidden by the Tucker Act.  *See Am. Libr. Ass'n v. Sonderling*, 2025 WL 1615771, at *8 (D.D.C. June 6, 2025) (citing the declarations filed in support of a motion for a preliminary injunction to determine that "[g]rant terminations are also the heart and soul of plaintiffs' standing and irreparable harm arguments" and the "plaintiffs' standing and irreparable injury largely do not exist prior to and apart from rights created under their grant agreements").

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 7
(Case No. C25-1228KKE)

Before proceeding further, the Court should require the States to show their standing to represent each Grantee.    Relatedly, the Court should dismiss Plaintiff State Nevada, altogether.  As the declaration from a deputy superintendent of the Nevada Department of Education shows, the grant at issue—the only one relied upon by Nevada as a party to this suit—expires by its own terms on September 30, 2025.  Dkt. 92, ¶8 (listing the five-year grant cycle for the SBMH grant as October 1, 2020–September 30, 2025).  Nevada will suffer no injury whatsoever from the Non-Continuation decision because the grant would have ended regardless during this final performance year.

## II.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS ACTION

"The Court has an independent duty to assure itself of subject-matter jurisdiction." *MSC Mediterranean Shipping Co. S.A. v. BNSF Ry. Co.*, 735 F.Supp.3d 1203, 1205 (C.D. Cal. 2024) (citing *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1116 (9th Cir. 2004)).  The Court does not have jurisdiction because contractual claims belong exclusively to the Court of Federal Claims, and, in any event, an agency's decision on how to spend funding from a lump-sum appropriation is committed to agency discretion by law.

### i. *Contractual claims can only be brought in the Court of Federal Claims.*

The States argue that the Grantees are entitled to the payment of millions of dollars pursuant to their discontinued contractual grant agreements.  In challenging their discontinuation, the States seek an order to enforce the Department's alleged contractual obligations to pay.  Specifically, they seek a preliminary injunction ordering the Department be enjoined "(1) from implementing or enforcing through any means the Non-Continuation Decision, including recompeting Program funds; and (2) from reinstituting the Non-Continuation Decision based on the same or similar reasons, including denying a continuation award based on performance issues, if any, caused by the Department's Non-Continuation Decision and its disruptive effects."  Dkt. 49 at 33.  While the States assert the discontinuation decision violates the APA or the Constitution, their requested relief

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 8
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

is premised on—and ultimately seeks to enforce—existing contracts with the United States.  In short, the States ask for specific performance of a contractual agreement.

Those essential facts—that the States seek to enforce contractual rights and are seeking contractual remedies—trigger jurisdiction in the Court of Federal Claims under the Tucker Act. Where a party seeks funding that it believes the government is obligated to pay pursuant to a contract or grant, the Tucker Act "impliedly forbids" judicial review under the APA.  5 U.S.C. §702; *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998).[6]  The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. §1491(a)(1).  And the Tucker Act's jurisdiction, and its waiver of sovereign immunity for monetary relief, is exclusive.  *Tucson Airport Auth.*, 136 F.3d at 646.

Regardless of how a claim is styled, a district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (*quoting Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004).  Thus, the States cannot escape the Tucker Act's jurisdictional bar by formulating their contract claims as APA claims.  *See Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025) ("[T]he APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money …. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.' 28 U.S.C. §1491(a)(1)."); *see also Tucson Airport Auth.*, 136 F.3d at 646.  This jurisdictional bar extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).  The proper

---

[6]  The APA also precludes judicial review if a party has an adequate legal remedy elsewhere.  5 U.S.C. §704.  However, this should not be conflated with the requirement that a cause of action not be "impliedly forbidden" under 5 U.S.C. §702.  They are "two distinct concepts."  *Tucson Airport Auth.*,136 F.3d at 646.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 9
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1    recourse for asserted violations of these grant agreements is a "suit in the Claims Court for damages

2    relating to [the] alleged breach." *Id.*[7]

3        Courts apply a straightforward test, followed in the Ninth Circuit and others, to determine

4    whether a claim falls within the exclusive Tucker Act jurisdiction of the Court of Federal Claims.

5    "The classification of a particular action as one which is or is not 'at its essence' a contract action

6    depends both on [1] the source of the rights upon which the Plaintiff bases its claims, and upon [2]

7    the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968; *see also United*

8    *Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*).

9        Here, both factors support a finding that the Court lacks jurisdiction over what are essentially

10    claims that lie in contract: (1) the source of Grantees' rights to funds previously awarded are

11    contractual grant agreements, and (2) the relief sought in this case amounts to the remaining,

12    undisbursed value of those agreements.

13        Underlying the grant agreements upon which the States bring their challenges are (1) an

14    application, *i.e.*, offer, to use the funding to provide mental health services; and (2) an acceptance by

15    the government, once it has determined that the activity proposed in the application serves the

16    government's interest.  *See Applications for New Awards; School-Based Mental Health Services*

17    *Grant Program*, 87 Fed. Reg. 60,137 (Oct. 4, 2022); *Applications for New Awards; Mental Health*

18    *Service Professional Demonstration Grant Program*, 87 Fed. Reg. 60,144 (Oct. 4, 2022).  The

19    payments of the grant awards are premised upon a series of terms and conditions that allow the

20    government to oversee the grantees and ensure stewardship of taxpayer dollars.  The very first term

21    of the awards' terms and conditions states: "THIS AWARD SUPPORTS ONLY THE [ONE YEAR]

22    BUDGET PERIOD SHOWN IN BLOCK 6.  IN ACCORDANCE WITH 34 CFR 75.253, THE

23    SECRETARY CONSIDERS, AMONG OTHER THINGS, CONTINUED FUNDING IF: [six

24

_____

25    [7]  In a lengthy order issued only days before this memorandum was filed, the Southern of District of New York denied a
motion for a preliminary injunction brought by many of the same states who are Plaintiffs in this action.  The States

26    sought an injunction restraining the termination of grants issued by the National Science Foundation.  Concluding that
the States claims were primarily contractual in nature, the Court decided that the States failed to carry their burden of

27    demonstrating that the Court had subject matter jurisdiction over their APA claims.  *See New York v. Nat'l Science
Found.*, 2025 WL 2180478, at *22 (S.D.N.Y. Aug. 1, 2025).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 10
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

requirements are met, including] THE DEPARTMENT DETERMINES THAT CONTINUING THE PROJECT WOULD BE IN THE BEST INTEREST OF THE GOVERNMENT." Dkt. 100-1 at 5 (MHSP grant); *see also* Dkt. 102-2 at 5 (SBMH grant).

The conclusion that the States are seeking to enforce contractual agreements on behalf of Grantees, regardless of the framing of their claims, accords with recent Supreme Court instruction. The Supreme Court recently granted a stay of an order to make payments based on certain grant agreements, concluding that the Department was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA." *California*, 145 S.Ct. at 968. That reasoning, which applies with full force here,[8] required a finding that actions to acquire unpaid grant funds were essentially contract actions. In *California*, a number of states challenged the Department's termination of various education-related grants for "discriminatory practices— including in the form of DEI" as violative of the APA. Appl. to Vacate Order Issued by U.S. Dist. Ct. for Dist. of Mass. & Request for Immediate Admin. Stay at *5, *California*, 145 S.Ct. 966, 2025 WL 945313 (Mar. 2025) (quotation omitted). The district court temporarily enjoined the grant terminations, and the district court and the First Circuit denied motions to stay that injunction. *See California v. Dep't of Educ.*, 132 F.4th 92, 101 (1st Cir. 2025). The Supreme Court, however, concluded that the lower court likely lacked jurisdiction because the remedy sought was ultimately an order to "enforce [the Government's] contractual obligation to pay money." *California*, 145 S.Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). The contracts at issue in *California* were government grants awards. *Id.* The Court identified the contractual grant award, considered the remedy sought, and concluded jurisdiction was likely precluded.

After *California*, the Fourth Circuit recently stayed a district court injunction nearly identical to the one sought here. *Sustainability Inst. v. Trump*, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Plaintiffs there brought APA and *ultra vires* constitutional claims against federal defendants

---

[8] The Supreme Court recently clarified that its "interim orders," like that in *California*, should "inform how a court should exercise its equitable discretion *in like cases*." *Trump v. Boyle*, --S.Ct.-- , 2025 WL 2056889 (July 23, 2025) (emphasis added).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 11
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

and, by virtue of those purported legal infirmities, sought to reverse or prevent grant terminations. *Id.* Looking to *California*, and the law it applied, the Fourth Circuit concluded that those defendants were likely to succeed in showing that the district court lacked jurisdiction. "While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* The same is true here. Moreover, the Circuit concluded that the *ultra vires* claims that alleged constitutional violations did not change this calculus, as they were still subsumed by the contracts and foreclosed by Congress's statutory scheme. *See id.*

Other courts—and most notably a district court in New Mexico deciding an identical case to this one—have since followed suit in finding claims barred by the Tucker Act. *See Bd. of Educ. for Silver Consol. Schs. v. McMahon.*, --F.Supp.3d--, 2025 WL 2017177 (D.N.M. July 18, 2025). In *Silver Consolidated Schools*, the plaintiff—a SBMH grant recipient—challenged the Non-Continuation decision on constitutional and APA grounds. *Id.* at *2. The court found that the plaintiff's claims "belong in the Court of Federal Claims" because "ultimately the controversy is over a contract." *Id.* at *7. The court stated that "at the end of the day, the reasoning of [*California*] controls." *Id.* at *8.[9]  *See also Amica Center for Immigrant Rights v. U.S. Dep't of Just.*, 2025 WL 1852762, at *17 (D.D.C. July 6, 2025) ("Plaintiffs … may not circumvent the Tucker Act or the APA's reviewability bar by reframing an alleged statutory violation as a constitutional claim.").

Similarly, here jurisdiction is committed to the Court of Federal Claims notwithstanding that the States argue that the Grantees' agreements were terminated for unconstitutional reasons or in excess of statutory authority. *See Van Drasek v. Lehman*, 762 F.2d 1065, 1071 (D.C. Cir. 1985). Such arguments are not excluded from Tucker Act jurisdiction because, it is the grant agreements, issued pursuant to statutes that authorize the disbursement of federal funds, that are money-

---

[9]  In the alternative, the court addressed the claims on their merits and concluded that the plaintiff failed to show a likelihood of success on the merits or irreparable harm. *Id.* at *8–12. And it "decline[d] to formally conclude the balance of equities and public interest factors weigh in Plaintiff's favor," explaining, "these factors are a wash because the 'wisdom' of decisions by the Executive branch is 'none of [the Court's] concern.'" *Id.* at *13 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020)).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 12
(Case No. C25-1228KKE)

mandating.  *See Boaz Hous. Auth.*, 994 F.3d at 1364; *and see Tucson Airport Auth.*, 136 F.3d at 648 ("[T]he Tucker Act prevents constitutional claims that are dependent on rights under a government contract from being brought in the district court.").

To be sure, the States assert that the Grantees' agreements were discontinued in violation of their constitutional and statutory rights—but the Court of Federal Claims can consider those constitutional and statutory issues in the context of determining whether the States are entitled to relief, *e.g.*, whether the agreements were improperly discontinued.  *Cf. Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680 (1986) ("we will not indulge the … assumption that Congress contemplated review … of 'trivial' monetary claims but intended no review at all of substantial statutory and constitutional challenges").  Here, while the States nominally bring Spending Clause claims, the substance of their claims is that the terminations of the agreements violate contracts; such claims are properly within the scope of the Tucker Act.  *See Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022); *Consol. Edison Co. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385 (Fed. Cir. 2001).  The States cannot evade the Court of Federal Claims' mandatory jurisdiction over the Grantees' money claims through tactical briefing, and this Court should "not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."  *Id.* at 1385.[10]

The States also satisfy the second factor of the *Megapulse* analysis because the relief they seek is essentially a monetary remedy.  This inquiry "boils down to whether the plaintiff effectively seeks to attain monetary damages in this suit."  *Crowley*, 38 F.4th at 1107.  Here, the States purport to seek equitable relief—but the effect of that relief is to order specific performance of grant agreements, *i.e.*, for the government to pay money.

---

[10] While Plaintiffs' contract-based claims are clearly money-mandating and therefore fully cognizable by the Court of Federal Claims under the Tucker Act, the Ninth Circuit has never made that a requirement for the Tucker Act's preclusion of APA claims.  Thus, in *Tucson Airport Auth.*, a contract that was not money-mandating but instead imposed a duty on the federal government to provide plaintiff a defense in actions brought by third-party was the basis for Tucker Act preclusion.  136 F.3d at 648; *and see Doe v. Tenet*, 329 F.3d 1135, 1141 (9th Cir. 2003), *rev'd on other grounds*, 544 U.S. 1 (2005) ("The fact that the Court of Federal Claims has no power to grant specific enforcement of a contract does not mean that a suit for specific enforcement can be brought in district court.").

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 13
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1    At bottom, in seeking to enjoin the Non-Continuation decisions, the States seek an injunction

2  to maintain payments pursuant to contracts with the United States.  In other words, the States

3  "want[] the Government to keep paying up."  *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,

4  770 F.Supp.3d 155, 163 (D.D.C.), *injunction pending appeal denied*, (D.C. Cir. Mar. 28, 2025) (per

5  curiam).  Because the claims here are "founded upon a contract" they "must be heard in Claims

6  Court."  *Id.*  at \*7 (citing *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.)

7  ("We know of no case in which a court has asserted jurisdiction … to issue an injunction compelling

8  the United States to fulfill its contractual obligations.")).  The States' request would amount to an

9  order to "enforce [the Government's] contractual obligation to pay money," *California*, 145 S.Ct. at

10  968 (citation omitted), and cannot move forward in this Court.

11                   *ii.  OESE's decision not to continue the contract is unreviewable under the APA.*

12    APA review is unavailable when "agency action is committed to agency discretion by law."

13  5 U.S.C. §701(a)(2); *Spencer Enters., Inc. v. United States*, 345 F.3d 638, 691 (9th Cir. 2003).  The

14  test to determine whether an action is committed to agency discretion asks whether there is a

15  "meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v.*

16  *Chaney*, 470 U.S. 821, 830 (1985); *see also Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000)

17  (discussing *Chaney*).

18    *Lincoln v. Vigil* is the seminal case concerning §701(a)(2) in the context of an agency's

19  decision to repurpose lump-sum appropriations.  508 U.S. 182 (1993).  There, the Supreme Court

20  reviewed the Indian Health Service's ("IHS") decision to discontinue funding for mental health

21  treatment centers for Indian children in the Southwest United States, which had been supported by

22  appropriations under the Snyder Act, 25 U.S.C. §13.  The Act authorized IHS to "expend such

23  moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the

24  Indians," and for the "relief of distress and conservation of health."  *Id*.  Ultimately, IHS

25  "discontinued the direct clinical services to Indian children in the Southwest" in order to repurpose

26  the funding to align with the agency's new priority of providing services nationwide.  *Lincoln*,

27  508 U.S. at 188.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 14
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

When recipients of services in the Southwest sued to enjoin IHS from repurposing the funds, IHS argued that the decision was committed to agency discretion by law under APA §701(a)(2). *Id.* at 189. The district court and court of appeals rejected the argument based on the understanding that there is a presumption of reviewability under the APA; however, they were reversed by the Supreme Court, which held that such a presumption was overcome in this context and that "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 189–192.

*Lincoln* is squarely on point with respect to the States' claims here, thus they too are unreviewable under APA §701(a)(2). The Department, like IHS, received a lump-sum appropriation to help improve youth mental health. The Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1342 (June 25, 2022)—which funds MHSP and SBMH and shares similar goals as the Snyder Act to improve health outcomes—authorized the agency to spend appropriated funds on "activities under section 4108 of the ESEA" which in turn directs funds to be used to develop, implement, and evaluate comprehensive programs and activities that "foster safe, healthy, supportive, and drug-free environments that support student academic achievement." 20 U.S.C. §7114. Congress, however, left it to the agency to determine how best to achieve those objectives.

The Department, like IHS before it, carried out Congress's marching orders to craft specific programming that sought to address Congress's goals. Where IHS determined to use the appropriations to fund health centers in the Southwest, the Department determined to use its appropriations to fund SBMH and MHSP. In both instances, when the agencies concluded that they could better effectuate Congress's goals a different way, IHS and the Department sought to discontinue the current use of funding and repurpose it. Because this is "the very point of a lump-sum appropriation," it is committed to the agency's discretion. *Lincoln*, 508 U.S. at 192. It is incumbent upon the Department to "meet its statutory responsibilities in what it sees as the most effective or desirable way," *id.*; therefore, it is not just appropriate but indeed required that the

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 15
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Department exercise its discretion to constantly reevaluate its use of lump-sum appropriations to ensure Congress's objectives are advanced.

If there is any daylight to be found between the two cases, it is that the Department had actual contract agreements with the Grantees, and the express terms of those agreements provided the Grantees with notice that the continuation of funding was not guaranteed, as it would depend upon the Secretary's determination that, among other things, the use of funds was still in the "best interest of the Federal Government." 34 C.F.R. §75.253(a)(5). The "best interest of the government" is a policy question best left to the Executive Branch to determine. *See Milk Train v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002). There are many different conceptions of what the "best interest" could be, and thus it does not provide a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830; *see also Silver Consol. Schs.*, 2025 WL 2017177, at *11 (an identical case, concluding the Department's decision about how to allocate funds under the Bipartisan Safer Communities Act "seems like a quintessential decision committed to agency discretion by law").

Because an agency's decision to discontinue a certain use of lump-sum appropriations is committed to the agency's discretion by law, the States' claims are unreviewable.

### III. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

> *i. Even if the APA permits review, the States are unlikely to prevail on their claim that the Department's Non-Continuation decisions were arbitrary and capricious.*

A court's review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and merely examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quotation marks omitted). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." *Id.* at 515. It "suffices that the new policy is permissible under the statute, that there are good

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 16
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* Because the Department's actions were reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), they satisfy the deferential "arbitrary and capricious" standard.

Notwithstanding the questionable premise that an agency must explain a decision *not* to spend its lump-sum appropriation in a certain manner, *see supra*, OESE's review of SBMH and MHSP grant awards was individualized and well-reasoned. In conducting its review, OESE identified four policy priorities that it used as the criteria for determining the "best interest of the Federal Government": (1) advancing civil rights, (2) prioritizing merit, fairness and excellence in education, (3) supporting the well-being of students the program intends to help, and (4) ensuring the appropriate use of federal funds. *See* Notice of Non-Continuation at 1. Moreover, in its notices, the Department explained that the grants were ending based on non-continuation authorities available when the Grantees received the grant awards. *Id.* So, the agency, pursuant to terms previously laid out, effectuated a long-held authority to determine whether grant awards are in conformity with current policy. That is well within the bounds of reasonable explanation.

The States claim the Department failed to consider the Grantees' reliance interests. Dkt. 49 at 26–27. But OESE was explicit in its NIAs seeking applicants that funding for future years was not guaranteed but contingent upon a "continuation award under 34 CFR 75.253." 87 Fed. Reg. at 60,144, 60,151. And the continuation requirement was also included in each grant's terms and conditions. Thus, from the very beginning of the contractual relationship, Grantees were on notice that they should not develop reliance interests because future years' funding was not guaranteed.

The States' remaining arbitrary-and-capricious arguments rest on conjecture. The States cite to a news article published three-days after the Non-Continuation decisions were issued, which notes that it "is unclear exactly how many of the 265 grantees listed on the Education Department's website lost their funding." Dkt. 50-9 at 6. The article also states that "The Indiana Department of Education, Fort Wayne Community Schools in Indiana, and Norma[n] Public Schools in Oklahoma," as of the time of publication, said that "they hadn't been contacted about changes to

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 17
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

their funding." *Id.* at 7.  The States then cite the Department webpages showing MHSP grants to Indiana in FY2023 (Dkt. 50-10) and SBMH grants to Oklahoma in FY2024 (Dkt. 50-11).  Contrary to the States' suggestion, this evidence sheds no light on whether those grants were ultimately discontinued, nor does it show that the Department "did not apply the same standards to all Program grants in deciding which grants to discontinue." Dkt. 49 at 28.[11]

Similarly, the States assert, with no support, "*[t]o the extent* that Defendants[] discontinued Program grants based on applicants' compliance with the GEPA Equity Directive, the Non-Continuation Decision was arbitrary and capricious." *Id.* (emphasis added).  But they cite nothing to suggest that grants were discontinued for this reason.  Instead, they cite only a statement from a Department spokesperson in the above-referenced news article, that "Grant recipients used the funding to implement race-based actions like recruiting quotas *in ways that* have nothing to do with mental health and could hurt the very students the grants are supposed to help." Dkt. 50-9 at 4 (emphasis added).  That is not evidence that grants were discontinued because of compliance with the GEPA Equity Directive.

Of the 134 SBMH grantees, OESE's individualized review resulted in the decision not to continue 70 awards.  Carr Decl. ¶3.  Of the 205 MHSP grantees, OESE's individualized review resulted in the decision not to continue 153 awards.  Carr Decl. ¶6.  This shows OESE's diligence in reviewing awards on an individual basis to determine whether they continued to serve the best interest of the federal government.  Because OESE conducted an individualized review to determine alignment with articulated criteria for what it understood to be the government's best interest, and it was clear from the beginning that funding was contingent and should not be relied upon, OESE's decisions pass the APA's deferential arbitrary and capricious review.

---

[11]  Indeed, the States concede that in making continuation decisions, the Department, among other things, considers "any relevant information regarding grantee performance." *Id.* at 14 (quoting applicable regulations).  Just because, as the States argue, the alleged "non-discontinued grants are a part of the same Programs, were awarded using the same application criteria, and necessarily reflect the same prior Administration's priorities and policy preferences," *id.* at 28, does not show that there were no *differences* between the grant programs that the Department could review as relevant to its discontinuation decisions.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 18
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1          *ii.  The States are not likely to prevail on their contrary to law claim.*

2        Even if the States' APA claims are reviewable, they have not shown that the Department's

3      non-continuation decisions were contrary to law under 5 U.S.C. §706(2)(A).  The States'

4      characterization of the process by which the Department determined that the grants would not be

5      renewed as "changing the game midstream" and "torpedoing multi-year, multi-million dollar

6      projects" entirely misperceives the nature of their grant agreements.  The Grantees did not receive

7      five-year grants.  And regardless of their expectations, the Grantees were never given a guarantee

8      that their grants would be renewed each year, or that the preference afforded to renewals over new

9      grant awards would supplant all other factors.  Indeed, the opposite is true.[12]  The grantees received

10     only conditionally renewable one-year grants based upon, among other conditions, a determination

11     by the Department each year that a renewal of the grant was "in the best interest of the Federal

12     Government."  34 C.F.R. §75.253(a)(5).

13       The States' effort to characterize the Department's decision to not renew their grants as an

14     application of new unlawful "priorities" also fails.  As the States recognize, "priorities" is a term

15     specific to the awarding of a *new* grant.  Dkt. 49, at 13, *ll.* 3-22; 34 C.F.R. §75.217.  But as to grant

16     *renewals*, the five factors in 34 C.F.R. §75.253 are determinative, not the priorities used by the

17     Department for grant selection.  Thus, a decision not to renew a grant because the Department, under

18     new leadership, determines that renewal of a grant is not in the best interest of the federal

19     government is not the unlawful imposition of a "new priority" on the Grantees.  They were already

20     selected for grant awards by a process that they do not challenge here.  The requirement that

21     continuation of their grants be in the best interest of the federal government is a condition of *renewal*

22     to which the grants were subject at the time they were awarded, as set forth in

23

24

25     ---
       [12] The preference given to continuation awards over new grants under 34 C.F.R. §75.253(c) is made expressly subject to

26     the criteria in subsections (a) and (b) of the regulation, including that the Department must determine that continuation is
       in the best interest of the federal government.  Thus, the Grantees' contention that non-performance based considerations
       of what is in the best interest of the federal government "are simply irrelevant to the continuation determination," dkt. 49

27     at 33, *ll.* 2-5, is plainly wrong.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 19
(Case No. C25-1228KKE)

34 C.F.R. §75.253(a)(5), a regulation promulgated under the notice and comment requirements of the APA.[13]

The States say that the Department acted contrary to law because in deciding not to renew the grants the Department considered factors other than grantee performance.  Dkt. 34 at 29, *ll.* 5 - 34, *l.* 2.  However, 34 C.F.R. §75.253 provides, as a separate and independent requirement for a continuation award, that the grantee "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government."  34 C.F.R. §75.253(a)(5).  Stated otherwise – even if a grantee is making substantial progress, submitting all required reports, and continuing to meet the eligibility requirements of the program, the Department's regulations impose a clear and separate requirement that each project receive a current determination that continuation is in the best interest of the federal government.  Resorting to various tools of statutory construction, the States argue fervently that this requirement means something other than what it clearly and straightforwardly says.  However, such contortions are unnecessary here because the meaning of the requirement is clear on its face.  *Pac. Mar. Ass'n v. Loc. 63, Int'l Longshoremen's & Warehousemen's Union*, 198 F.3d 1078, 1081 (9th Cir. 1999) ([I]f the statute is clear, one looks no further."); and *Diefenderfer v. Merit Sys. Prot. Bd.,* 194 F.3d 1275, 1278 (Fed. Cir. 1999) ("If the terms of the statute or regulation are unambiguous, no further inquiry is usually required.").  The Department's authority under the regulation is plain and unambiguous and thus the Court need "look no further."

However, because a straightforward application of this requirement is distinctly unhelpful to their case, the States skip over their obligation to demonstrate ambiguity and proceed directly to an argument that the regulation means something opposite of what it clearly says, using this maneuver to invent a meaning more to their liking and benefit.  This argument should be rejected.

Even if the Court were to overlook the absence of any ambiguity in the regulation, the States' effort to restrict the Department's purview in its renewal decisions to considering only the Grantees'

---

[13] Thus, contrary to the Grantees' argument, *see* dkt. 49 at 34, *ll.* 13 – 35, *l.* 2, the Department has already fulfilled any obligation to promulgate a regulation pursuant to notice and comment rulemaking before deciding not to renew the grants.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 20
(Case No. C25-1228KKE)

past performance fails.  An examination of the history of this regulation demonstrates that the best

interest determination has been a separate and independent requirement of the regulation since as far

back as 1980.  45 Fed. Reg. 22,497 (Apr. 3, 1980), redesignated at 45 Fed. Reg. 77,368 (Nov. 21,

1980). In 1997, for example, 34 C.F.R. §75.253 provided, in pertinent part, as follows:

> (a) The Secretary may make a continuation award for a budget period after the first budget period of an approved multi-year project if:
>> (1) The Congress has appropriated sufficient funds under the program;
>> (2) The recipient has either—
>>> (i) Made substantial progress toward meeting the objectives in its approved application; or
>>> (ii) Obtained the Secretary's approval of changes in the project that—
>>>> (A) Do not increase the cost of the grant; and
>>>> (B) Enable the recipient to meet those objectives in succeeding budget periods;
>> (3) The recipient has submitted all reports as required by § 75.118, and
>> (4) Continuation of the project is in the best interest of the Federal Government.
> (b) Subject to the criteria in paragraph (a) of this section, in selecting applications for funding under a program the Secretary gives priority to continuation awards over new grants.

Kipnis Decl., Ex. A.

The subsection of the current version of the regulation relied upon by the States as the basis

for their argument that the Department's may only consider Grantee performance in its best interest

determination, 34 C.F.R. §75.253(b), was added to the regulation much later.  It was first proposed

as an amendment to the current regulation in 2012 (77 Fed. Reg. 74,392), and the regulation was

amended to include it in 2013 (78 Fed. Reg. 49,338).

To support the States' argument, there would need to be some clear indication in the Notice

of Proposed Rulemaking (NPRM) that the Department's purpose in proposing this new subsection

was to limit the Department's preexisting unrestricted authority under the regulation in making a

best interest determination.  There is none.

The NRPM states that:

> Under current §75.253(a), a grantee may only receive a continuation award if the grantee has met certain requirements, *including the requirement that the grantee make substantial progress toward the objectives of the grant.*  If a grantee does not

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 21
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1    make substantial progress, it must obtain permission from the Department to make
2    changes to the project that would help the grantee make substantial progress during
     the remainder of the project period.

3    77 FR 74,392, 74,399 (emphasis added).  The NPRM explains that the reason for the proposed new

4    subsection is because "current §75.253 does not describe the standards used *to determine whether a*

5    *grantee has made substantial progress on its grant.*"  *Id.* (emphasis added).  Thus, according to the

6    NPRM, the purpose of the change is "to clarify the Department's standards."  *Id.*  Nowhere in the

7    NPRM does the Department indicate that the purpose of this new subsection of the regulation was to

8    limit its preexisting discretion under the entirely separate and independent requirement of the

9    regulation to decide that renewal of an existing grant is not in the best interest of the federal

10   government.

11        The earlier regulatory history relied on by the States (59 Fed. Reg. 30,258) is not to the

12   contrary.  Only by eliminating a crucial clause from a quoted sentence, and thereby changing the

13   meaning of the sentence completely, do the States sustain their argument. The States assert:

14        The Department explained that the same §75.253(a) standards would still apply—
          including the requirement "that continuation of the project is in the best interests of
15        the Federal Government"—but that performance report requirements would "take on
          increased importance" because "the continuation award decision ... will be based
16        entirely on the submission of reports." *Id.*

17   Dkt. 49, at 33, *ll.* 6-16.  In context, however, the recommendation under consideration was "to make

18   non-competing continuation awards on the basis of acceptable and timely performance reports

19   *without requiring the recipient to submit applications for those awards*."  59 Fed. Reg. at 30258

20   (emphasis added).  The Department noted continuation funding would be based on evidence that the

21   grantee has "met the standards for continuation included in 34 CFR 75.253," including that

22   continuation of the project is in the best interest of the federal government, and mentioning last that

23   "the grantee submit, as required by §75.118, every report that it must submit to get the continuation

24   award."  *Id.* at 30,259.  In the next sentence, (incompletely quoted by the States) the Department

25   said:

26        This last standard will take on increased importance under the amended regulations
          because the continuation award decision—including the decision about whether the
27        grantee has made substantial progress—will be based entirely on the submission of

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 22
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

reports as specified by the Secretary, *rather than on the submission of a continuation award application.*

*Id.* (emphasis added). The emphasized clause was omitted from the States' memorandum. Read in context, this statement clearly means that the requirement that the grantees submit the reports required by §75.118 will take on more importance because the decision whether or not the grantee has made substantial progress will "be based entirely" on the submission of those reports as the grantees will no longer be required to submit a "continuation award application." It does not have the meaning attributed to it by the States, *i.e.,* that grant renewal decisions will thereafter be based entirely on performance reports.

The States' effort to undermine the plain meaning of the regulation by relying on a passage in a guidance document is unavailing. Dkt. 49, at 31, *l.* 17 – 32, *l.* 14. The guidance text does not support the Grantee's interpretation of the regulation. Certainly, *one* reason that renewal of a grant might not be in the best interest of the federal government is poor performance by the grantee. However, nowhere in the passage of the document relied on by the grantee is there *any* indication that poor grantee performance is the *only* factor that the Department can consider in deciding that renewal of a grant is not in the best interest of the federal government. Moreover, in the event of any conflict between the guidance and the regulation, the regulation is controlling because the guidance document does not have the force and effect of law. *See Stork v. United States*, 278 F.Supp. 869, 876 (S.D. Cal. 1967), *aff'd*, 430 F.2d 1104 (9th Cir. 1970) ("The instructions in this manual were not promulgated in accordance with the Administrative Procedures Act, therefore, the regulations control over any conflicting provisions in the manual.")

Lastly, in deciding not to renew the grants, the Department did not violate the requirement of 34 C.F.R. §75.253(c) that the Department give preference to continuation award over new grants. As set forth previously, continuation is not a guarantee but is subject to the requirements of subsection (a) and (b) of the regulation including the requirement that the Department determine that renewal is in the best interest of the federal government. According to the States, this regulation was violated because they will be "forced" to submit new grant applications and be required to compete against other applicants for a new grant. However, under the States' construction of the regulation,

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 23
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1    the Department could never decide not to renew a grant unless it also barred the discontinued grantee

2    from applying for a future grant.  Because the Department ordinarily lacks that authority, the States'

3    interpretation of the regulation would essentially mean that the Department could never decide not to

4    renew a grant, thereby eviscerating the purpose of the regulation entirely.  That cannot be a correct

5    interpretation of the Department's authority under the regulation.  *See Medberry v. Hegstrom*, 786

6    F.2d 1389, 1391 (9th Cir. 1986) ("The agency's interpretation of the regulation is common-sense

7    and straightforward.")

8

9           *iii.  Discontinuing the grant agreements did not impose any new conditions or violate the Spending Clause.*

10    Under the Spending Clause, U.S. Const. art. I §8, cl. 1, "Congress may attach conditions on

11    the receipt of federal funds, and [it] has repeatedly employed the power to further broad policy

12    objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal

13    statutory *and administrative* directives."  *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal

14    quotation omitted, emphasis added).  The spending authority permits conditions on the receipt of

15    federal funds that are (1) "in pursuit of the general welfare;" (2) unambiguous such that recipients

16    can make informed choices; and (3) related to the federal interest in the funded program.  *Id.*

17    (internal citations omitted).

18    The States' Spending Clause challenge centrally focuses upon the second *Dole* factor,

19    alleging that the Department's decision to discontinue the grant awards was retroactive and

20    ambiguous.  Dkt. 49 at 35–36.  The argument fails, however, because it is not possible for the Non-

21    Continuation decisions to have been "retroactive," *id.*, as it was a forward-looking decision about

22    whether to renew a contract.  Additionally, the first line of the terms and conditions section of the

23    Grantees' grants states that "THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN

24    IN BLOCK 6 [THE ANNUAL BUDGET PERIOD]. IN ACCORDANCE WITH 34 CFR 75.253,

25    THE SECRETARY CONSIDERS, AMONG OTHER THINGS, CONTINUED FUNDING IF …

26    THE DEPARTMENT DETERMINES THAT CONTINUING THE PROJECT WOULD BE IN

27    THE BEST INTEREST OF THE GOVERNMENT[.]"  Dkt. 100-1 at 5 (MHSP grant); *see also*

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 24
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Dkt. 102-2 at 5 (SBMH grant).  Thus, the contract agreement left no ambiguity as to what was necessary for the Department to renew the awards for future budget periods.

It is not clear how OESE's decision on April 29, 2025, to not continue to provide funding that has not yet been obligated for the 2026 year is "retroactive."  While the Notice of Non-Continuation said nothing about "eliminat[ing] equity measures," *see, e.g.*, Dkt. 100-3, the States speculate that such an "anti-equity condition is also impermissibly retroactive and unrelated to the purpose of the Programs."  Dkt. 49 at 36.  There is no basis in the record for such a conclusion; thus, it is conjecture to suggest that the Department instituted a new, retroactive condition on its funding.

In any event, even if the Department *had* decided that funding "equity measures" did not advance the best interests of the government, such a decision would have been a valid basis for non-continuation under 34 C.F.R. §75.253 because, as discussed *supra*, it is entirely within the Department's discretion to determine what the government's best interests are.

Reading what the Notices of Non-Continuation actually say rather than what the States would like them to say, the letters indicated that the Department had reviewed its grants under the programs, and it had decided not to continue those that it determined "violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds."  Notice of Non-Continuation at 1.  The Secretary was thus quite clear about her criteria for what constituted the best interest of the government.  *Id.*

The plain text of the award agreements and 34 C.F.R. §75.253 are also perfectly clear.  The Grantees knew or should have known that (i) their contracts required an affirmative continuation decision for future award periods, and (ii) that any such decision depended upon a "best interests" determination.  A continuation decision has been required each year since the awards were initially granted for additional award funding to be available.  Thus, the continuation decision should not have come as a surprise to Grantees; they have needed to obtain such decisions before.  *See, e.g.*, Dkt. 100, ¶14, 100-2.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 25
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Because the Notices of Non-Continuation did not impose any new conditions on funding, and because the conditions that would need to be met for continuation of future funding were clear, the States' Spending Clause claim lacks merit.

IV.    THE STATES CANNOT SHOW IRREPARABLE HARM

To obtain an injunction, the moving party must establish it is likely that it will suffer irreparable harm without an injunction.  *Winter*, 555 U.S. at 22.  "Speculative injury does not constitute irreparable injury …" *Doe v. S.D. Unified Sch. Dist*., 19 F.4th 1173, 1181 n.7 (9th Cir. 2021).  And monetary harm typically does not constitute irreparable harm, as economic losses can generally be recovered.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980); *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320–21 (9th Cir. 1994) (where a plaintiff seeks money to be paid, and later payment is possible, there is rarely irreparable harm); *cf. Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.").

The States' decision to seek emergency relief from a discontinuation decision that does not take effect until 2026 is perplexing.  The Grantees do not have one less dollar available to them to spend today (and until the end of the year) than they did before they received the Notices of Non-Continuation.  Moreover, the States' delay in seeking relief, first by the Grantees foregoing the opportunity to pursue the Department's appeals process and second by suing two months after receiving the Notice of Non-Continuation, betrays the lack of urgency to the States' request.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (delay can undercut a claim of irreparable harm).  For these reasons alone, the States' request for a preliminary injunction should be denied.

Not only are the States' irreparable-harm arguments speculative (*see, e.g.*, Dkt. 49 at 37, arguing that if the Department recompetes and obligates "funds to other grantees, the discontinued grantees will never be able to obtain relief"), at least as to some Grantees, they are not harms *to the States* (the only plaintiffs in this suit). *See supra* (discussion of standing).  The injunctive relief

analysis should be limited only to named plaintiffs so long as there is no class certification, and the Court should accordingly look only at their irreparable harm. *See Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727–29 (9th Cir. 1983). Thus, the States' various references to harms to institutions and entities that are not parties to this suit cannot suffice. *See, e.g.*, Dkt. 56 at 6–8 (discussing the alleged harms to Para Los Ninos).

Finally, the Supreme Court's order in *California*, 145 S.Ct. at 969, supports finding that the States have not shown irreparable injury here. The Supreme Court held it was appropriate to stay a temporary restraining order enjoining the government from terminating various education-related grants, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum." *Id.* *See also Silver Consol. Sch.*, 2025 WL 2017177, at *12 ("[L]ater-in-time money damages—*i.e.*, disbursement of the non-renewed future year grant money—would solve Plaintiff's purported injuries. This means injunctive relief isn't the only remedy. Nor is the harm irreparable."). Accordingly, the States have not demonstrated irreparable injury for which the extraordinary remedy of a preliminary injunction is either necessary or appropriate.

## V.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DEFENDANTS

Lastly, the States cannot establish that the balance of equities and public interest favor granting the extraordinary remedy of preliminary relief. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

The Supreme Court in *California* squarely explained that the balance of the equities favors the federal government in this context. The public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. *California*, 145 S.Ct. at 969; *see also Heckler v. Turner*, 468 U.S. 1305, 1307–08 (1984) (Rehnquist, J., in chambers) (prospect of government being forced to make $1.3 million in improper payments per month supported a stay of injunction); *cf. Sustainability Inst.*, 2025 WL 1587100, at *2 ("[T]he Government has demonstrated irreparable

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 27
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

harm because it is being forced to disburse funds from a finite appropriation and will not be able to recoup those funds once expended.").

Here, the public interest in allowing the democratically accountable leaders at the Department to exercise their discretion to spend a lump-sum appropriation in the way they determine best serves the American people and the objectives of Congress—by pooling the discontinued funding and requesting new applications, *see* Carr Decl. ¶9—is significant.  So too the public has an interest in the judiciary respecting the Executive Branch's ability to lawfully direct and guide agencies' spending decisions, and, in particular, ensuring that tax dollars are allocated to grant programs that most effectively advance the priorities of the Department.  This is all in addition to the fact that any injunction interfering with the Administration's policies is itself a substantial harm in the balance of the equities analysis.  For, "[a]ny time [the Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).  To the extent the Court finds the balance of various factors close, this equities analysis should tip against an injunction.

The equities also weigh against injunctive relief given the Grantees' decisions to forego the administrative appeals process available to them.  *See Premoh v. City of Cincinnati*, 2016 WL 451357, at *4 (S.D. Ohio Feb. 4, 2016) (equities tipped in favor of denying a preliminary injunction in part because of "the availability of a remedy in the form of an administrative appeal"); *cf. Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137–38 (9th Cir. 2011) (inability to participate in the administrative appeals process can factor in the balance of the equities).  The Department gave the Grantees the chance to "set forth [their] basis for disagreeing with the Department's decision not to make a continuation award and include any relevant supporting documentation."  Dkt. 100-3 at 3. Most Grantees requested reconsideration but then voluntarily withdrew their requests when this suit was filed.  *See generally* Dkt. 51–57, 59–106.  In these circumstances, where Grantees have chosen to leapfrog the appeals process—which could have obviated any basis for this Court's intervention— the equities tip against the extraordinary remedy of injunctive relief.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 28
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Finally, the States' assertion that the "threat of harm to Plaintiff's mental healthcare infrastructure in public schools far outweighs the federal government's interests in ending programmatic mental health care funding in schools," Dkt. 49 at 32, overlooks that the Department intends to reissue NIAs for the remaining SBMH and MHSP funds. Carr Decl. ¶9. The funds will be awarded to programs that, within the applicable statutory and regulatory framework, the Department determines will "foster safe, healthy, supportive, and drug-free environments that support student academic achievement." 20 U.S.C. §7114. And it is the Department—not the States or this Court—that is best positioned to determine how best to achieve those goals.

## VI.    ANY INJUNCTIVE RELIEF MUST BE LIMITED TO THE PARTIES

In *CASA, Inc.*, 145 S.Ct. at 2551, 2557, the Supreme Court held that courts only may grant those "equitable remedies traditionally accorded by courts of equity at our country's inception," which are limited to providing "complete relief *to the plaintiffs before the court*." The relevant inquiry is focused on remedying the *plaintiffs*' injury; that injury sets the outer bounds of relief the Court may properly order. *Id.* at 2558. Considering this clear principle, any injunctive relief the Court grants here must be limited to the parties to this suit.

Equitable relief is available only to remedy the injuries of "plaintiff[s] with standing to sue." *Id.* at 2563. But as argued above, the States have not shown they have standing to sue on behalf of all the Grantees. And the States cannot assert the rights of nonparties or seek relief tailored to those nonparties' alleged injuries. This Court may craft injunctive relief focused only on the States' alleged injuries, and as the parties seeking an injunction, it is the States' burden to show that an injunction is necessary to remedy their alleged harms. *See Winter*, 555 U.S. at 20. Thus, if the Court is inclined to grant emergency relief, it should do so only as to those SBMH and MHSP grants that the States can show run directly to them or their instrumentalities. Because, as shown above, it is not evident that each non-party Grantee meets that test, the Court—just as it must with respect to the standing inquiry—should require the States to prove which Grantees are entitled to relief as a party to the suit. *CASA, Inc.*, 145 S.Ct. at 2551.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 29
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

VII.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND
        SECURED BY A BOND

If the Court issues an injunction, the Department respectfully requests that it be stayed

pending a determination by the Solicitor General whether to appeal and, if appeal is authorized,

pending any appeal.

Further, the Department respectfully request that any injunctive relief be accompanied by a

bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction

… only if the movant gives security in an amount that the court considers proper to pay the costs and

damages sustained by any party found to have been wrongfully enjoined or restrained."  A bond is

appropriate here given that any preliminary relief would potentially mandate that the Executive

spend money that may not be recouped once distributed.

## CONCLUSION

For the foregoing reasons, the Department respectfully requests that the Court deny the

States' motion for a preliminary injunction.

## CERTIFICATION

I certify that this memorandum contains 11,128 words, in compliance with this Court's order

of July 8, 2025 (Dkt. 58).


DATED this 6th day of August 2025.

Respectfully submitted,


TEAL LUTHY MILLER
Acting United States Attorney


*/s/ Brian C. Kipnis*
BRIAN C. KIPNIS
Assistant United States Attorney
Office of the United States Attorney
5220 United States Courthouse
700 Stewart Street
Seattle, Washington 98101-1271
Phone: 206 553 7970
E-mail: brian.kipnis@usdoj.gov

Attorneys for Defendants

DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 30
(Case No. C25-1228KKE)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970