1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

              Plaintiff(s),

     v.

UNITED STATES DEPARTMENT OF
EDUCATION, et al.,

              Defendant(s).

CASE NO. C25-1228-KKE

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

In 2018 and 2020, Congress established and funded two grant programs via the United States Department of Education ("the Department") to support mental health services at elementary and secondary schools throughout the country.  Recognizing the prevalence of violence and traumatic crises in schools, and the negative impact of these disruptions on the learning environment, Congress allocated appropriations to the Department to "support learning environments where students feel safe, supported, and ready to learn."  Dkt. No. 1 ¶ 44 (citation modified).  The Department funded hundreds of multi-year grants via these programs.

But in April 2025, the Department notified certain grant recipients that their funding would not be renewed at the end of their current budget period, which expires December 31, 2025.  Sixteen states filed this lawsuit against the Department and its secretary to challenge the Department's decision to discontinue funding to their grantees, seeking a court order that would

enjoin implementation of that decision and require the Department to issue legally compliant continuation decisions before the next budget period.  Dkt. No. 1 at 44–45.

Defendants filed a motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim.  Dkt. No. 161.  After considering the parties' briefing, the relevant record, and the oral argument of counsel, the Court finds that the complaint's allegations are sufficient to withstand a challenge to Plaintiffs' standing as well as to this Court's subject matter jurisdiction.  Therefore, the Court will deny Defendants' motion to dismiss.

## I.     BACKGROUND

**A.     Congress Identified the Need to Increase School-Based Mental Health Services.**

In 2018, following the tragic shooting deaths of 14 students and three staff members at Marjory Stoneman Douglas High School in Parkland, Florida, Congress created the Mental Health Service Professional Demonstration Grant Program ("MHSP") in the Department to increase the number of mental health professionals serving the nation's public schools.  Dkt. No. 1 ¶ 41. Congress appropriated no more than $10 million to this program to

> test and evaluate innovative partnerships between institutions of higher learning and States or high-need local educational agencies to train … mental health professionals qualified to provide school-based mental health services, with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools in order to address the shortages of mental-health service professionals in such schools.

*Id.* (quoting H.R. Rep. No. 115-952, at 543 (2018) (Conf. Rep.), *available at* https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf).

Shortly thereafter, President Trump established a Federal Commission on School Safety to make recommendations for improving school safety.  Dkt. No. 1 ¶ 42 (citing Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 84 Fed. Reg. 29180, 29181 (June 21, 2019)).  Noting the lack of access to mental health professionals in high-poverty

districts and schools where needs are the greatest, this commission made a series of recommendations, including expanding access to mental health care services in schools, where treatment is much more likely to be effective and completed. *Id.* (citing Betsy DeVos, et al., Federal Commission on School Safety, Final Report of the Federal Commission on School Safety 37 (Dec. 18, 2018), *available at* https://www2.ed.gov/documents/school-safety/school-safety-report.pdf).

For fiscal year 2020, Congress expanded this effort and appropriated $10 million to establish the Department's School-Based Mental Health Services Grant Program ("SBMH"), to "increase the number of qualified, well-trained … mental health professionals that provide school-based mental health services to students." Dkt. No. 1 ¶ 44 (citing Explanatory Statement, DIVISION A-DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2020, at 134 (Dec. 16, 2019), *available at* https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf).

For fiscal year 2021, Congress maintained MHSP funding at $10 million and increased SBMH funding to $11 million. Dkt. No. 1 ¶ 45. In fiscal year 2022, Congress increased the appropriations for the MHSP to $55 million and for SBMH to $56 million. *Id.*

In May 2022, school violence again shook the nation as a former student shot and killed 19 students and two teachers at an elementary school in Uvalde, Texas. Dkt. No. 1 ¶ 46. In response, Congress dramatically increased the funding for both programs, appropriating an additional $100 million per year for each program for fiscal years 2022 through 2026 via the Bipartisan Safer Communities Act. *Id.* ¶ 47.

//

//

//

**B.    The Department Established Grant Program Priorities and Awarded Multi-Year Grants.**

Beginning in 2019 and 2020, when the first MHSP and SBMH grant applications were invited (respectively), and in subsequent years when grant applications were solicited, the Department set forth in the Federal Register the priorities that would be used to judge grant applications for that year.  Dkt. No. 1 ¶¶ 58–66.  Each set of priorities was published only after completing notice-and-comment rulemaking, as required by statute.  *Id*. ¶¶ 50–51.

The 2019 notice published for the MHSP grant competition stated one "absolute priority" that all applicants were required to meet:

> Expand the capacity of high-need [local educational agencies ("LEAs")] in partnership with [institutes of higher education ("IHEs")] to train school-based mental health services providers … with the goal of expanding the pipeline of these professionals into high-need public elementary schools and secondary schools in order to address the shortages of school-based mental health service providers in such schools.

Dkt. No. 1 ¶ 59 (quoting 84 Fed. Reg. 29180, 29181 (June 21, 2019)).  In 2022, the Department again engaged in rulemaking to establish priorities for future MHSP grants.  After providing notice and reviewing comments, the Department announced four final priorities:

> (1)  expand the number of school-based mental health services providers in high-need LEAs through partnerships with IHEs, wherein IHE graduate students would be placed in high-need LEAs; (2) increase the number of school-based mental health services providers in high-need LEAs that reflect the diverse communities served by the high-need LEAs; (3) provide evidence-based pedagogical practices in mental health services provider preparation programs or professional development programs that are inclusive and that prepare school-based mental health services providers to create culturally and linguistically inclusive and identity-safe environments for students when providing services; and (4) partner with historically black colleges and universities; tribal colleges and universities; and minority-serving institutions.

*Id*. ¶ 61 (citing 87 Fed. Reg. 60083 (Oct. 4, 2022)).

The Department engaged in the same priority-setting process for the SBMH, beginning in 2020 and again in 2022.  The four "final priorities" announced in 2022 were:

(1) proposals from [state educational agencies ("SEAs")] to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need through recruitment and retention; (2) proposals from LEAs with demonstrated need to increase the number of credentialed school-based mental health services providers through recruitment and retention; (3) proposals prioritizing respecialization, professional retraining, or other preparation plan that leads to a state credential as a school-based mental health services provider and that is designed to increase the number of services providers qualified to serve in LEAs with demonstrated need; and (4) proposals to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need.

Dkt. No. 1 ¶ 65 (citing 87 Fed. Reg. 60092, 60097 (Oct. 4, 2022)).

When the Department awarded new MHSP/SBMH grants, it approved them for a five-year project period: providing funds for the first year and stating its intention to fund the remainder of the project through one-year continuation awards. Dkt. No. 1 ¶ 4. Department regulations provide that grantees approved for multi-year projects do not apply and compete to receive continuation awards after that first year; instead, the Department reviews information relevant to a grantee's performance for that year to evaluate whether the project made substantial progress. *Id.* ¶ 55. According to Department regulations, priority should be given to funding continuation awards over new grant applications. *Id.* ¶ 113.

**C.    The Department Awarded Multi-Year MHSP and SBMH Grants in Plaintiff States.**

Plaintiffs are 16 states whose elementary and secondary schools have offered mental health services supported by grants awarded via the MHSP and the SBMH. In furtherance of the priorities published by the Department, grantees in Plaintiff States ("Grantees") applied for and were awarded multi-year MHSP/SBMH grants. For example, the Department awarded a five-year SBMH grant to Educational Service District 189 ("NWESD"), an LEA that serves as regional liaison between Washington state and 35 school districts in northwest Washington. Dkt. No. 1 ¶ 70. Forty percent of NWESD's schools were unable to access critical mental health services for

students due to barriers such as high student-to-provider ratios, attrition, complexity and intensity of mental health challenges, and geographic isolation. *Id*. Notably, two of the counties in NWESD's service area are located on islands and three other counties are in remote mountain areas far from urban corridors. *Id*. NWESD was able to use the SBMH grant to develop a recruiting package that allowed it to fill positions more quickly than anticipated. *Id*. ¶ 72. By the second year of its five-year project, NWESD had exceeded its early recruitment and retention goals. *Id*. The increase in staffing has already allowed NWESD to improve its mental health provider-to-student ratio by 60%—from 1:1,160 to 1:656. *Id*.

Similarly, the Department awarded a five-year MHSP grant to the University of Washington's SMART Center for its Workforce for Student Well-Being Initiative ("WSW"). Dkt. No. 1 ¶ 74. The WSW funds competitive conditional scholarships to graduate students enrolled in six schools of social work across Washington, and requires these students to work in a high-need school district in Washington for a minimum of two years after graduation. *Id*. ¶¶ 75–76. As of halfway through the third year of the grant program period, the WSW project has recruited and trained 27 graduate students committed to maintaining employment as school social workers in high-need school districts across Washington state. *Id*. ¶ 77.

The complaint also describes grant-funded programs in other Plaintiff States. For example, the Michigan Department of Education was awarded a five-year MHSP grant. Dkt. No. 1 ¶ 78. This grant funded the Michigan Earn, Learn, and Serve in Schools program, which aims to create jobs for 165 new school mental health providers working in high-need schools across Michigan to combat a critical shortage of school-based mental health professionals. *Id*. Similarly, Oregon State University received grant funds to train school counselors in partnership with four central Oregon school districts that had experienced a significant decline in available mental health services. *Id*. ¶ 93. The complaint further alleges multiple grant programs in California, including

partnerships between numerous county offices of education and local agencies, the University of California, and five California State University campuses aimed at increasing the availability of mental health professionals serving California communities. *Id.* ¶¶ 88–91.

The complaint alleges these programs have been successful at increasing school-based mental health services across the Plaintiff States. Dkt. No. 1 ¶ 79. Specifically, Plaintiffs cite a finding from the National Association of School Psychologists that "during the Programs' first year under Congress's transformative funding appropriation, grantees served nearly 775,000 elementary and secondary students and hired nearly 1,300 school mental health professionals." *Id*. Plaintiffs further allege these programs have resulted in decreased suicide risk, absenteeism and behavioral issues at high-need schools; significantly reduced student wait time for services; and allowed schools to successfully recruit and retain mental health professionals in underserved communities throughout Plaintiff States. *Id.* ¶ 5.

**D.    The Department Notified Grantees of Discontinuation.**

On April 29, 2025, the Department notified "most or all" Grantees in Plaintiff States that their grants (hereinafter "Grants") would be discontinued at the end of the current budget period (December 31, 2025). Dkt. No. 1 ¶ 80. Plaintiff States allege the discontinuation notices were identical and stated:

> This letter provides notice that the United States Department of Education has determined not to continue your federal award, S184xxxxxxx, in its entirety, effective at the end of your current grant budget period. See, inter alia, 34 C.F.R. § 75.253(a)(5) and (f)(1). …
>
> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

> The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

*Id*. In conjunction with sending the notices, the Department informed Congress that it was discontinuing approximately $1 billion in awards, and that it planned to re-compete those funds with different priorities. *Id.* ¶¶ 6, 81.

Plaintiff States filed this action on June 30, 2025, claiming that the Department did not comply with its own regulations or the Administrative Procedure Act ("APA") in discontinuing the Grants, and that its actions also violate the Constitution's Spending Clause and Separation of Powers and are *ultra vires*. Dkt. No. 1. Specifically, Plaintiff States allege the discontinuation "notices providing the same boilerplate explanations untethered to specific grants and the performance of specific grantees" lack the reasoned explanation required by the APA. *Id.* ¶¶ 100, 103. Plaintiff States further allege that the Department violated the APA by implementing new priorities without engaging in the statutorily required notice-and-comment rulemaking, and that the Department acted contrary to its regulations by failing to consider grantee performance in making continuation awards, failing to prioritize continuation awards over new grants, and retroactively applying new priorities to previously approved grants. *Id.* ¶¶ 104, 111–13. The same allegations form the basis for Plaintiff States' constitutional and ultra vires claims. *Id.* ¶¶ 130–56.

Plaintiff States subsequently filed a motion for preliminary injunction. Dkt. No. 49. After the briefing on the motion was complete, the parties filed notices of supplemental authority, and the Court ordered the parties to provide supplemental briefing. Dkt. Nos. 154, 155, 156, 157, 158, 159. The Court held oral argument on the motion for preliminary injunction, during which the Department's counsel indicated that Defendants would be filing a motion to dismiss later that day. Dkt. No. 167 at 24.

1    Defendants indeed filed a motion to dismiss, and the Court held oral argument on that

2  motion after the close of briefing. Dkt. Nos. 161, 172, 187. The motion to dismiss is now ripe for

3  resolution and will be denied for the following reasons.

4                                    **II.    ANALYSIS**

5  **A.    The Complaint's Allegations Establish That Plaintiff States Have Standing and the**
   **Authority to Bring the Claims Asserted.**

6    Article III of the United States Constitution limits the jurisdiction of federal courts to

7  deciding "Cases" and "Controversies," which in turn requires that "at least one plaintiff must have

8  standing to sue." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). "To have standing, a

9  plaintiff must allege an injury in fact 'that is concrete, particularized, and actual or imminent; fairly

10 traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'"

11 *Id*. (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). Requiring a plaintiff to

12 establish an injury in fact "helps to ensure that the plaintiff has a 'personal stake in the outcome of

13 the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth*

14 *v. Seldin*, 422 U.S. 490, 498 (1975)).

15   A defendant may challenge a plaintiff's lack of standing via a motion to dismiss under

16 Federal Rule of Civil Procedure 12(b)(1). *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134,

17 1142–43 (9th Cir. 2024). Where, as here, a defendant brings a facial attack on jurisdiction in a

18 Rule 12(b)(1) motion, the court is confined to resolving the motion based on the allegations in the

19 complaint. *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036,

20 1039 n.2 (9th Cir. 2003). "For purposes of ruling on a motion to dismiss for want of standing,

21 both the trial and reviewing courts must accept as true all material allegations of the complaint and

22 must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501.

23

24

1

2

Defendants claim Plaintiff States lack standing to challenge the discontinuation decisions. Dkt. No. 161 at 7–8. They contend that only two paragraphs in the complaint describe the relationship between Plaintiff States and Grantees:

> Defendants' unlawful actions have already caused and will cause immediate and devastating harm to Plaintiffs. Starting this fall, many schools in Plaintiff states will no longer be able to reliably provide mental health services to kids that need them most. These discontinuances threaten the very purpose of these Programs— to protect the safety of our children by permanently increasing the number of mental health professionals providing mental health services to students in low-income and rural schools.

> If the discontinuances are not rescinded, Plaintiff educational agencies will be forced to lay off the very same professionals they recruited and hired to provide mental health services at their rural and low-income schools using Program funds. Plaintiff institutes of higher education will be forced to terminate financial support for graduate student internships to provide mental health services to rural and low-income schools. As a result, hundreds of graduate students will make the difficult choice whether they should enter or continue a graduate program no longer able to offer tuition assistance—drying up a workforce pipeline Congress recognized needed development.

Dkt. No. 1 ¶¶ 15–16. In their briefing, Defendants argue that these allegations are insufficient to establish that any Plaintiff State has standing to represent the interest of any Grantee. Dkt. No. 161 at 7–8. Defendants note that although the complaint references "Plaintiff educational agencies" and "Plaintiff institutes of higher education," Plaintiffs are in fact states rather than educational agencies or institutes of higher education. *Id*. Defendants also question whether the attorneys general for Plaintiff States may pursue an action on behalf of "unnamed third parties" that are merely located in those states without an official connection to them. *Id*. at 9.

Notwithstanding these arguments, Defendants clarified at oral argument that they do not challenge Plaintiff States' standing as to their own state-component Grantees, such as the University of Washington or the Michigan Department of Education. The Department's concession that Plaintiff States have standing via their instrumentalities is fatal to Defendants' motion to dismiss for want of standing. The Ninth Circuit recognizes that "[a]s a general rule, in

an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (citing *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008)).  The Ninth Circuit has also held, more broadly, that "[t]he general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."  *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).  Thus, Defendants' concession that Plaintiff States have standing via their instrumentalities is sufficient to permit this case to proceed.

Even if Defendants had not so conceded, the Court finds that the complaint adequately pleads a fiscal harm to *each* Plaintiff State resulting from Defendants' actions, even as to Grantees that are not instrumentalities of Plaintiff States, such as private universities training mental health providers to work in public schools.  *See, e.g.*, Dkt. No. 1 ¶ 94.  While Defendants argue that Plaintiff States have neither standing nor authority to bring claims on behalf of non-State entity Grantees, at oral argument, counsel for Plaintiff States emphasized that they are not bringing claims "on behalf of" third-party Grantees at all, but rather, the States are suing to protect their *own interests* in light of the harm that results to them due to the discontinuation decisions.  For example, the complaint alleges that:

> If Defendants are not enjoined from implementing the Non-Continuation Decision, [G]rantees in Plaintiff states will be forced to lay off school-based mental health service providers, reducing access to much-needed mental health services to their rural and low-income schools.  These [G]rantees will lose qualified mental health service providers; and the benefits of the relationships their students have developed with these providers.  The spillover effect of students turning to community mental health services—to the extent they are available—will tax Plaintiffs' already-strained mental health care system.

Dkt. No. 1 ¶ 86.  This allegation adequately identifies a fiscal harm to Plaintiff States that will flow from Defendants' actions: whether a particular Grantee is a State entity or not, the discontinuation

of any Grant will decrease student access to school-based services and lead students in each Plaintiff State to seek needed mental health services elsewhere, namely "Plaintiffs' already-strained mental health care system." *Id.* The complaint further alleges that the discontinuation of the Grant-funded partnerships in Plaintiff States will dry up the pipeline of trained mental health providers willing to work in rural and low-income communities, and that "Plaintiffs' relationships with community partners will be irreparably damaged because Plaintiffs can no longer honor the commitments they made to provide mental health services to the children in these communities." *Id.* ¶ 87.

Defendants characterize these allegations as conclusory or speculative (Dkt. No. 180 at 4), but "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). The Court finds that Plaintiff States' allegations adequately identify a general injury to the States that logically follows from the discontinuation of any Grantee's funding. *See Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175 (9th Cir. 2024) (noting that while an "injury need not be direct, there must be a strong 'causal chain' that 'links' the federal action to the alleged harm" (quoting *California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018)); *see also Diamond Alt. Energy, LLC v. Envt'l Prot. Agency*, 606 U.S. __, 145 S. Ct. 2121, 2136 (2025) (explaining that where standing depends on "predictable" behavior of third parties, "commonsense inferences may be drawn"). Because Grantees generally seek to provide mental health services for students with high need in low-income and rural areas, any services students seek after discontinuation of school-based services will likely be provided by Plaintiff States, where those services are available at all. *See* Dkt. No. 1 ¶¶ 86, 89, 94. As the students who would benefit from continuation of the Grants

are currently receiving services and have therefore demonstrated a need for them, and are also located in rural or low-income areas with few (if any) private providers available to them, there is only one link in the chain between discontinuing Grants and an increased use of State-funded providers. *Id.* The Court does not find this link to be so attenuated or unpredictable that a reasonable inference cannot be drawn.

Finally, the complaint also alleges that each Plaintiff State's attorney general has authority to bring this action to redress harms suffered by Plaintiff States. Dkt. No. 1 ¶¶ 21–36. Therefore, because the complaint adequately alleges an injury to Plaintiff States, and the authority of the attorneys general to bring claims to redress those injuries, the Court denies Defendants' motion to dismiss the complaint for want of standing.

## B.    The Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Is Denied.

A complaint must be dismissed under Rule 12(b)(1) if the court lacks subject matter jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In this case, Defendants contend that the Court lacks subject matter jurisdiction over Plaintiff States' claims because they are contract-based and jurisdiction lies only in the Court of Federal Claims. Dkt. No. 161 at 10–19.

"Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" *United States v. Bormes*, 568 U.S. 6, 9–10 (2012) (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992)). "Congress has enacted several broad waivers of the United States' sovereign immunity." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168 (9th Cir. 2017). A plaintiff "may sue the United States only if Congress has waived sovereign immunity for the lawsuit, and may bring its claim in federal district court only if Congress has provided for jurisdiction there." *North Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc). The APA waives sovereign immunity for suits "seeking relief

other than money damages" against a federal agency, so long as no other statute "expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

Even if an APA action does not seek money damages, it may nonetheless contain a contract claim mischaracterized as an APA claim, which would fall outside the APA's waiver of sovereign immunity.  *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. __, 2025 WL 2415669 (2025); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025).  Per the Tucker Act, the exclusive jurisdiction for such claims is found in the Court of Federal Claims:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  But the Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if the action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

The Tucker Act likewise deprives district courts of jurisdiction to hear contract claims disguised as constitutional claims.  *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647–48 (9th Cir. 1998).  Although sovereign immunity does not bar claims against federal officials whose actions "go beyond limitations" on "powers [] limited by statute" or the Constitution, that *ultra vires* exception to sovereign immunity does not apply to contract-based claims.  *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 704 (1949) ("The Government as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right.").

Courts, including those in the Ninth Circuit, look to factors first identified in *Megapulse* to determine whether a claim against the United States is a contract claim in disguise:

The classification of a particular action as one which is or is not "at its essence" a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate). Where … there is a possible alternative basis for jurisdiction independent of the Tucker Act, such as is arguably the case before us, we must be more deliberate in our examination. Although it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions, we must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.

672 F.2d at 968.  Post-*Megapulse*, the Supreme Court explained that a district court has jurisdiction to set aside an agency action under the APA, even if that judgment eventually results in the agency paying sums of money, if that "outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law."  *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).

In this case, Defendants contend that Plaintiff States' APA and constitutional claims are contract claims in disguise, seeking to enforce the Grants as contracts in order to compel the Department to continue funding the Grants.  Dkt. No. 161 at 13.  But for their part, Plaintiff States insist that their injury arises from violations of statutes, regulations, and the Constitution, rather than any breach of the Grant terms, and note that their complaint does not "seek an order requiring Defendants pay pursuant to their grants."  Dkt. No. 174 at 23.  Plaintiff States point to their complaint's prayer for relief, seeking a procedural rather than a contractual remedy: new decisions on continuation that comply with both the APA and the Constitution.  *Id*. (citing Dkt. No. 1 at 44–45).  Plaintiff States also emphasize that the Grants will be discontinued in the future rather than terminated, and that the Grantees are still receiving funds (for now), and thus no contract to pay has been breached.  *Id*.

The Court agrees that none of Plaintiff States' claims sounds in contract, considering first the source of their claims.  Plaintiff States' claims allege violations of the APA, the Department's regulations, and the Constitution, without any reference to the terms of the Grants.  Specifically,

Plaintiffs allege that the Department adopted new regulatory priorities without engaging in notice and comment rulemaking as required by the General Education Provisions Act (20 U.S.C. §§ 1221e-4, 1232a(2), (d)) and then retroactively applied the new priorities to discontinue the existing programs in Plaintiff States.  Dkt. No. 1 ¶¶121-129.  Plaintiffs further allege that Defendants violated Department regulations by unlawfully relying on the new priorities in making continuation decisions and failing to give priority to continuation awards over new grants.  *Id.* ¶¶ 112-113.  The Ninth Circuit recently found similar allegations to present statutory, not contract, claims. [1]  *See Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, __ F.4th __, 2025 WL 2884805, at *4-6 (9th Cir. Oct. 10, 2025) ("Plaintiffs advance standard APA claims that the Government violated statutory (TVPRA) and regulatory (Foundational Rule) obligations and acted arbitrarily and capriciously by changing position without reasoned explanation."); [2] *see also*, *e.g.*, *Maryland v. Corp. for Nat'l & Cmty. Serv.,* 785 F. Supp. 3d 68, 105 (D. Md. 2025) ("The source of the rights for the States' notice-and-comment claims is a federal statute, not the grants.").

Moreover, Plaintiffs do not allege a violation of any grant term, either as the source of their claims or in their request for relief.  That the Department continues to pay out on the Grants and did not terminate them also undermines the availability of contract remedies.  Finally, though many Grantees are state instrumentalities, some are not.  As the Ninth Circuit recently reiterated, where

---

[1] Moreover, such a challenge could be analogized to the vacatur of agency guidance in *NIH*, which was not at issue in the Supreme Court's order.  *See NIH*, 2025 WL 2414669, at *2–3 (Barrett, J., concurring).  As Justice Barrett explained there, "[v]acating [internal agency guidance explaining new priorities for awarding grants] does not reinstate terminated grants[,]" and therefore a challenge to that agency guidance would not necessarily be funneled to the Court of Federal Claims as a disguised contract claim.  *Id.*

[2] Defendants argue that the Supreme Court's interim decisions in *California* and *NIH* undermine this Court's jurisdiction.  As the Ninth Circuit has now interpreted both *California* and *NIH* to permit a district court's exercise of jurisdiction over APA claims arising from grant-related scenarios similar to the Grants at issue here, this Court is required to do the same.  *See Yong v. I.N.S.*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000) ("[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it[.]").

no privity exists between the plaintiffs and the government, "the Court of Federal Claims's jurisdiction does not cover this dispute." *Cmty. Legal Servs.*, WL 2884805, at *7. Under these circumstances, the Court finds that the source of Plaintiff States' claims supports the exercise of jurisdiction.

The Court reaches a similar conclusion after considering the type of relief Plaintiff States seek. Defendants' repeated characterizations in briefing and at oral argument notwithstanding, the complaint does not seek monetary relief either explicitly or implicitly. *See* Dkt. No. 1 at 44–45. Instead, Plaintiff States seek an injunction setting aside the discontinuation decisions based upon the new priorities, preventing the Department's re-competing of the Grant funds, and requiring the Department to make new continuation decisions consistent with 34 C.F.R. § 75.253(b) before the next budget period. *Id.* Plaintiff States acknowledge that new decisions must be made, but seek only to require the Department to make "lawful" decisions, rather than to require continuation of Grantee funding. *See* Dkt. No. 167 at 51–52. The Ninth Circuit has characterized such claims as "garden-variety APA claims." *See Cmty. Legal Servs.*, 2025 WL 2884805, at *3.

Further, even if some or all of the Grantees' funding would be continued via new decisions, that would not transform Plaintiff States' claims into claims for "money damages" under discontinued Grant contracts. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (finding that where plaintiffs seek relief that "would not be determined by reference to the terms of the contract[,]" the claims are not in essence contract claims). Thus, because Plaintiff States request that Defendants issue new continuation decisions consistent with their statutory, regulatory, and constitutional obligations, rather than seeking to enforce any particular term of the Grants themselves, the Court finds that the relief sought by Plaintiff States confirms the Court's jurisdiction here. *See Cmty. Legal Servs.*, 2025 WL 2884805, at *6–7 (discussing the second

*Megapulse* prong).  Because both *Megapulse* prongs favor the Court's exercise of jurisdiction, the Court will deny Defendants' motion for lack of subject matter jurisdiction.

In so doing, the Court acknowledges that Defendants cite two recent cases where courts have found, in grant-related scenarios, that plaintiffs' APA claims were in fact contractual in nature and therefore forbidden under the Tucker Act.  Dkt. No. 161 at 15 (citing *Climate United Fund v. Citibank, N.A.*, __ F.4th __, 2025 WL 2502881 (D.C. Cir. Sep. 2, 2025); *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)).  These out-of-circuit decisions are not binding on this Court and are, moreover, distinguishable as involving terminated grants that plaintiffs sought to reinstate, rather than future discontinuances that plaintiffs sought to set aside.  Here, where Plaintiff States request "a process correction, not a payment direction" (Dkt. No. 167 at 16), the Court finds that, under binding Ninth Circuit authority, Plaintiff States' claims "fall outside the jurisdictional bounds of the Tucker Act[.]" *Cmty. Leg. Servs.*, 2025 WL 2884805, at *8.

## C.    The Defendants' Motion To Dismiss for Failure to State a Claim is Denied.

Defendants' motion seeks dismissal on two additional grounds under Federal Rule of Civil Procedure 12(b)(6): (1) that the Grantees, rather than Plaintiff States, are the real parties in interest; and (2) the Department's discontinuation decision is not subject to judicial review.

In deciding a motion to dismiss under Rule 12(b)(6), a court examines the complaint to determine whether, if the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To state a plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court will address each of Defendants' arguments in turn.

1.  *Plaintiff States Are the Real Parties in Interest.*

Federal Rule of Civil Procedure 17(a)(1) requires that an action "must be prosecuted in the name of the real party in interest." Defendants' motion argues that Grantees, rather than Plaintiff States, are the real parties in interest here, although they note that "[t]he federal rules do not contain a specific procedure for raising an objection that a plaintiff is not a real party in interest." Dkt. No. 161 at 6.

Defendants' concession at oral argument that Plaintiff States have standing to seek redress of injuries flowing from the discontinuation of grants to State instrumentalities guts most of Defendants' "real party in interest" argument. Plaintiff States are the real party in interest when their instrumentalities have been injured. *See State of Alaska v. Chevron Chem. Co.*, 669 F.2d 1299, 1302 (9th Cir. 1982) (rejecting a "real party in interest" challenge where a state attorney general was authorized to bring a suit on behalf of state instrumentalities); *Corp. for Nat'l & Comm. Serv.*, 785 F. Supp. 3d at 98 (finding that states have standing to challenge the "loss of federal funding for grants awarded to state service commissions and state instrumentalities").

Moreover, because the Court has found that the complaint alleges that Plaintiff States will suffer fiscal harm via their State-funded mental health services due to Defendants' discontinuation of any Grant, Plaintiff States seek to redress their own harms in this action with respect to Grantees that are not State instrumentalities as well. Accordingly, the Court will deny Defendants' motion to dismiss this action for lack of a real party in interest.

2.  *The Non-Continuation Decision is Reviewable Under the APA.*

Defendants raise an additional challenge to the Court's exercise of jurisdiction here, contending that the Department's decision to discontinue the Grants constitutes a discretionary agency decision not subject to judicial review. Dkt. No. 147 at 14–16, Dkt. No. 161 at 3. Defendants' argument relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993), which involved yearly lump-

sum appropriations from Congress to the Indian Health Service ("IHS"). From 1978 to 1985, IHS funded the Indian Children's Program ("ICP") using those appropriations, but in 1985 announced that it would discontinue funding ICP's direct clinical services in favor of funding nationwide treatment efforts. *Id*. at 187–88. Children eligible for ICP services sued, arguing that IHS' "decision to discontinue direct clinical services" violated several statutes (including the APA), regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution. *Id*. at 189. The Supreme Court reasoned that "[t]he allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion" because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192. Accordingly, the *Lincoln* court concluded that judicial review of IHS' decision under the APA was unavailable. *Id*. at 193–94.

Although Defendants urge the Court to find that *Lincoln* is analogous, the Court finds the facts here distinguishable because, as even Defendants acknowledge, *Lincoln* did not involve grants with regulatory criteria for continuation. Accordingly, this case does not present the "rare circumstance[]" at issue in *Lincoln* where a court would have "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191. The Department must comply with its own regulations when determining whether to renew a grant award for another budget year. *Confederated Tribes & Bands of Yakima Indian Nation v. Fed. Energy Reg. Comm'n*, 746 F.2d 466, 474 (9th Cir. 1984) ("It is a well-known maxim that agencies must comply with their own regulations."). The existence of these regulations means that, unlike the IHS in *Lincoln*, the Department does not have unfettered discretion to discontinue grant funding for any reason or no reason at all, but that it must comply with regulatory requirements. *See* 34 C.F.R. § 75.253(a). Because this regulation cabins the Department's authority to discontinue funding,

*Lincoln* is distinguishable.  *See, e.g.*, *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 328 F. Supp. 3d 1133, 1147 (E.D. Wash. 2018) (finding that 34 C.F.R. § 75.253(a) governs an agency's ability to terminate a grant and therefore creates "a meaningful standard of review" under the APA).  Accordingly, the Court rejects Defendants' argument that the discontinuation decisions are not subject to judicial review.

### III.    CONCLUSION

For these reasons, the Court DENIES Defendants' motion to dismiss.  Dkt. No. 161.  The Courtroom Deputy is directed to issue an order requiring the parties to file a joint status report to assist in setting a case schedule no later than October 31, 2025.

Dated this 21st day of October, 2025.

Kymberly K. Evanson
United States District Judge

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 21