1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>　　　　　　　　Plaintiff(s),<br>　　v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, et al.,<br><br>　　　　　　　　Defendant(s). | CASE NO. C25-1228-KKE<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

13

14

15

16

17

18

19

20

21

22

23

24

　　　　In 2018 and 2020, Congress established grant programs via the United States Department of Education ("the Department") to fund mental health services for elementary and secondary schools throughout the country.  Recognizing the prevalence of violence and traumatic crises in schools, and the resultant negative effect on the learning environment, Congress allocated appropriations to the Department to "support learning environments where students feel safe, supported, and ready to learn."  Dkt. No. 1 ¶ 44 (citation modified).  The Department funded hundreds of multi-year grants via these programs.

　　　　But in April 2025, the Department notified certain grant recipients that their funding would not be renewed at the end of their current budget period, which (in most cases) expires December 31, 2025.  Sixteen states filed this lawsuit against the Department and its secretary to challenge the Department's decision to discontinue funding to their grantees, seeking to enjoin implementation

of that decision and to require the Department to issue legally compliant continuation decisions before the next budget period begins. Dkt. No. 1 at 44–45.

Plaintiff States filed a motion for preliminary injunction, requesting that the Court enjoin implementation and enforcement of the discontinuation decisions, and enjoin new discontinuation decisions based on the same or similar reasons. Dkt. No. 49-1.[1] Plaintiff States also request that the Court enjoin the Department's re-competing of the discontinued funds. *Id.* After considering the parties' briefing on the motion, supplemental briefing, and notices of supplemental authority (Dkt. Nos. 49, 147, 150, 156, 157, 158, 159, 185), and the oral argument of counsel, the Court finds that Plaintiff States are entitled to preliminary relief as to most of the Grantees documented in the record. The Court will therefore issue a modified preliminary injunction with respect to those Grantees in Plaintiff States.

## I.    BACKGROUND[2]

### A.    Congress Identified the Need to Increase School-Based Mental Health Services.

In 2018, following the tragic shooting deaths of 14 students and three staff members at Marjory Stoneman Douglas High School in Parkland, Florida, Congress created the Mental Health Professional Demonstration Grant Program ("MHSP") in the Department to increase the number of mental health professionals serving the nation's public schools. Dkt. No. 1 ¶ 41. Congress appropriated no more than $10 million to this program to

> test and evaluate innovative partnerships between institutions of higher learning and States or high-need local educational agencies to train … mental health professionals qualified to provide school-based mental health services, with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools in order to address the shortages of mental-health service professionals in such schools.

---

[1] This order refers to the parties' briefing by CM/ECF page number.

[2] The Court reiterates background facts from its prior order denying Defendants' motion to dismiss (Dkt. No. 190) for the sake of completeness.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 2

*Id.* (quoting H.R. Rep. No. 115-952, at 543 (2018) (Conf. Rep.), *available at* https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf).

Shortly thereafter, President Trump established a Federal Commission on School Safety to make recommendations for improving school safety. Dkt. No. 1 ¶ 42 (citing Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 84 Fed. Reg. 29180, 29181 (June 21, 2019)). Noting the lack of access to mental health professionals in high-poverty districts and schools where needs are the greatest, this commission made a series of recommendations, including expanding access to mental health care services in schools, where treatment is much more likely to be effective and completed. *Id.* (citing Betsy DeVos, et al., Federal Commission on School Safety, Final Report of the Federal Commission on School Safety 37 (Dec. 18, 2018), *available at* https://www2.ed.gov/documents/school-safety/school-safety-report.pdf).

For fiscal year 2020, Congress expanded this effort and appropriated $10 million to establish the Department's School-Based Mental Health Services Grant Program ("SBMH"), to "increase the number of qualified, well-trained … mental health professionals that provide school-based mental health services to students." Dkt. No. 1 ¶ 44 (citing Explanatory Statement, DIVISION A-DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2020, at 134 (Dec. 16, 2019), *available at* https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf ).

For fiscal year 2021, Congress maintained MHSP funding at $10 million and increased SBMH funding to $11 million. Dkt. No. 1 ¶ 45. In fiscal year 2022, Congress increased the appropriations for the MHSP to $55 million and for SBMH to $56 million. *Id.*

In May 2022, school violence again shook the nation as a former student shot and killed 19 students and two teachers at an elementary school in Uvalde, Texas. Dkt. No. 1 ¶ 46. In

response, Congress dramatically increased the funding for both programs, appropriating an additional $100 million per year for each program for fiscal years 2022 through 2026 via the Bipartisan Safer Communities Act. *Id.* ¶ 47.

The MHSP and SBMH programs are subject to Congress's directive via the General Education Provisions Act ("GEPA") that the Department require grant applicants to:

> develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. § 1228a(b).

## B.    The Department Established Grant Program Priorities and Awarded Multi-Year Grants.

Beginning in 2019 and 2020, when the first MHSP and SBMH grant applications were invited (respectively), and in subsequent years when grant applications were solicited, the Department set forth in the Federal Register the priorities that would be used to judge grant applications for that year. Dkt. No. 1 ¶¶ 58–66. Each set of priorities was published only after completing notice-and-comment rulemaking, as required by statute. *Id.* ¶¶ 50–51.

The 2019 notice published for the MHSP grant competition stated one "absolute priority" that all applicants were required to meet:

> Expand the capacity of high-need [local educational agencies ("LEAs")] in partnership with [institutes of higher education ("IHEs")] to train school-based mental health services providers … with the goal of expanding the pipeline of these professionals into high-need public elementary schools and secondary schools in order to address the shortages of school-based mental health service providers in such schools.

Dkt. No. 1 ¶ 59 (quoting 84 Fed. Reg. 29180, 29181 (June 21, 2019)).  In 2022, the Department again engaged in rulemaking to establish priorities for future MHSP grants.  After providing notice and reviewing comments, the Department announced four final priorities:

> (1) expand the number of school-based mental health services providers in high-need LEAs through partnerships with IHEs, wherein IHE graduate students would be placed in high-need LEAs; (2) increase the number of school-based mental health services providers in high-need LEAs that reflect the diverse communities served by the high-need LEAs; (3) provide evidence-based pedagogical practices in mental health services provider preparation programs or professional development programs that are inclusive and that prepare school-based mental health services providers to create culturally and linguistically inclusive and identity-safe environments for students when providing services; and (4) partner with historically black colleges and universities; tribal colleges and universities; and minority-serving institutions.

*Id.* ¶ 61 (citing 87 Fed. Reg. 60083 (Oct. 4, 2022)).

The Department engaged in the same priority-setting process for the SBMH, beginning in 2020 and again in 2022.  The four "final priorities" announced in 2022 were:

> (1) proposals from [state educational agencies ("SEAs")] to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need through recruitment and retention; (2) proposals from LEAs with demonstrated need to increase the number of credentialed school-based mental health services providers through recruitment and retention; (3) proposals prioritizing respecialization, professional retraining, or other preparation plan that leads to a state credential as a school-based mental health services provider and that is designed to increase the number of services providers qualified to serve in LEAs with demonstrated need; and (4) proposals to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need.

Dkt. No. 1 ¶ 65 (citing 87 Fed. Reg. 60092, 60097 (Oct. 4, 2022)).

When the Department awarded new MHSP/SBMH grants, it approved them for a five-year project period: providing funds for the first year and stating its intention to fund the remainder of the project through one-year continuation awards.  Dkt. No. 1 ¶ 4.  Department regulations provide that grantees approved for multi-year projects do not apply and compete to receive continuation

awards after that first year; instead, the Department reviews information relevant to a grantee's performance for that year to evaluate whether the project made substantial progress. *Id.* ¶ 55. According to Department regulations, priority should be given to funding continuation awards over new grant applications. *Id*. ¶ 113.

## C.    The Department Awarded and Then Discontinued Multi-Year MHSP and SBMH Grants in Plaintiff States.

Plaintiffs are sixteen states whose elementary and secondary schools have offered mental health services supported by MHSP and SBMH grants.  In furtherance of the priorities published by the Department, grantees in Plaintiff States ("Grantees") applied for and were awarded multi-year MHSP/SBMH grants.  The declarations submitted in support of the motion describe a range of partnerships between states and LEAs, IHEs, and in some cases non-profit organizations. *See* Dkt. Nos. 51–57, 59–104.  The declarations detail the lack of mental health providers available in specific areas in Plaintiff States and explain the efforts taken by the states and their agencies and partners to fulfill the purposes of the MHSP and SBMH programs: increasing the pipeline of credentialed school-based mental health professionals working in rural and underserved areas while providing direct services to students in high-needs schools. *Id.*

As noted earlier in this order, when a multi-year grant project is approved, the Department funds the first year and typically continues funding beyond the first year.  34 C.F.R. § 75.251(b)(2) (the Department "indicates [its] intention to make continuation awards to fund the remainder of the project period"); 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024) ("In general, we do not deny a large number of non-competing continuation awards …").   In previous budget years, the Department would notify grantees in December of continued funding for the next calendar year, and any notices of discontinuation would be sent earlier. *See* Dkt. No. 53 ¶¶ 11, 13.  Many Grantees testified that in their experience, discontinuation of a project's funding is very rare and

occurs only in cases of misconduct, and even then, grantees are typically given notice and opportunities to make corrections. *Id.*; *see also*, *e.g.*, Dkt. No. 99 ¶ 14, Dkt. No. 104 ¶ 11, Dkt. No. 105 ¶ 16.

But on April 29, 2025, the Department notified "most or all" Grantees in Plaintiff States that their grants (hereinafter "Grants") would be discontinued at the end of the current budget period (December 31, 2025). Dkt. No. 1 ¶ 80. Plaintiff States allege the discontinuation notices were identical and stated:

> This letter provides notice that the United States Department of Education has determined not to continue your federal award, S184xxxxxxx, in its entirety, effective at the end of your current grant budget period. See, inter alia, 34 C.F.R. § 75.253(a)(5) and (f)(1). …
>
> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

*Id.* In conjunction with sending the notices, the Department informed Congress that it was discontinuing approximately $1 billion in awards, and that it planned to re-compete those funds with different priorities. *Id.* ¶¶ 6, 81.

Plaintiff States have submitted evidence describing both the programs funded by the Grants and the impact of the discontinuation decisions. For example, Plaintiff State Rhode Island provided testimony from Rosemary Reilly-Chammat, Ed.D., of the Rhode Island Department of Elementary and Secondary Education ("RIDE"), which is the "state agency responsible for ensuring every student has access to high-quality teaching and learning opportunities" and tasked with setting "statewide educational priorities." Dkt No. 99 ¶ 4. Dr. Reilly-Chammat testified that

Rhode Island's student-to-counselor ratio was far below the recommended average, and that its student population faced "urgent and ongoing mental health challenges" in the wake of the COVID-19 pandemic. *Id.* ¶¶ 9–10. RIDE received a SBMH grant in 2022, which has (among other things) funded nine new school-based mental health professionals and placed 22 graduate-level behavioral health interns across four partner LEAs statewide. *Id.* ¶¶ 11, 13. Dr. Reilly-Chammat testified that discontinuation of RIDE's Grant has led to a pause in hiring, termination of existing staff positions, and the scaling back of planned service expansions, which "directly undermines Rhode Island's strategy to build a more sustainable, diverse, and qualified mental health workforce for schools" and causes "ongoing" harm to its mission. *Id.* ¶¶ 19, 29, 31. She further testified that the decision undermines years of trust building and collaboration between the state, LEAs, IHE partners and community-based organizations, which "compromises Rhode Island's credibility as a stable partner in mental health systems development and may discourage future participation in similarly ambitious state-led efforts." *Id.* ¶ 30.

Similarly, Megan Welter, Ph.D., of the Maine Department of Education described the SBMH Grant her entity received, which allowed nine participating school districts to hire 10 new school-based mental health professionals and retain an additional four providers with Grant funds. Dkt. No. 88 ¶¶ 8, 12. Grant funds also allowed IHEs to fund Maine graduate students pursuing degrees and licensure in school-based mental health fields. *Id.* ¶ 12. Dr. Welter averred that because of the discontinuation of this Grant, "Maine will suffer damage to relationships with LEAs and to the SBMH graduate programs" and rural Maine schools face the imminent loss of 14 mental health providers. *Id.* ¶ 17. She further testified to losses of critical services for students in rural areas following the loss of staff and funding for teletherapy, the resulting impact on community-based mental health services in Maine, and the "abrupt end" to the state's work with three public universities in Maine that are developing Maine's school-based mental health workforce pipeline,

providing services that are "crucial to addressing student mental health needs in [the] state."  *Id.* ¶¶ 18–19.  Declarations from additional state education departments describe similar partnerships and harms arising from the sudden discontinuation of these programs.  *See e.g.*, Dkt. No. 80 (Colorado Department of Education), Dkt. No. 84 (Illinois State Board of Education), Dkt. No. 89 (Michigan Department of Education), Dkt. No. 106 (Wisconsin Department of Public Instruction).

Numerous public universities also submitted declarations describing their Grants and the impact of the discontinuation decisions.  For example, Katie Stalker, MSW, Ph.D., testified that the University of Buffalo, which is part of the State University of New York system, has used MHSP Grant funds to create a fellowship program for graduate social work students placed for training in rural schools.  Dkt. No. 95 ¶ 10.  As a result of the discontinuation of its Grant, the University of Buffalo will be forced to terminate 10 internship placements, "disrupting professional training pathways for graduate students."  *Id.* ¶ 18. This will cause significant harm to both students and rural communities in western New York, as 3,000 students will lose access to critically needed mental health services and 36 graduate social work trainees will lose placements in rural schools after December 31, 2025.  *Id.*  Other public universities in California, Colorado, Connecticut, Delaware, Massachusetts, Maryland, New York, Oregon, and Washington created similar training programs and describe similar immediate harms stemming from the abrupt end of partnerships with state and local agencies, loss of staff and graduate student employees, mid-year cancellation of scholarships and research projects, and the immediate loss of services currently being provided to students in Plaintiffs States via the Grants.  *See e.g.*, Dkt. Nos. 63, 77, 81, 82, 85, 86, 93, 98, 103, 104.

LEAs also attest to similar harms.  For example, Natalie Gustafson of Washington state's Northwest Educational Service District 189 ("NWESD 189") explained how its Grant funds have allowed it to recruit and hire 19 school-based mental health professionals plus three clinical

supervisors and two paid interns.   Dkt. No. 102 ¶¶ 24, 26.   Gustafson testified that the discontinuation of the Grant results in the loss of staff members and undermines NWESD 189's mission to promote equity and excellence through leadership and service.   *Id*. ¶ 36.   She further testified that the area served by NWESD 189 is home to several community mental health agencies, but they cannot accommodate all the students who will lose access to services without the Grant. *Id*. ¶ 32.   The discontinuation also exacerbates the ongoing shortage of mental health professionals willing to work in rural and low-income Washington communities.   *Id.* ¶ 34.   Again, the record reflects similar harms resulting from the sudden end of programs addressing similar needs in other LEAs throughout Plaintiff States.   *See e.g.*, Dkt. No. 53 (San Diego County Office of Education), Dkt. No. 69 (Solano County Office of Education), Dkt. No. 100 (Washington's Educational Service District 100), Dkt. No. 103 (Washington's Educational Service District 105).

**D.    Plaintiff States Filed This Lawsuit.**

Plaintiff States filed this action on June 30, 2025, claiming that the Department did not comply with the Administrative Procedure Act ("APA") in discontinuing the Grants, and that its actions also violate the United States Constitution's Spending Clause and Separation of Powers and are ultra vires.   Dkt. No. 1.   With respect to the APA claims, Plaintiff States allege the discontinuation decisions are arbitrary and capricious for several reasons, are contrary to law, and were enacted without required notice-and-comment rulemaking.   *Id.* ¶¶ 95–115, 121–29.   The same allegations form the basis for Plaintiff States' constitutional and ultra vires claims.   *Id.* ¶¶ 130–56.

Plaintiff States subsequently filed a motion for preliminary injunction.   Dkt. No. 49.   After the briefing on the motion was complete, the parties filed notices of supplemental authority, and the Court ordered the parties to provide supplemental briefing.   Dkt. Nos. 154, 155, 156, 157.   The Court held oral argument on the motion for preliminary injunction, during which the Department's

counsel stated that Defendants would be moving to dismiss later that day.  Dkt. No. 167 at 24.

After briefing on the motion to dismiss was complete, the Court denied that motion.  Dkt. No. 190.

The Court now turns to consider Plaintiff States' motion for preliminary injunction.  As Plaintiff States have met their burden to show that preliminary relief is warranted, the Court will grant the motion.

## II.    ANALYSIS[3]

### A.    Legal Standards

"Preliminary injunctive relief is an extraordinary equitable remedy that is never awarded as of right."  *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024) (citation modified).  "The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits."  *Doe v. Horne*, 115 F.4th 1083, 1098 (9th Cir. 2024) (citation modified).

To succeed on a motion for preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge."  *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

---

[3] The threshold jurisdictional issues raised in Defendants' opposition brief were subsequently expanded in a motion to dismiss, which the Court denied.  *See* Dkt. No. 190.  Thus, this order addresses only the remaining issues as to the injunction sought by Plaintiff States.

1

2

**B.      Plaintiff States Are Likely to Succeed on the Merits of at Least One of Their APA Claims.**

As noted earlier in this order, the complaint brings several claims against Defendants challenging the lawfulness of the discontinuation decisions, including that the discontinuation decisions are arbitrary and capricious under the APA as well as constitutional theories.  *See* Dkt. No. 1 ¶¶ 121–51.  Plaintiff States argue that they are likely to succeed on the merits of their APA claims as well as their Spending Clause claim.  Dkt. No. 49 at 23.  For the following reasons, the Court finds that Plaintiff States are likely to succeed on the merits of their arbitrary and capricious APA claim and have therefore satisfied the first *Winter* factor.[4]

Courts must set aside agency action[5] that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).  The "well-worn arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The Court finds that Plaintiff States have met their burden to show that they are likely

---

[4] Because the Court finds that Plaintiffs are likely to succeed on the merits of their "arbitrary and capricious" APA claim, it need not address whether Plaintiffs are likely to succeed on other claims to find that the first *Winter* factor has been satisfied.  *See, e.g.*, *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, No. 25-1407 (PLF), __ F. Supp. 3d __, 2025 WL 2158340, at *14 n.6 (D.D.C. July 30, 2025).

[5] Defendants do not contest that the discontinuation decisions represent final agency action.  *Compare* Dkt. No. 49 at 24–25 *with* Dkt. No. 147 at 16–17.  Nor do they directly dispute that Plaintiff States are within the "zone of interests" protected by the APA.  *See, e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 914 (N.D. Cal. 2025) (explaining that the APA's "zone of interests" test "is not especially demanding" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue" (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667 (9th Cir. 2021)).  The Court finds no such apparent defect in Plaintiff States' interest in lawful agency action here, for the reasons explained with respect to standing and injury in the prior order denying Defendants' motion to dismiss (Dkt. No. 190), particularly because Defendants do not directly contend otherwise.  *See* Dkt. No. 180 at 6 n.3 (Defendants' reply brief to the motion to dismiss, contending that whether Plaintiff States satisfy the "zone of interests" test is "beside the point").

to succeed on the merits of their APA claim that the discontinuation decisions are arbitrary and capricious in at least two ways.

    *1.   The Discontinuation Decisions are Likely Arbitrary and Capricious as Unexplained and Conclusory.*

First, Plaintiff States argue that the discontinuation decisions are arbitrary and capricious because they do not contain individualized reasons for not renewing the Grants. Dkt. No. 49 at 26 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) (finding agency action arbitrary and capricious where a party is "compelled to guess at the theory underlying the agency's action")). As even Defendants acknowledge (Dkt. No. 189 at 14), the decisions are generic and identical, were all issued the same day, and recite a disjunctive list of reasons that the Grants are not in the best interests of the federal government (stating that the discontinued grants "violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds"). *See, e.g.*, Dkt. No. 102-5 at 2. The decisions neither identify *which* principle or principles are in conflict with the Grant, nor explain *why* the Grants conflict with any principle. *Id.* According to Plaintiff States, this lack of individualized reasoning renders the decisions arbitrary and capricious because they are left guessing why the Grants were discontinued. Dkt. No. 150 at 15.

Defendants argue that no further explanation is required. Because the regulations permit the Department to discontinue a grant if it is found to be in the best interest of the federal government to do so, and the Department identified the criteria it applied to make this determination, Defendants posit that they have satisfied their obligation to provide a reasonable explanation for the decision. Dkt. No. 147 at 17. This argument is not persuasive. In reviewing an agency decision, courts look to whether the agency "examined 'the relevant data' and

articulated 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicles Mfrs.*, 463 U.S. at 43). Here, there is no evidence the Department considered any relevant data pertaining to the Grants at issue and it is undisputed that it provided no Grant-specific explanation of the application of the Department's new "best interest" criteria. In the absence of any findings, the Court cannot determine whether the Department's decision bears a rational connection to the facts. Rather, the discontinuation decisions are wholly conclusory, which prevents meaningful judicial review.[6]

Although an agency decision need not be written with "ideal clarity" (*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation modified)), Defendants concede that an agency must demonstrate that its decision "was the product of reasoned decisionmaking." Dkt. No. 147 at 16–17 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52). Beyond an unsupported assertion that the decisions were "reasonable and reasonably explained" (*id*. at 16), Defendants make no effort to analogize the discontinuation decisions or the process by which the decisions were reached to the cases they cite. *See id*. at 16–17. Indeed, Defendants' counsel admitted at oral argument that he had no information about how the Department decided which Grants to discontinue, and that the record contains none. Dkt. No. 167 at 38. Because the Court agrees with Plaintiff States that the discontinuation decisions are unexplained and

---

[6] The complete lack of explanation also precludes a meaningful opportunity to seek reconsideration. The discontinuation notices advise Grantees that under 34 C.F.R. § 75.253(g), they may seek reconsideration of the Department's decision, however, they "must submit information and documentation supporting" their position. *See e.g.*, Dkt. No. 103-4 at 2. But without any information as to the factual basis for the Department's decision, such a process would require Grantees to guess at the Department's rationale, mount arguments against such a rationale, *and* provide documentation to do so. Such a process contravenes the APA. *See Washington v. U.S. Dep't of Com.*, No. C25-1507 MJP, 2025 WL 2978822, at *8 (W.D. Wash. Oct. 22, 2025) ("One is effectively left to guess at what the new priorities are and why the awards are now misaligned with them—this violates the APA.").

conclusory, the Court finds that Plaintiff States have shown a likelihood of success on the merits of their APA claim on this basis.

> 2. *The Discontinuation Decisions are Likely Arbitrary and Capricious Because the Department Did Not Consider Reliance Interests.*

Plaintiff States argue that Defendants failed to consider the Grantees' reliance interests before issuing the discontinuation decisions. Dkt. No. 49 at 27–28. The Supreme Court has explained that an agency acts arbitrarily and capriciously when it changes an existing policy without considering "'serious reliance interests.'" *Wages & White Lion Invs.*, 604 U.S. at 568 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). Plaintiff States submitted evidence establishing that the Department had previously instructed Grantees that continued funding depended on their project performance as measured against the Department's published priorities. Introducing new considerations pertaining to the interests of the federal government for the first time in discontinuation decisions fails to account for the time and resources Grantees invested in structuring their projects and budgets to conform to the performance data that they reasonably believed would help them ensure continued funding. Dkt. No. 49 at 27 (citing Dkt. No. 65 ¶ 22, Dkt. No. 86 ¶ 11–12, Dkt. No. 87 ¶ 11, Dkt. No. 100 ¶ 13, Dkt. No. 101 ¶ 15, Dkt. No. 103 ¶ 13, Dkt. No. 104 ¶ 20).

Defendants argue in opposition that because the regulations explicitly instruct that continuation awards are not automatically granted, such that future funding is not guaranteed, Grantees should not have developed reliance interests on future funding. Dkt. No. 147 at 17. Defendants' litigation position on the strength of the Grantees' reliance interests is not an adequate substitute for the Department's consideration of the Grantees' reliance interests at the time of the discontinuation decisions, however. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020) (where an agency is "not writing on a blank slate" it is "required

to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (citation modified)).   In other words, the Department should have considered the Grantees' reliance interests at the time the decisions were made, and Defendants' post-hoc legal arguments cannot remedy this failure.  *See Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) ("[A]n agency 'must defend its actions based on the reasons it gave when it acted,' not with post hoc rationalizations." (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 24)).   Because there is no evidence before the Court that Defendants considered any reliance interests (as Defendants conceded at oral argument (Dkt. No. 167 at 38–39)), the Court finds Plaintiffs are likely to prevail on their APA claim challenging the discontinuation decisions as arbitrary and capricious on this basis as well.

For these reasons, the Court finds that Plaintiffs have met their burden to show a likelihood of success on the merits on at least two APA theories, thus satisfying the first *Winter* factor.

## C.    Plaintiffs States Have Presented Evidence They Are Likely to Suffer Irreparable Harm Without Preliminary Relief.

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages" after a full adjudication on the merits.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).   Monetary harm does not typically constitute irreparable harm, as economic losses can generally be recovered at a later date.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  "But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.  A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must

*demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation modified).

The Ninth Circuit has recognized that Plaintiffs in APA cases can show irreparable harm where agency action causes a "significant change in their programs and a concomitant loss of funding[.]" *E. Bay Sanctuary Covenant*, 993 F.3d at 677 ("Both constitute irreparable injuries: the first is an intangible injury, and the second is economic harm for which the Organizations have no vehicle for recovery."). Courts have likewise found irreparable harm in cases alleging APA violations where a plaintiff shows serious "'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs*., 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

Plaintiff States make this showing. They have submitted declarations detailing numerous irreparable harms flowing from the discontinuation decisions, such as the immediate cessation of mental health services to students in rural and underserved parts of Plaintiff States, staff layoffs in Grantee programs, a steep decline in graduate student retention in Grant-funded training programs, the mid-year termination of scholarships and research projects, the halt to a Grantee university's accreditation process, and the dismantling of the workforce development programs in Plaintiff States that the Grants were intended to promote. *See* Dkt. No. 101 ¶ 19; Dkt. No. 103 ¶¶ 19, 24; Dkt. No.104 ¶ 34. As the MHSP and SBMH programs were created to support multi-year projects in Plaintiff States to benefit students and schools, it is unsurprising that discontinuing Grant funding mid-project would cause harm to the States' interests. Congress created these programs to address the states' need for school-based mental health services in their schools, and has repeatedly reaffirmed the need for those services over the years by reauthorizing and increasing

appropriations to these programs.  This further supports the Grantees' testimony that an interruption in the provision of financial support would harm the Plaintiff States.

Defendants argue in opposition that at least some of these harms are borne not by Plaintiff States but by Grantees, and are merely speculative in any event.  Dkt. No. 147 at 26–27.  As explained in the Court's prior order denying Defendants' motion to dismiss, however, whether a Grantee is an instrumentality of the State or not, Plaintiff States are likely to be concretely injured by the discontinuation of any Grant.  *See* Dkt. No. 190 at 12–13.  And Plaintiff States have submitted declarations from Grantee representatives explaining how the discontinuation decisions are already impacting Plaintiff States' students, prospective school psychologists, and community partnerships, even if the Grant funding is not discontinued until December 31, 2025.[7]  *See, e.g.*, Dkt. No. 101 ¶ 19 (explaining that the University of Washington Tacoma cannot admit the full number of students into school psychology graduate program without Grant funding), Dkt. No. 103 ¶ 19 (a public agency in Washington that supports school districts and schools was forced to lay off two employees in August 2025 because budgets are planned for an entire school year, and fewer social work graduate student interns can be supervised in the 2025–26 school year), Dkt. No. 105 ¶ 21 (explaining that the discontinuation of fellowship funding means that the University of Wisconsin-Madison's cohort of six graduate students will not be able to participate in professional development training to allow them to graduate on time in May 2026).

And although Defendants emphasize that Grantees may file new applications and could be awarded similar grants in the future, new funding could not remedy all of the harms flowing from

---

[7] Plaintiff States have not made this showing with respect to Plaintiff Nevada, however.  The only declaration from a Nevada Grantee indicates that its Grant funding was scheduled to expire on September 30, 2025, before the effective date of the discontinuation decision.  *See* Dkt. No. 92 ¶ 8.  Plaintiff States resist dismissal of Nevada because "it has demonstrated a stake in declaratory relief[.]"  Dkt. No. 150 at 9 (citing Dkt. No. 92 ¶¶ 13–18).  But because Plaintiff States have failed to show that Plaintiff Nevada has an interest in *injunctive* relief, the Court will exclude Nevada from the scope of the preliminary injunction.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 18

the discontinuation decisions.  That school budgets in future years could include mental health services cannot remedy the lack of such services for this school year, and schools and graduate programs will be harmed by a loss of expertise in staff members, even if they could eventually rehire staff for those positions.  *See, e.g.*, Dkt. No. 101 ¶ 24 ("There is no way to recover lost time or restore continuity once disrupted, and staff who depart will take their training and expertise with them, requiring new investment in recruitment, hiring, and training."); *see also Cmty. Legal Servs.*, 780 F. Supp. 3d at 924–25 (finding a likelihood of irreparable harm where plaintiffs demonstrated that the Government's termination of funding would cause a "non-speculative loss of substantial funding" that would require plaintiffs to "issue layoff notices and threaten[] to require them to dismiss their specialized and seasoned attorneys").

Moreover, because the Department has started the process to recompete the discontinued funds with different priorities (*see* Dkt. No. 179), once those funds are awarded elsewhere, Grantees may lose access to funding entirely without preliminary relief.  *See, e.g.*, *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390, at *19 (N.D. Cal. Sep. 23, 2025) (finding a disruption in federal funding "cannot be remedied down the line with money alone as Defendants contend because by then projects on which millions of taxpayer dollars have already been spent, and which require years to complete and coordination across many parties, will have been compromised").

For all these reasons, Plaintiff States have demonstrated a likelihood of imminent irreparable harm flowing from the discontinuation decisions.  This conclusion is not undermined by the timing of this suit and/or request for preliminary relief, despite Defendants' contention that Plaintiff States' two-month delay in filing suit after the discontinuation decisions were issued suggests that any harm is not imminent.  Dkt. No. 147 at 26.  The Ninth Circuit has held that a plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and

irreparable harm." *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). But the timing here does not evince a "long delay": the suit was filed two months after the discontinuation decisions were issued, and this reaction appears reasonably swift, particularly considering the number of Plaintiff States and Grantees involved and that other lawsuits were also filed to address the discontinuation decisions. *See* Dkt. No. 109. The motion for preliminary injunction was filed nine days after the suit was filed. Dkt. No. 49. This timeline does not undermine the evidence supporting the likelihood of imminent irreparable harm.

Accordingly, the Court finds that Plaintiff States have made the requisite showing as to the second *Winter* factor.

## D.    The Balance of Equities Tips in Plaintiffs' Favor and an Injunction is in the Public Interest.

As noted above, the third and fourth *Winter* factors merge when a preliminary injunction is sought against the Government, and the Court must therefore determine whether the balance of equities and public interest favor injunctive relief. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).

The Court finds that these factors easily favor injunctive relief. The hardships faced by Plaintiff States, whose schools depend so heavily (if not entirely) on federal funding to achieve Congress's goals for the MHSP and SBMH programs, in the absence of an injunction far outweigh the hardship to the Government in pausing the recompeting of funds to allow lawful continuation decisions to be rendered.

Likewise, the public is served by requiring the Government to provide reasoned explanations and to consider reliance interests when changing a position via agency actions, and by setting aside arbitrary and capricious agency decisions that fail to do so. *See, e.g., Azar*, 911 F.3d at 581 ("The public interest is served by compliance with the APA[.]"); *League of Women*

*Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). That "democratically accountable leaders at the Department" (Dkt. No. 147 at 28) authorized the discontinuation decisions does not relieve them from compliance with longstanding requirements for lawful agency action. *See Valle del Sol*, 732 F.3d at 1029 (holding that it "is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law" (citation modified)).

Although Defendants complain that "[t]he public interest is harmed when the United States is forced to pay out funds that it may not be able to recover" (Dkt. No. 147 at 27), Plaintiff States do not ask this Court to order Defendants to pay out any funds. The preliminary relief Plaintiff States request instead enjoins the implementation of the discontinuation decisions to allow time for lawful decisions to be issued before the funds are reallocated.

Defendants also suggest that this action could have been obviated if Grantees had simply requested reconsideration of the discontinuation decisions, and therefore the extraordinary remedy of injunctive relief tips the equities against Plaintiff States. Dkt. No. 147 at 28. As explained earlier, however, the discontinuation decisions do not provide a reasoned explanation for the discontinuation of the Grants, which leaves Grantees guessing as to the Department's rationale. Requiring Grantees to seek reconsideration of an unspecified rationale would be a waste of time, particularly where Defendants do not dispute that the discontinuation decisions represent final agency action.

Because all of the *Winter* factors have therefore been satisfied, the Court will grant Plaintiff States' motion but must, in the next section of this order, determine the scope of the preliminary injunction to be issued.

**E.    The Scope of the Injunction Is Limited to Grants Documented In Plaintiff States Other Than Nevada.**

When a plaintiff satisfies its burden to demonstrate that a preliminary injunction should issue, "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). But "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987). "[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*." *Id*. at 1170–71.

Here, Plaintiff States do not request an injunction that extends beyond their borders into other states or to the nation as a whole, but they do request statewide relief as to themselves. It is unclear whether the Grantees who filed declarations constitute all the discontinued Grants in Plaintiff States, or whether they are merely representative of a larger group. *See, e.g.*, Dkt. No. 189 at 43. In any event, though the Court found that Plaintiffs States had sufficiently alleged an Article III injury arising from the discontinuation of any Grant awarded within its borders (Dkt. No. 190 at 11–12), there is insufficient evidence of irreparable harm to infer that enjoining the implementation of *every* discontinuation decision in Plaintiff States is required to provide complete relief to Plaintiff States. *See, e.g.*, *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 58 (2d Cir. 2004) (explaining that where plaintiffs submit evidence permitting an inference that testifying plaintiffs are similarly situated in terms of irreparable harm to all other plaintiffs, then a "court could permissibly engage in inductive reasoning to reach the conclusion that *every* plaintiff suffered the threat of irreparable harm"). And the situation of Plaintiff Nevada (discussed earlier)

supports the exercise of caution, as the Court is aware that not every discontinuation decision may cause irreparable harm to Plaintiff States.

Accordingly, the Court declines to infer without proof that Plaintiff States are likely to be irreparably harmed by the discontinuation of every Grant within each state. At this point, the Court will therefore limit the scope of the preliminary injunction to those Grants about which the Court has evidence of irreparable harm flowing from the discontinuation decisions, as detailed below.

**F.    No Bond Is Required.**

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified).

Here, the Court waives the imposition of any bond on Plaintiff States. "In public-interest litigation where the court enjoins unlawful agency action, a nominal bond is appropriate, especially where, as here, the government-defendant fails to provide any evidence that an injunction would impose a substantial cost." *Washington v. U.S. Dep't of Transp.*, __ F. Supp. 3d __, 2025 WL 1742893, at *31 (W.D. Wash. June 24, 2025) (citation modified). And in recent cases enjoining federal agency defendants, courts have waived the bond requirement altogether. *See, e.g.*, *King County v. Turner*, 785 F. Supp. 3d 863, 893 (W.D. Wash. 2025); *Los Angeles Press Club v. Noem*, __ F. Supp. 3d __, 2025 WL 2658327, at *24 n.33 (C.D. Cal. Sep. 10, 2025); *Washington*, 2025 WL 1742893, at *31.

Defendants suggest that a "bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed."

Dkt. No. 147 at 30. But again, Plaintiff States do not request an order requiring Defendants to continue the Grants. Because Defendants' argument depends on a mischaracterization of Plaintiff States' requested relief, and because Defendants have not shown that the relief actually sought would impose any cost, the Court denies their request for a bond in its entirety.

**G.     A Stay Pending Appeal Is Not Warranted.**

Defendants request that "[i]f the Court issues an injunction, … it be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal." Dkt. No. 147 at 30. Defendants do not explain why this relief is warranted, or address any of the factors that would impact the Court's analysis of the issue. In the face of this cursory request, the Court will deny Defendants' request for a stay pending appeal.

### III.   CONCLUSION

For these reasons, the Court GRANTS Plaintiffs' motion for preliminary injunction (Dkt. No. 49) as modified herein:

1. Defendants and all their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with them who receives actual notice of this order are hereby fully enjoined from the following:

>    a. implementing or enforcing through any means the discontinuation decisions as to affected Grantees, including recompeting Program funds;

>    b. reinstituting the discontinuation decisions based on the same or similar reasons, including denying a continuation award based on performance issues, if any, caused by the Department's discontinuation decision and its disruptive effects.

2. Defendants must immediately take every step necessary to effectuate this Order, including clearing any administrative, operational, or technical hurdles to implementation, and notifying affected Grantees that the discontinuances have been set aside.

3. This injunction is limited to the following Grantees located within Plaintiff States: Santee School District; Northern Humboldt Union High School District; San Diego County Office of Education; Los Angeles Unified School District; Madera Unified School District; Para Los Niños; McKinleyville Union School District; University of Redlands; Tulare County Office of Education; Ukiah Unified School District; California State Polytechnic University, Humboldt; California State University, East Bay; Santa Maria-Bonita School District; California State University, Long Beach; Marin County Office of Education; the Multicultural Learning Center; Solano County Office of Education; University Corporation at Monterey Bay; Conejo Valley Unified School District; San Francisco State University; Santa Clara County Office of Education; University of Northern Colorado; University of Colorado Denver; University of Denver; Metropolitan State University of Denver; Colorado Department of Education; University of Connecticut; University of Delaware; Northern Illinois University; Illinois State Board of Education; University of Massachusetts Boston; Bowie State University; University of Maryland, Baltimore; Maine Department of Education; Michigan Department of Education; Grand Valley State University; Central Region Educational Cooperative; Binghamton University; University of Buffalo; the Research Foundation for the State University of New York; Portland State University; Oregon State University; Rhode Island Department of Elementary and Secondary Education; Educational Service District 112; University of Washington; Northwest Educational Service District 189; Educational Service District 105; University of Wisconsin-Madison; Wisconsin Department of Public Instruction.

4. Defendants' counsel shall provide written notice of this Order within 24 hours to all Defendants, and their employees, contractors, and affected Grantees.

5. Defendants' counsel shall file a status report within 48 hours, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

6. A bond is not necessary under these circumstances and the Court exercises its discretion not to require one.

7. This preliminary injunction remains in effect pending further orders from this Court.

Dated this 27th day of October, 2025.

_____
Kymberly K. Evanson
United States District Judge