IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

          Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

          Defendants.

CASE NO. C25-1228KKE

**<u>DECLARATION OF DANA CARR</u>**

I, Dana Carr, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate to the best of my information and belief:

    1.     I am a Supervisory Program and Management Analyst and Group Leader in the Office of Safe and Supportive Schools ("OSSS") of the Office of Elementary and Secondary Education ("OESE") at the United States Department of Education ("Education" or "the Department"). I am a duly authorized Custodian of Records, or other qualified witness for Education. I am competent to make the statements contained in this declaration. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

    2.     As a Supervisory Program and Management Analyst and Group Leader, my job responsibilities include managing two federal discretionary grant programs, the School-Based Mental Health Services Program ("SBMH") and the Mental Health Service Professional Demonstration Grant Program ("MHSP"). My responsibilities include supervising staff; grants

management activities related to soliciting, reviewing and selecting applications for funding; overseeing grants monitoring activities and oversight; providing and coordinating technical assistance; program reporting; and administering program budgets as appropriated by Congress. I have been in my current role since August 2024.  I previously worked in the Office of Safe and Drug-Free Schools, the precursor to OSSS, at the Department from December 2003 until March 2011.

3. There are one hundred and thirty-eight SBMH and MHSP grants that were the subject of the Court's recent order on December 23, 2025 that requested non-competing continuation (NCC) awards to fund their next project period, which aligns with the January 1, 2026-December 31, 2026 calendar year, and did not receive continuation awards.

4. The Court issued its December 23, 2025, order after the Department's DC headquarters offices were closed, with staff unavailable. We currently have limited resources and staff available to responsibly issue new grant awards by December 31. Because the Department adheres to a stringent protocol and process for grant-making, described below, that ensures compliance with grantmaking regulations, policies, and processes, it will be unable to determine whether a grant should be continued by the deadline established by the Court's December 23, 2025 order. In addition, we are unable to immediately gather more information, as described below, from grantees who may also be unavailable this week. Given these circumstances, the Department requests until January 9, 2026 to process interim NCC awards.

5. If additional time is permitted by the Court, Education proposes providing NCC awards for an interim period of up to four months from January 9, 2026. During this time, the Department would individually review each grant for continuation in accordance with relevant laws and regulations and established Department procedures and criteria.  In the interim,

the Department proposes to provide each grantee in the Plaintiff states with a prorated amount equal to five weeks of funding, based on their full requested amount for the next performance period. This 5-week award, or 5/52 of their total year award, would allow grantees to continue activities as the Court considers the Department's motion to alter or amend the judgment. This 5-week period would also allow the Department to gather updated information to guide individualized NCC award determinations.

6. Under this proposal, Education could take immediate steps to make interim NCC awards no later than January 9, 2026 to comply with the Court's order. The source of these funds would be the program funding reserved pursuant to the Court's October 27, 2025, preliminary injunction.

7. Education would then take the following steps to reach individualized determinations on each grantee as to the appropriateness of NCC awards beyond the interim period. This process could be completed no later than January 30, 2025.

8. First, the program office would review current available information, such as the most recently submitted Annual Performance Report (APR) and notes from the grantee's file. The program office could also request additional information from the grantee as well as administrative sources to determine eligibility for NCC awards. Because some grantees submitted APRs several months ago (either in April or June, depending on the cohort), while others have not at all, the program office could request updates to the reports to ensure that all information and progress is considered in assessing NCC eligibility.

9. Although some grantees covered by the Court order received notification of substantial progress, this assessment was based on performance from the previous project period

(ending December 31, 2024). Some of the other grantees in this group did not submit APRs at all. The program office would seek to update all grantee's information to ensure that all information and progress is considered in assessing NCC eligibility.

10. APRs include information on the previous year's activities, budget information, such as expenditures and encumbered funds, and progress towards the grantee's goals and objectives. The program office would assess each grantee's progress towards their goals and objectives using the standard process of determining "substantial progress." The program office would also check each grantee for active System for Award Management (SAM.gov) registration, as required by 2 CFR 200.206.

11. The program office would also analyze each grantee's compliance and risk history, consistent with 2 C.F.R. 200.206. This analysis combines grantee records with the Department's Entity Risk Review and addresses reporting and financial management requirements, including but not limited to internal controls and associated risks, grant oversight, and financial risk and expenditure history, such as excessive drawdowns or large available balances.

12. Following the review and analysis of grantees' progress, the program office would assess the grantees' available balances, requested budgets, and their proposed activities for the next performance period. If the grantee has a large available balance, the program office will determine if the NCC award should be reduced accordingly.

13. Following these steps, the program office would prepare the internal NCC slate memorandum or memorandums, using approved NCC templates, to document the process, recommended total awards, and special conditions or considerations.

14. The program office would coordinate with the Department grants policy team to facilitate the multi-level Departmental review and clearance process, including edits and changes based on comments. This process requires concurrence from all Department offices responsible for ensuring compliance with legal, budget, and program components, as well as alignment with policy and administrative priorities.

15. Once the slate is approved, the program office would work with appropriate offices to allot and commit funds, complete Congressional Notification, and prepare the awards for obligation and grantee notification.

16. The steps outlined above are necessary to ensure compliance with relevant regulations and the Department's internal policies and procedures, as well as to reduce the likelihood of errors in the grant award process.

I declare under the penalty of perjury that the forgoing is true and correct.

Executed on this 30th day of December, 2025.

*Dana Carr*

Dana Carr