# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| COUNCIL FOR OPPORTUNITY IN EDUCATION, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:25-cv-3491-TSC |
| v. | ) Case No. 1:25-cv-3514-TSC |
| | ) |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | ) **\*Hearing Requested** |
| | ) |
| | ) **REDACTED[1]** |
| Defendants. | ) |

## <u>PLAINTIFF'S EXPEDITED MOTION TO ENFORCE PRELIMINARY INJUNCTION</u>

Nearly half of the Department of Education's grant reconsideration decisions violate the Court's preliminary injunction. Rather than cure the flaws in the original decisions the Court vacated earlier this year, the Department doubled down. For 28 TRIO programs, the Department issued, in effect, the same unlawful decisions. Yet again, the Department wrote programs boilerplate decision letters, relied on DEI language in their applications that the Department had approved years ago, and failed to seek their voluntary compliance with federal civil rights laws. The Court enjoined the Department from "enforcing or implementing" the original decisions "through any means," but that is precisely what the Department has now done.

That is not all though. While the Court ordered the Department to "issue new determinations regarding ***continuation***" of grants, the Department elected to issue these 28 programs "termination" decisions. This maneuver seems to signal a forthcoming jurisdictional

---

[1] This Motion and the accompanying declaration and exhibits thereto are otherwise being filed under seal pursuant to the Court's opinion and order, Docs. 33 & 44, granting COE's prior motion to file under seal certain documents that reveal the identities of COE's additional members. COE is filing this redacted version of this Motion and the accompanying declaration and exhibits on the public docket.

challenge. But the Court retains jurisdiction to enforce its orders, notwithstanding the Department's efforts to evade it.

Beyond the 28 TRIO terminated programs, the Department re-denied and re-discontinued 10 other programs for non-DEI reasons. These decisions are independently problematic. The Court ordered the Department to consider programs' applications for new Student Support Services ("SSS") grants in accordance with its opinion and applicable laws, regulations, and procedures. But the Department did not make decisions based on the final scores that SSS programs earned on their peer-reviewed applications—and yet again did not disclose the scores to programs. Instead, after a "screening" process, the Department re-denied several SSS programs for purportedly not providing certain "assurances" of their compliance. Incredibly, the Department ignored the very form it created and that the programs completed providing *these exact assurances*. Worse, after the injunction, the Department in January told SSS programs it "intended" to contact them in February to collect any "necessary," "updated assurances." But it never followed up before re-denying them for a lack of "assurances" in March.

The Department's decisions for several other TRIO programs were also not in accordance with the law. Indeed, the Department penalized one program for allegedly not providing certain "services" that the authorizing statute and regulations do not actually require. In other cases, the Department concluded that programs did not submit certain information to the Department, but the evidence, submitted with this Motion, shows that they did. Illustrating the Department's overall lack of attention to detail throughout the "reconsideration" process is one decision in particular: in rejecting a program, the Department relied on language in *another program's* application.[2]

---

[2] In ███████████s Notice of Termination, the Department cited the wrong award number and quoted language that is not in ████████ grant application. The Department cited award number ████████████ that corresponds to another program's Talent Search grant, not ████████████ that

Just as concerning is how the Department distinguished between the programs on reconsideration. By all accounts, the Department based its decisions at least in part on the type of TRIO grant rather than solely on the criteria considered for continuation. For example, the Department terminated **all 28** Talent Search, Upward Bound, Upward Bound Math and Science, Veterans Upward Bound, Educational Opportunity Center, and Training programs.[3] Yet it did not terminate **any of the 11** McNair grants, and instead issued them continuation awards. Equally perplexing, the Department seemingly treated the programs it reconsidered in March more favorably than the programs it reconsidered in May; after re-denying grants to **all four** SSS programs in March, it issued new grants to **all 17** SSS programs in May. The type of TRIO grant and the timing of reconsideration are obviously not relevant considerations on reconsideration. Why the Department proceeded as it did, at least for now, is a mystery.

While the programs have independently sought relief from the Department (several as far back as March), none of them have received a response.

As a result, although the Court already ruled in its favor, COE has no choice but to ask the Court to enforce the injunction. "A court's powers to enforce its own injunction by issuing additional orders is broad, particularly where the enjoined party has not 'fully complied with the court's earlier orders.'" *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 26–27 (D.D.C. 2000) (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)).

COE therefore respectfully requests that the Court direct the Department to reconsider yet

___

corresponds to ▮▮▮▮▮ grant. Given that the Department terminated every Talent Search grant anyway, this mistake likely would have made no difference in the outcome for ▮▮▮▮▮ *See* Jones Decl. Ex. H.

[3] The federal TRIO programs consist of eight separate grant programs (including SSS). COE refers to TRIO and SSS as they relate to the two separately filed lawsuits, No. 25-cv-3491 and No. 25-cv-3514, which the Court has consolidated.

again, in the manner it should have the first time. And given the delay in this process, this time COE requests expedited relief. It has been nearly a year since the original decisions, about nine months since COE sought relief, and almost five months since the Court awarded relief. Thirty-eight programs and their students continue to suffer ongoing harm, and the 2025-2026 budget period for which they wrongly lost grants will end this summer. Since the inception of this case, the Department has repeatedly sought extensions and dragged out the reconsideration process. It is waging a war of attrition, and regrettably, a handful of programs have waved the white flag. For the 38 pushing forward, the Department must reconsider and issue new decisions immediately.

### BACKGROUND

**I.      The Court's preliminary injunction is in effect**

Without reviewing the litigation frame by frame, COE initiated this litigation in September 2025, challenging the Department's summer 2025 decisions to both discontinue COE members' TRIO grants and to deny their applications for new SSS grants. The Department based these decisions on language in the programs' grant applications that was inconsistent with the Department's new anti-DEI policies and priorities and purportedly violated civil rights laws.

COE moved for immediate injunctive relief, and on January 16, 2026, the Court entered a preliminary injunction in favor of COE, vacating the decisions and directing the Department to reconsider. Initially, the injunction covered 11 COE member institutions' programs (seven TRIO, four SSS programs) that COE named. *See* Doc. 29. On April 13, 2026, the Court extended the injunction to cover 67 additional programs (50 TRIO, 17 SSS programs) that COE named in February 2026. *See* Doc. 41.

The January 16 and April 13 injunction orders contain the same operative language. For both denied SSS programs and discontinued TRIO programs, the Court first enjoined the

Department "from implementing or enforcing ***through any means***" the original decisions. Second, the Court ordered the Department to "take all necessary actions and steps to reconsider" and issue both new SSS selection decisions and "new determinations ***regarding continuation***," in accordance with its opinion and "all applicable laws, regulations, and procedures." Third, the Court enjoined the Department from issuing new notices of non-selection (*i.e.*, denials) or non-continuation "without satisfying the requisite procedures, including, where applicable, the requirements under Title VI, Title IX, and any other applicable federal laws and regulations."

## II.     The Department's reconsideration process

The Department's reconsideration process occurred in two phases. After the January 16 injunction, the Department, without citing any authority to request additional information from programs, wrote on January 30 to the seven initially-named TRIO programs requesting information and updated budgets ("reconsideration packages"), which the programs timely submitted. Doc. 31-2. The Department did not seek such packages from the four initially-named SSS programs, but it sent them a letter on January 23, stating that "Department staff may be in communication to coordinate the submission of any updated application material or other information necessary to issue a new funding decision." Doc. 31-3. The Department likewise stated in a status report filed on January 30 that it "intends to contact [SSS programs] regarding any updated assurances or information necessary to inform its selection decision." Doc. 31 at 2. The Department ultimately, however, did not follow up with the SSS programs. Doc. 39 at 2.

On March 9, the Department issued new decisions to the 11 programs, including six continuation awards to TRIO programs, one discontinuation decision to a TRIO program, and four re-denial decisions to SSS programs. Doc. 37; Doc. 39-1.

Following the April 13 injunction, the Department on April 15 similarly requested

- 5 -

reconsideration packages from the 50 additional TRIO programs, but not from the 17 additional SSS programs. Exhibit 1, Declaration of Kimberly Jones ("Jones Decl."). The Department set an April 24, 2026 5 p.m. E.T. deadline, and all but a handful of TRIO programs timely submitted.[4] The Department issued decisions for 64 of the 67 additional programs on May 19; according to the Department, three programs declined a reconsideration decision. Doc. 42 at 2. A full list of COE's named member institutions, and their corresponding programs and reconsideration decisions, is attached as **Exhibit A** to the Jones Declaration.[5]

Relevant to this motion to enforce are 38 of the 78 reconsideration decisions issued to three groups of programs: (a) 28 TRIO programs that received Notices of Termination on May 19; (b) five TRIO programs that received Notices of Non-Continuation on May 19; and (c) four SSS programs that received a Notice of Non-Selection, and one TRIO program that received a Notice of Non-Continuation, on March 9. These decisions are discussed in turn next.

a.      May 19: 28 terminated TRIO programs

The May 19 Notices of Termination to 28 TRIO programs consist of a 2-page form letter that begins by stating: "As incorporated into your grant agreement, under 2 C.F.R. § 200.340(a)(4), a Federal award may be terminated in part or its entirety if an award no longer effectuates the program goals or agency priorities." Jones Decl. Ex. H. The Notices continue, stating: "The Department has reviewed the federally-funded activities under your award, and determined that the following activities to be performed under this award no longer effectuate the program goals or the Department's priorities." *Id.* The Notices then quote language from each program's

---

[4] After submitting declarations in February 2026, some programs declined to submit reconsideration packages in April. Jones Decl. ¶24. These programs are not at issue here.

[5] This exhibit corresponds with the table COE previously filed at Doc. 32-1 at 7–8 (under seal); Doc. 33-1 at 7–8 (redacted).

application (with the exception of ▮▮▮▮▮▮, as noted *infra*) relating, in one way or another, to DEI activities.

For several programs, the quoted language in the Notices of Termination overlaps, with the language quoted in the original decision. For example, in one Notice of Termination, the Department quoted three separate passages from a program's application that stated:

> • In the plan to employ personnel, ▮▮▮▮▮▮▮▮ TRIO and other educational opportunity programs have demonstrated a strong commitment and ability to employ highly qualified personnel who have succeeded in overcoming barriers similar to those confronting the project's target populations by hiring project staff who were first-generation and low-income college students, are people of color and are non-native English speakers." page e72. This is further operationalized in the grantee's hiring process, such as "Work with the Office for Diversity, Equity and Inclusion (ODEI) to develop hiring strategy that that targets the populations represented by Talent Search students; send postings to identified networks, list serves.'" page e72

Jones Decl. Ex. H (quoting Notice of Termination for ▮▮▮▮▮▮▮▮ Remarkably, the Department quoted the same exact DEI language that it quoted in this program's original notice of non-continuation:

> During the review process, Department staff identified that ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ application for funding contains information indicating that the applicant has proposed project activities that may conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; or violate the letter or purpose of Federal civil rights law. Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ application for funding states that they will "work with the Office for Diversity, Equity and Inclusion (ODEI) to develop hiring strategy that targets the populations represented by Talent Search students" (page 58). In addition the application states that, ▮▮▮▮▮▮▮▮ TRIO and other educational opportunity programs have demonstrated a strong commitment and ability to employ highly qualified personnel who have succeed in overcoming barriers similar to those confronting the project's target population by hiring project staff who were first-generation and low-income college students, are people of color and are non-native English speakers." (page 58). As a result of the information identified above, the Department has determined that continuation of the project is not in the best interest of the Federal Government.

Doc. 32-23 at 19 (sealed); Doc. 33-23 at 19 (redacted). For another program, the Notice of Termination quoted a section of its application that stated:

> - Funded activities to include train the trainer course outcomes including, "Build a strong foundation in social emotional learning (SEL); includes equity based, culturally responsive and trauma sensitive practices," page e 91

Jones Decl. Ex. H (Notice of Termination for ██████████ All 28 Notices of Termination quote similar DEI-related language. *See generally* Jones Decl. Ex. H.

Moreover, in every Notice of Termination, the Department stated that it "has determined the benefits of allocating funding consistent with current agency priorities outweigh potential reliance interests." Jones Decl. Ex. H. The Notices all stated that the termination is "effective as of the date of this notice on May 19, 2026," but that programs "may use any remaining grant funds for obligations made during the final budget period through May 19, 2026." *Id.* With respect to reconsideration, the Notices stated, "Consistent with 2 C.F.R. § 200.342, if you wish to object to the termination of this award, or believe the reason for the proposed termination can be resolved, you may challenge the termination in writing and provide any information or documentation relevant to your challenge." *Id.*

b. May 19: Five re-discontinued TRIO programs

Also on May 19, the Department issued Notices of Non-Continuation to five TRIO programs. *See* Jones Decl. Exs. I–M. Each Notice of Non-Continuation is a form letter that restates the requirements for continuation under 34 C.F.R. §§ 75.253 and 75.118. The Notices continue by outlining the Department's outreach after the Court entered the April 13 injunction order:

> On April 15, 2026, you received a communication from the Department requesting that, as part of the Department evaluation of meeting all the criteria for a continuation award under 34 C.F.R. § 75.253(a), you submit the following performance and financial information: (1) an updated budget, (2) updated eligibility information and assurances, and (3) all relevant updates to your grant performance targets. The letter also included a requirement to provide a plan for resuming operations. The letter set a deadline of April 24, 2026 at 5 p.m. ET to submit this updated grant performance and financial information. The letter further indicated that failure to submit timely performance and financial information would result in a decision to non-continue your grant.

*E.g.,* Jones Decl. Ex. I. Each Notice contains a generic conclusion regarding the program's

reconsideration packages:

> The Department did not receive a response with all requested performance and financial reporting information to the April 15, 2026 letter. Therefore, we are non-continuing your grant for failure to submit the most current performance and financial information under 34 C.F.R. § 75.118(a) and 34 C.F.R. § 75.253(a)(2) as directed by the Department. A copy of the April 15, 2026 letter, emailed to the contact information provided by you for your grant, is attached.

*Id*. Thus, all these Notices claimed that the five programs did not submit the requested "current performance and financial information" by the Department's April 24 deadline.

c.      March 9: Four re-denied SSS programs and one re-discontinued TRIO program

Earlier, during the first phase of reconsideration, the Department on March 9, 2026 re-denied four SSS programs, and re-discontinued one TRIO program.

The Notices of Non-Selection to each SSS program stated that the Department had "screened" its application and determined that it was "ineligible for further consideration of support because . . . [t]he application proposes a project that cannot be supported under the authorizing statute." Jones Decl. Exs. C–F. Specifically, the Department found that these programs did not provide sufficient assurances that their projects would serve the minimum percentage of low-income students with disabilities, as required under the SSS statute and program regulations. *Id*. None of these SSS programs were re-denied based on the final scores they had earned on their peer-reviewed applications, as required by 20 U.S.C. § 1070a-11(c)(3), and none of them received their peer-reviewed applications and their final scores, as required by 34 C.F.R. § 646.24(c)(3). *See* Jones Decl. ¶¶13–16.

As for the one discontinued TRIO (Upward Bound) program, the Notice of Non-Continuation stated that the program's reconsideration package did not "provide any evidence regarding past provision" of certain "required services" under the Upward Bound statute. *See* Jones Decl. Ex. B.

d.      Requests for reconsideration

The four SSS programs re-denied and the one TRIO program re-discontinued on March 9 immediately requested reconsideration. Jones Decl. ¶11, 13–16 & Exs. B–F. The five TRIO programs discontinued and many of the TRIO programs terminated on May 19 already have requested reconsideration. Jones Decl. ¶23. No program has received a decision from the Department on its request as of the date of this filing. Jones Decl. ¶¶11, 13–16, 25–28.

## ARGUMENT

"Federal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) (quoting *Hutto v. Finney*, 437 U.S. 678, 690 (1978)) (cleaned up). "[E]very court, with few exceptions, has inherent power to enforce its decrees and to make such orders as may be necessary to render them effective." *Horn & Hardart Co. v. Nat'l Rail Passenger*, 843 F.2d 546, 548 (D.C. Cir. 1988) (cleaned up). This power "is grounded in 'the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by the parties to a court proceeding.'" *Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984)). Without such authority, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (quoting *Riggs v. Johnson Cnty.*, 73 U.S. 166, 172 (1867)). "The exercise of this authority is 'particularly appropriate' when a case returns to a court on a motion to enforce the terms of its mandate to an administrative agency." *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (quoting *Int'l Ladies' Garment Workers' Union*, 733 F.2d at 922). "A motion to enforce must be granted if a prevailing plaintiff demonstrates that a defendant has not complied with a prior judgment entered against it, and denied if a plaintiff has received all

relief required by the prior judgment." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 2026 WL 1256234, at *8 (D.D.C. 2026).

For several reasons, the Department's reconsideration decisions violate the injunction.

**I.     The May 2026 termination decisions violate the preliminary injunction**

a.     <u>The Department did not issue "continuation determinations" to 28 TRIO programs</u>

The largest group of decisions is the May 19 Notices of Termination to 28 TRIO programs. The Court had vacated their original discontinuation decisions and directed the Department to make "new determinations *regarding continuation of grants*." Doc. 41 at 2. The Department stated that it would in fact do that. In an April 15 letter to these programs—titled "New Continuation Determinations"—the Department stated that "we are writing in order to obtain additional information needed to issue a *new determination regarding continuation for your award*." *Id.* The Department explained that its "analysis will include a determination of whether you have made substantial progress towards your goals and objectives in your approved application," and that "[t]his review is consistent with the Department's *standard procedures to determine continuation awards*." *Id.* Whether such requests are standard is debatable.

Regardless, the Department did not undertake this analysis or follow these "standard procedures" for these 28 programs. Instead, it issued Notices of Termination, based not on whether these programs made "substantial progress" but on anti-DEI reasons, again. The Department thus ignored the Court's order, walked back its representation about what its "analysis" would entail, and deviated from its "standard procedures to determine continuation awards." This begs the question why the Department solicited information and documents from programs on April 15 if it never intended to consider them. Like on remand, "agency action" on reconsideration "must be more than a barren exercise of supplying reasons to support a pre-ordained result." *Food Mktg.*

*Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978); *see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 768 F. Supp. 3d 1, 3 (D.D.C. 2025) (granting motion to enforce TRO where the government "ha[d] continued . . . the very action that the [order] enjoined").

By issuing termination decisions in lieu of continuation determinations, the Department appears to preview a forthcoming argument that challenges to grant terminations belong in the Court of Federal Claims. This is jurisdictional gamesmanship. As COE argued in its motion for preliminary injunction, as the Department acknowledged in its briefing on the motion, and as the Court observed in its ruling, there are significant differences between discontinuation and termination. *See* No. 1:25-cv-3514, Doc. 2 at 20–22. These differences are at least partly why the Court concluded that it had jurisdiction over COE's claims challenging the discontinuation decisions. Doc. 28 at 14–15. The Department cannot "avoid[ ] . . . [the] injunction through a mere change of terminology"—here, issuing termination decisions in an effort to manufacture jurisdiction elsewhere. *United States v. Christie Indus.*, 465 F.2d 1002, 1007 (3d Cir. 1972). "A district court retains jurisdiction to enforce the terms of a previously entered injunction." *Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 120 F. Supp. 2d 23, 27 (D.D.C. 2000).

  b. <u>The Department could not "terminate" grants that do not exist</u>

The Court thus maintains subject-matter jurisdiction over COE's claims. Indeed, nothing has changed in this regard. COE does not seek the payment of money, and the programs still do not have grants (or contracts). The Notices of Termination, notably, are written as if these programs did have grants that were capable of being "terminated." The Notices state that the termination is "effective May 19, 2026," and that "[the grantee] may use any remaining grant funds for obligations made during the final budget period through May 19, 2026." But that ignores the obvious reality that none of the programs had a grant. They had grants in summer 2025, but they

were not continued beyond the 2025-2026 budget period. As COE argued in briefing the preliminary injunction motion, there is no operative grant once a budget period concludes unless the grant award is continued. *See* No. 1:25-cv-3514, Doc. 2 at 22–24. Thus, without a continuation award, their grants expired (on either August 31, 2025 or September 30, 2025). Likewise, the Department's statement that these programs "may use any remaining grant funds" makes no sense—no "grant funds" have been even disbursed to them since 2025. While the Court vacated those discontinuation decisions, the injunction did not reinstate the grants. The Notices of Termination thus ignore the binary grant continuation framework and raise the peculiar question of whether a grant that was neither continued nor discontinued can be terminated. The answer can only be no.

      c.      <u>The Notices of Termination substantively violate the injunction</u>

Beyond improperly styling them as terminations, these 28 decisions substantively violate the injunction, for they repeat the exact agency action that the Court found likely arbitrary and capricious and contrary to law, in violation of the APA and mandatory procedures under federal civil rights laws. This independently violates the injunction, as the Department is "implementing or enforcing" the original decisions "through other means."

The Court's January 16 opinion began by holding that the original discontinuation decisions "are impermissibly vague" and that despite "referenc[ing] a sentence or two of the members' application materials," "the court is left to guess *how* the excerpted sentences conflict with the Administration's policies, priorities, or violate civil rights law." Doc. 28 at 29 (emphasis in original). This "vague and conclusory language" did not suggest that the Department "examined 'the relevant data,' nor do its discontinuation letters offer 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" Doc. 28

at 30 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) and *Motor Vehicle Mfrs. of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). The Court concluded by stating:

> the application statements the Department identified strongly suggest that continuation determinations were made based on a keyword search for terms relating to diversity, equity, and inclusion, as opposed to any information regarding the discontinued grantees' actual performance.

Doc. 28 at 30. The Court next addressed Title VI's and Title IX's requirement to seek voluntary compliance *before* refusing to grant or deny federal financial assistance. The Court explained that "the Department was not permitted to rely on Title VI as the basis for its discontinuation decisions without having satisfied the requisite procedures" and "the same is true of any reliance on purported Title IX noncompliance." Doc. 28 at 30. Next, the Court held that the Department failed to "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." Doc. 28 at 31 (quoting *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (cleaned up)). Finally, the Court concluded by stating "the court is left to wonder what considerations, if any, led to the change in continuation criteria because the Department has yet to explain itself." Doc. 28 at 32.

The Notices of Termination are no different than the original decisions. Once again, the Department failed to notify programs why or how their applications "no longer effectuate the program goals or the Department's priorities." If anything, the Notices of Termination are *more* vague and *more* conclusory. They contain no specificity beyond a brief quotation from the programs' applications, and with respect to their reliance interests, the Department's cursory conclusion flies in the face of its actions. Just like the original discontinuation decisions, the Department appears to have used a simple keyword search for terms relating to DEI. And with respect to Title VI and Title IX, the Department again took no steps whatsoever to seek the programs' voluntary compliance. Jones Decl. ¶23.

Again, the Court already ruled on these issues; it must direct the Department to comply with its injunction and issue new "continuation" decisions for all 28 terminated TRIO programs.

## II. The May 2026 Notices of Non-Continuation are not in accordance with the court's order

In an effort to cooperate with the Department, the five TRIO programs that received Notices of Non-Continuation on May 19 had provided the materials requested by the Department on January 30. However, per the regulations this Court ordered the Department to follow, these programs already provided the documentation required to obtain a continuation award in 2025. *See* 34 C.F.R. § 75.118. Nothing in the Court's order, the statute, nor the regulations permit the Department to request more information to use in making continuation award decisions. Thus, non-continuation decisions based on newly-created criteria are in violation of this Court's order and must be rectified.

The damage from the Department's newly-created criteria is evident in its application of it to the five referenced programs. The Notices of Non-Continuation stated that the Department "did not receive a response with ***all requested performance and financial reporting information*** to the April 15, 2026 letter." None of the Notices, however, identified what about their submissions were incomplete, and specifically, what "performance and financial reporting information" was missing. All these programs did submit the required information, and did so by the Department's deadline. ▮▮▮▮▮ submitted (for two grants) on April 24, 2026. Jones Decl. ¶25 & Exs. I–J. So did ▮▮▮▮▮▮▮. Jones Decl. ¶26 & Ex. K. After receiving an extension of the April 24 deadline to May 1, the ▮▮▮▮▮▮ submitted on April 27.[6] Jones Decl. ¶27 & Ex.

---

[6] On April 23, 2026, the Department sent a letter to ▮▮▮ that contained two different deadlines. In the heading of the letter, the Department stated that information was required by "5 p.m. ET on May 1, 2026." In the body of the letter, the Department instructed ▮▮▮▮ to submit the requested information "by no later than 5 p.m. E.T. April 24, 2026." To

L. As for the ██████████████████████, the Department claimed that it "did not receive a timely response to the April 15, 2026 letter." Jones Decl. ¶28 & Ex. M. But ██ ████████ did submit its reconsideration package—two days before the deadline—on April 22, 2026. *Id.* These five programs are therefore left to guess why the Department discontinued their grants, now a second time.

COE hoped to avoid the Court's involvement over these decisions in particular, but the Department has left it no choice. Thus, COE respectfully requests that the Court enforce the Order and require the Department to issue continuation decisions based on the regulatory requirements.

### III.    The March 2026 Notice of Non-Selection and Notice of Non-Continuation conflict with TRIO laws and regulations

The final group of programs at issue are four SSS programs re-denied and one TRIO (Upward Bound) program re-discontinued on March 9.

#### a.    The SSS programs provided the requisite assurances of compliance

With respect to the SSS programs, the Department found that Big Bend Community College (which had applied for two SSS grants), Green River College, and SIU Carbondale did not provide "assurances" with their applications that their proposed projects would serve the requisite minimum percentage of certain types of students. Jones Decl. Exs. C–F. Specifically, the Notices of Non-Selection said they did not provide sufficient "assurances" that "not less than one-third of the individuals with disabilities served also will be low-income individuals[,] as required under 34 CFR § 646.11(a)(3) and 20 U.S.C. § 1070a-14(e)(3)," or that "not less than two-thirds of

---

clarify this clear error, ████████ followed up with the Department by email and was instructed to follow the May 1 deadline. Accordingly, ████████ reconsideration package was submitted on time, and to the extent that the Department relied on the April 24 deadline that is stated in ████████ Notice of Non-Continuation, the Department flatly contradicts itself. *See* Jones Decl. ¶27 & Ex. L.

the project participants will be low-income individuals who are first generation college students; or (ii) Individuals with disabilities under 34 CFR § 646.11(a)(1)." *Id.* Such Department findings are contrary to the law and regulations, and the Department has again created new criteria in an effort to not comply with the Court's order in numerous respects.

There are at least four serious flaws with these Notices—which the programs all pointed out in urging the Department to reconsider back in March. *First*, these programs' applications gave these exact same assurances, as they completed the assurance form that the Department requires. Jones Decl. Exs. C–F. The Department inexplicably ignored the assurance forms. *Second*, recall that the Department represented in January that it "intended to contact [SSS programs] regarding *any updated assurances* or information necessary to inform its selection decision." Doc. 31 ¶5; Doc. 39 at 3. But the Department chose not to make such contact with these programs before redenying their applications precisely based on their (purported) lack of "assurances." Had the Department done so, this ordeal could have been avoided; indeed, the Department's own procedures contemplate the agency following up with programs in this situation to "resolve issues." Department of Education, Handbook for the Discretionary Grant Process (2023)[7], p. 146 ("Program officers contact applicants about technical issues—such as obtaining missing certifications . . . prior to awarding a grant. Such clarifications occur as soon as program offices identify that a clarification is necessary. Initiating clarification contacts at this time will allow program offices to resolve issues."). *Third*, the programs' applications outlined the types of students their projects planned to serve, and they all met the minimum percentages required. Big Bend's SSS-Regular application, for example, proposed to serve 12 students with disabilities, including eight that would be "low-income and disabled," exceeding the requirement that "not less

---

[7] *Available at* https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/foia-hb-01.pdf.

than one-third of the individuals with disabilities served also will be low-income individuals." Jones Decl. Ex. C; *see also* Ex. D (20 disabled, including 10 low income); Exs. E–F. *Fourth*, the Department erred by calculating the percentage of low-income students with disabilities enrolled *at the entire institution*. *E.g.*, Jones Decl. Ex. C. But the assurance requirement in the SSS statute and regulations applies to students in the "project," not to students enrolled at the institution. 20 U.S.C. § 1070a-14e(1); 34 C.F.R. § 646.11(a). The Department cannot deny applications by looking at a different dataset than what the statute and regulations require that it review.

Finally, when it issued these Notices, the Department again did not disclose to these SSS programs the final scores they earned on their peer-reviewed applications, and again, did not provide them with copies of their applications, as SSS regulations require. *See* 34 C.F.R. § 646.24(c)(3).

b.      SUNY Plattsburgh was held to a nonexistent standard under the law

The March 9 Notice of Non-Continuation to SUNY Plattsburgh's Upward Bound program (P047A220168) is more of the same. This Notice claimed that the program "did not provide any evidence regarding past provision of [] required services" under the Upward Bound statute. Jones Decl. Ex. B. This statute requires programs to provide "guidance on and assistance in" (A) secondary school reentry; (B) "alternative education programs" leading to a diploma; (C) entry into GED programs; **_or_** (d) postsecondary education. 20 U.S.C. § 1070a-13(b)(5) (emphasis added). The Department found that SUNY Plattsburgh did not provide evidence of "planned activities for guidance on and assistance in entry into GED programs." Jones Decl. Ex. B. In doing so, the Department misquoted the statute and turned a disjunctive list into a conjunctive list. Section 1070a-13(b)(5) does not require a program offer *all* these services: it uses the word "or," not "and." The Notice omitted this part of the statute. The Department then cherry-picked data

showing that "a small number (three participants)" in 2023-2024 did not graduate high school. From that, it concluded that the program did not provide "concrete evidence" of these required services. Yet the data shows the opposite. SUNY Plattsburgh reported a 98% advancement rate, which *exceeded* the objective of 90%.

The Department cannot misquote statutes and misinterpret data to implement heightened performance requirements that do not exist in statute or regulation. Although the Department may attempt to defend this decision on "performance" grounds, a careful review reveals otherwise.

## IV.    Requested relief

These 38 reconsideration decisions did not comply with the injunction. They do not comport with "all applicable laws, regulations, and procedures," and they "implement[] or enforc[e]" the original decisions "through other means." COE respectfully requests the Court order the Department to reconsider and issue new *continuation* decisions to TRIO programs and new selection decisions to SSS programs.

As COE explained at the outset of the case, these programs need relief now. The 2025-2026 budget year has almost concluded for all these programs, and through repeated delay tactics, the Department has frustrated the effectiveness of relief already awarded.

Accordingly, COE is separately requesting an expedited briefing schedule (which the Department opposes). COE is also requesting a hearing (either remote or in-person) as soon as the Court is available (unless the Court finds a hearing is unnecessary). COE finally requests that the Court grant this Motion as soon as practicable, and direct the Department to issue new decisions within seven (7) days of ruling.

## CONCLUSION

For these reasons, COE respectfully requests that the Court grant this Motion.

## District of D.C. Local Rule 7.1(m) Duty to Confer

Undersigned counsel certifies compliance with Local Rule 7.1(m)'s duty to confer. Specifically, undersigned counsel for COE raised noncompliance with the Court's preliminary injunction to the Department's counsel by email on June 3, 2026. Counsel for COE conferred again with the Department's counsel regarding this matter on June 9, 2026 by teleconference before filing this motion and was unable to resolve the dispute. Consequently, the Department opposes this motion.

Dated: June 9, 2026

Respectfully submitted,

**THOMPSON COBURN LLP**

*/s/ Brandt P. Hill*
Brandt P. Hill (*Pro hac vice*)
Lorrie L. Hargrove (*Pro hac vice*)
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P.      (205) 769-4303
E.      bhill@thompsoncoburn.com
         lhargrove@thompsoncoburn.com

Jayna Marie Rust (D.C. Bar No. 998326)
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.      (202) 585-6929
E.      jrust@thompsoncoburn.com

*Counsel for the Council for Opportunity in Education*

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, I served the foregoing document on all counsel of record using the Court's CM/ECF system.

*/s/ Brandt P. Hill*
Of Counsel